1   STEVEN S. LUBLINER (SBN 164143)
    Law Offices of Steven S. Lubliner
2   P.O. Box 750639
    Petaluma, CA 94975
3   Telephone: (707) 789-0516
    Facsimile: (707) 789-0515
4
    On Behalf of Plaintiff Donald J. Beardslee
5

6

7              IN THE UNITED STATES DISTRICT COURT

8           FOR THE NORTHERN DISTRICT OF CALIFORNIA

9   DONALD J. BEARDSLEE,               )   Case No.:
                                       )
10             Plaintiff,              )
                                       )   **DEATH PENALTY CASE:**
11        v.                           )   **EXECUTION DATE SET**
                                       )
12   JEANNE S. WOODFORD, Director of    )   DECLARATION OF STEVEN S.
     the Department of Corrections, JILL L. )   LUBLINER IN SUPPORT OF
13   BROWN, Acting Warden of the        )   MOTION FOR EXPEDITED
     California State Prison at San Quentin, )   DISCOVERY AND TO COMPEL
14   and DOES 1-50.                     )   PRODUCTION OF DOCUMENTS
                                       )
15             Defendants.             )
                                       )   **EMERGENCY ACTION**
16                                     )   **REQUESTED**
                                       )
17   _____)

18

19

20

21

22

23

24

25

26

27

28

I, Steven S. Lubliner, declare as follows:

1. I am retained counsel for death row inmate Donald J. Beardslee, the plaintiff in this litigation challenging California's lethal injection procedure as violative of his rights under the First and Eighth Amendments to the United States Constitution. Since 2000, I have also served as Mr. Beardslee's federal habeas counsel in this Court, the U.S. Court of Appeals for the Ninth Circuit and the U.S. Supreme Court. I have personal knowledge of all matters stated herein and, if called as a witness, could and would testify competently thereto.

2. On Monday, December 13, 2004, I faxed defendant Warden an informal request for documents that I felt would be necessary to fully and fairly litigate the case in federal court if Mr. Beardslee did not obtain administrative relief. A copy of this letter is attached hereto as Exhibit A.

3. On the afternoon of December 16, 2004, I telephoned the Warden to find out if a response would be forthcoming. The Warden informed me that she had turned the request over to the California Attorney General's office.

4. I then telephoned Dane Gillette, who has served as lead counsel from the Attorney General's office throughout plaintiff's state and federal proceedings. Mr. Gillette said that he had seen the request and that nothing would be produced without a court order. Mr. Gillette said that none of the documents referred to in the request were discoverable.

5. On December 21, 2004, I telephoned Mr. Gillette again in an effort to meet and confer in greater depth about the document request. I left a voice mail message asking Mr. Gillette if his sweeping view that none of the requested documents was discoverable was because he believed that they were not relevant to the subject of the action

1 | or because he felt that plaintiff's offer to enter into an appropriate protective order somehow
2 | did not address defendants' confidentiality concerns. Mr. Gillette never returned my call.
3 |       6. Attached as Exhibit B is a true and correct copy of the June 13, 2003
4 | revision of Procedure No. 770, which only goes up to page 39.
5 |
6 |       I declare under penalty of perjury under the laws of the State of California and
7 | the United States of America that the foregoing is true and correct.
8 |       Executed in Petaluma, California
9 | Dated: December 19, 2004

# PROOF OF SERVICE

I, Steven S. Lubliner, certify and declare under penalty of perjury that I: am a citizen of the United States; am over the age of 18 years; am in practice at the address indicated; am a member of the State Bar of California, the Bar of this Court and the Bar of the Northern District of California; am not a party to or interested in the cause entitled upon the document to which this Proof of Service is affixed; and that I served a true and correct copy of the following document(s) in the manner indicated below:

MOTION FOR EXPEDITED DISCOVERY AND TO COMPEL PRODUCTION OF DOCUMENTS

DECLARATION OF STEVEN S. LUBLINER IN SUPPORT OF MOTION FOR EXPEDITED DISCOVERY AND TO COMPEL PRODUCTION OF DOCUMENTS

[PROPOSED] ORDER GRANTING MOTION FOR EXPEDITED DISCOVERY AND TO COMPEL PRODUCTION OF DOCUMENTS

( )    by today depositing, at Petaluma, California, the said document(s) in the United States mail in a sealed envelope, with first-class postage thereon fully prepaid (and/or):

(x)    by today personally delivering the said document(s) to the person(s) indicated below in a manner provided by law, by leaving the said document(s) at the office(s) or usual place(s) of business, during usual business hours, of the said person(s) with a clerk or other person who was apparently in charge thereof and at least 18 years of age, whom I informed of the contents.

Dane R. Gillette
Senior Assistant Attorney General
Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-3664

Executed in Petaluma, California on December 20, 2004

_____

MOTION FOR EXPEDITED DISCOVERY AND TO COMPEL PRODUCTION OF DOCUMENTS

# EXHIBIT 'A'

## LAW OFFICES OF STEVEN S. LUBLINER
P.O. Box 750639
Petaluma, CA 94975
Phone: (707) 789-0516
Fax: (707) 789-0515
E-mail: sslubliner@comcast.net

December 13, 2004

VIA FACSIMILE: (415) 454-6288
Jill L. Brown, Acting Warden
San Quentin Prison
San Quentin, CA 94964

      Re:    Donald J. Beardslee, C-82702

Dear Warden Brown,

      Thank you for your courtesy to date at this difficult time.

      Mr. Beardslee has submitted his 602 claims about the lethal injection procedure to the Director for Third Level review. I anticipate that the Director will deny the appeal and that I will be forced to bring a §1983 suit on Mr. Beardslee's behalf in federal court as soon as possible.

      To avoid unnecessary discovery procedures, I am writing to request informally that you provide me with documents that will be necessary to fully and fairly litigate the case. I understand that you will probably have concerns about confidentiality. I am certainly agreeable to stipulating to an appropriate protective order that we can present to the court as soon as a judge is assigned to the case.

      Please provide me with the following documents. The term documents is used in its broadest sense to include all writings, communications and recordings in any media.

- A complete copy of the current version of San Quentin Operational Procedure No. 770. I currently have the June 13, 2003 revision through page 39. This appears to be incomplete.
- Complete copies of any other publications or writings governing the lethal injection procedure.
- All documents related to the decision to implement lethal injection in California as it is currently practiced.

- A complete copy of the "Execution Security Plan," referred to on p. 2 of the June 13, 2003 revision of Procedure No. 770.
- All documents related to "staff assignments on the execution detail," referred to on p. 12 of the June 13, 2003 revision of Procedure No. 770.
- All documents related to the readiness, operational and equipment checks performed at various intervals preceding the execution, as stated in the June 13, 2003 revision of Procedure No. 770.
- All documents related to the proper control of the necessary chemicals, referred to on p. 12 of the June 13, 2003 revision of Procedure No. 770.
- All documents related to obtaining the lethal injection, referred to on p. 17 of the June 13, 2003 revision of Procedure No. 770.
- All documents related to the Execution Team who will execute Mr. Beardslee, including but not limited to the identities of the team members and the Lieutenant in Charge of the Chamber, the role that each member is to play in Mr. Beardslee's execution, the training that each member has had in his or her intended role, each member's employment history including discipline and complaints, any medical training that they have had at any time, any history of drug use, any criminal records whether or not resulting in conviction, and any background checks done on the team members.
- All documents related to "the administration of the lethal injection," referred to on p. 19 of the June 13, 2003 revision of Procedure No. 770.
- All documents related to the State Physician and staff physician, referred to on p. 19 of the June 13, 2003 revision of Procedure No. 770, including but not limited to their identities, employment history, medical training, any history of drug use, criminal history, disciplinary history, history of malpractice or complaints wherever registered and any background checks done on them.
- All documents related to the procedures to be used to monitor Mr. Beardslee's heart as referred to on p. 19 of the June 13, 2003 revision of Procedure No. 770.
- All documents related to the mixing of the drugs and the preparation of the syringes of sodium pentothal, pancuronium bromide and potassium chloride to be used in the execution process.
- All documents related to the decision not to have a backup syringe of sodium pentothal prepared, while backup syringes of pancuronium bromide and potassium chloride are prepared, as referred to on pp. 26-27 of the June 13, 2003 revision of Procedure No. 770.
- All documents related to procedures to be used to revive Mr. Beardslee in the event a stay or reprieve is issued after the execution process has begun but before it is complete.
- All documents related to what constitutes proper storage of all chemicals and equipment, as referred to on p. 30 of the June 13, 2003 revision of Procedure No. 770.
- All documents related to the "injection team," as referred to on p. 32 of the June 13, 2003 revision of Procedure No. 770, including but not limited to the qualifications for serving on the injection team, identities of the team members, their employment history including discipline and complaints, medical training,

2

any history of drug use, criminal history whether or not resulting in convictions, and background checks done on the team members.

- All documents related to the person or persons in the pharmacy who will issue the "necessary agents" to a member of the lethal injection team, as referred to on p. 32 of the June 13, 2003 revision of Procedure No. 770, including but not limited to their identities, employment history, medical training, any history of drug use, criminal history, disciplinary history, history of malpractice or complaints wherever registered and any background checks done on them.
- All documents related to the procedure for rolling back the lip of the diaphragm on the "Y" injection site, as referred to on page 36 of the June 13, 2003 revision of Procedure No. 770.
- All documents related to the decision to administer a saline solution between the pancuronium bromide and the potassium chloride, as detailed on the CDC web site.
- All documents related to the decision to prepare the syringe of sodium pentothal last, as referred to on p. 37 of the June 13, 2003 revision of Procedure No. 770.
- All documents related to how it is determined when the execution will proceed so that the syringe of sodium pentothal can be prepared, as referred to on p. 37 of the June 13, 2003 revision of Procedure No. 770.
- All documents related to the decision to use a single syringe of five grams of diluted sodium pentothal as opposed to a continuous flow.
- All documents related to what constitutes a "person qualified, trained or otherwise authorized by law" to insert the angiocath, as referred to on p. 39 of the June 13, 2003 revision of Procedure No. 770.
- All documents related to what constitutes a usable vein, as referred to on p. 39 of the June 13, 2003 revision of Procedure No. 770, and the timing and determination of whether or not Mr. Beardslee has usable veins.
- All documents related to procedures to be used to execute Mr. Beardslee in the event a usable vein cannot be found.
- All documents related to how it will be determined that a malfunction or blockage in the first line exists, as referred to on p. 32 of the June 13, 2003 revision of Procedure No. 770.
- All documents related to how, in the event of a malfunction or blockage in the first line during the administration of the sodium pentothal, it will be determined that Mr. Beardslee has achieved a level of unconsciousness to allow the execution to proceed.
- All documents related to how, if Mr. Beardslee has not been rendered unconscious by the sodium pentothal, he will be able to communicate that fact to the injection team, execution team or assembled witnesses in light of the administration of the paralytic agent pancuronium bromide.
- All execution logs of all prisoners executed by lethal injection.
- All documents related to the conduct of prior executions in California by lethal injection.
- All documents related to blood tests performed on other inmates executed in California by lethal injection, including, but not limited to, toxicology reports measuring the presence of the execution chemicals in the bloodstream.

3

Please do not hesitate to contact me with any questions. I would appreciate it if you could get back to me by Thursday with a list of the documents that you will be producing and any concerns you might have about this request. I am confident that we can resolve any disagreements promptly and amicably.

Very truly yours,

Steven S. Lubliner

EXHIBIT 'B'

Issue Date: 10/01/92

Revised Date: 6/13/03

I.      LETHAL INJECTION CHAMBER, SAN QUENTIN STATE PRISON
        (REDACTED)

        San Quentin Operational Procedure No. 770

II.     PURPOSES AND OBJECTIVES

        The purpose of this plan is to establish the procedure for the care and treatment of
        inmates from the time an execution date is set through execution by lethal injection.
        In addition, this plan identifies staff responsibilities pursuant to preparation for
        executions and operation of the Lethal Injection Chamber.

III.    REFERENCES

        California Penal Code Sections: 1193, 1217, 1227, 3600, 3601, 3603, 3604, 3605,
        3700, 3700.5, 3701, 3702, 3703, 3704, 3704.5, 3705, 3706.

        California Administrative Manual, Article 2, Legal Executions, Sections 6200(a)
        through (f). (See Resource Supplements REF. 1-4.)

IV.     APPROVAL AND REVIEW

        This plan will be reviewed and/or revised by the Chief Deputy Warden annually in
        the month of October and forwarded to the Warden for approval prior to submitting
        the manual to the Director of Corrections.

        This Institution Procedure is confidential and may be reviewed by staff with the
        need to know at the Warden's office only.

V.      RESPONSIBILITY      —

        A.      The Warden is responsible for the overall operation of this procedure.

        B.      The Chief Deputy Warden is responsible for the security of the institution in
                the event of a scheduled execution.

        C.      The Lieutenant in Charge of the execution chamber is responsible for
                monitoring and ensuring that this procedure is followed.

        D.      The Associate Warden, Unit III will be familiar with all aspects of this plan.

VI.     METHODS

The first execution date for an individual is set under the provisions of Penal Code Sections 1193. The execution date must be scheduled no sooner than 60 days, but no later than 90 days from the 1193 PC hearing.

All subsequent execution dates are set under the provision of Penal Code Sections 1227. Execution dates set under this provision of the penal code sections must be scheduled no sooner than 30 days, but no later than 60 days from the 1227 PC hearing.

A. Chronology of Events Prior to Execution:

    1. Upon receipt of the execution order:

        a. The Warden will:

            1) Notify the Director of Corrections via the Deputy Director - Institutions Division by telephone, if the execution appears imminent, followed with a copy of the execution order to the Director of Corrections, via the Deputy Director of Institutions.

            2) Together with the Legal Affairs Coordinator and Associate Warden, Unit III interview the inmate to be executed, serve the execution order, and document the interview on the Service of Execution Warrant Form.

            3) Notify the Governor's Legal Affairs Secretary by mail of the scheduled execution with a copy of the execution order enclosed. Notify the Director of Corrections via the Deputy Director - Institutions Division of the scheduled execution.

            4) Submit to the Director via the Deputy Director - Institutions Division, the names of three (3) psychiatrists who will serve as the required panel of alienists. The alienists will be employees of the Department of Corrections who have previously received the approval of the Director.

            5) Secure from the Case Records Manager the central file of the inmate, which will be maintained in the Warden's office seven days prior to the date of execution.

        b. The Chief Deputy Warden will:

            1) Prepare to activate execution security plan.

        c. The Associate Warden, Unit III will:

            1) Move inmate to designated area. Inmates housed in East Block will be moved to the first tier upon receipt

of the warrant. Inmates in North Segregation will remain in their assigned cells. Inmates in the Adjustment Center will remain in their assigned cells. Five days prior to an execution, inmates will move to a designated cell in North Segregation. Inmates in the Adjustment Center may be moved to North Segregation or remain in the Adjustment Center at the discretion of the Warden.

2) Implement hourly checks and logs by Condemned Unit staff.

3) Direct the Condemned Unit staff to commence documentation of the inmate's behavior on CDC 128B on each shift. These 128B's will be forwarded daily to the Legal Affairs Coordinator via the Associate Warden, Unit III. Any documentation regarding unusual behavior will be brought to the attention of the Warden.

4) Initiate daily contact with unit on procedural follow through.

d. The Legal Affairs Coordinator will:

1) Act as liaison between the inmate's family and the Warden, answering questions the family may have, and coordinating visits and other communication between the inmate and his or her family. In addition, if necessary, the Legal Affairs Coordinator will make telephone contact with the inmate's family or attorney prior to the mailing of any necessary notifications regarding the execution, informing the family that the correspondence will be forthcoming and explaining its purpose and necessity. The Legal Affairs Coordinator will attend all meetings of the execution team.

2) Direct the Administrative Assistant to direct the mailroom Sergeant to deliver all non-legal incoming mail for the inmate to the Administrative Assistant to be inspected, logged and forwarded to the inmate via the oncoming Third Watch Condemned Row Sergeant. Mail that is sent to the inmate by anonymous senders, containing offensive messages, will be hand carried to the inmate by the Condemned Row Correctional Counselor II. The Correctional Counselor II will give the inmate the option to accept or reject the offensive correspondence. The Administrative Assistant will instruct the First Watch Condemned Row Sergeant to inspect and log all non-legal outgoing mail from the inmate. The Condemned Row Sergeant will forward any unusual mail immediately to the Administrative Assistant for

the Warden's attention. This process must be handled expeditiously to avoid unnecessary delay of outgoing or incoming mail in this category.

3) Receive from the Visiting Lieutenant a copy of the list of approved visitors. A print-out of visits will be provided and filed in the pre-execution record.

4) Instruct the Office Assistant who schedules legal visiting to give priority accommodations to the attorney for the inmate. If a scheduling problem occurs, the Legal Affairs Coordinator will immediately be notified.

5) Construct a file on the inmate that shall contain all pertinent court documents; i.e., execution order, etc., a biographical information sheet from the Public Information Officer's condemned data, photocopy of the visiting card(s), Service of Execution Warrant form, pre-execution activity log, behavior 128B's, and any other pertinent information. This file shall be kept at hand in the Legal Affairs Coordinator's office. In the event the execution is stayed, the file will be closed and filed in the Legal Affairs Coordinator's office.

6) Update the list of scheduled executions and distribute it to the Administrative Officer of the Day (AOD) book, Chief Deputy Warden, Associate Warden, Unit III, Visiting Lieutenant, Mailroom Sergeant, Chief Psychiatrist and Chaplains.

e. The Public Information Officer will:

1) Advise the Assistant Director of Communications, by telephone, of the execution date. Coordinate with the Assistant Director of Communications a press release for release to inquiries of news media agencies.

f. The Visiting Lieutenant will:

1) Flag the computer file in the memo field with the following instruction:

(a) Priority Visiting Privileges. Do not turn away visitors without approval of Warden or Administrative Officer of the Day (AOD). Notify Warden's office (Public Information Officer) seven days prior to imminent execution of each visit that this inmate has on the day that it occurs, or if on weekend or holiday, the next workday.

The Visiting Lieutenant will ensure that these instructions are complied with.

2) Make photocopies of the inmate's visiting file along with a computer print-out of all approved visitors and deliver them to the Legal Affairs Coordinator so that visits can be filed in the pre-execution file.

3) Ensure that the attorney for the inmate is afforded every assistance in expeditiously having access to his or her client. In the final weeks prior to the execution, this may include facilitating attorney visits during weekends and holidays should such be necessary.

4) Upon receipt of a warrant of execution for an inmate, and when it appears the execution is imminent, the Visiting Lieutenant will be notified that all visiting for a Grade A inmate will take place in the plexiglass booths of the Main Visiting Room during normal visiting hours. A correctional officer will be assigned to provide constant and direct supervision of the visit.

Grade B inmates will continue to receive non-contact visits in Main Visiting.

5) Beginning at least five (5) days prior to the scheduled execution, the following visiting procedure will be adhered to:

(a) Non-legal visitors will be limited to family members only. If the inmate does not have family members visiting him or her, non-legal visits will be limited to individuals who have an established history of visiting the inmate.

(b) Grade B inmates will continue to receive non-contact visits during designated visiting hours.

(c) A state vehicle will be supplied to transport visitors from the East Gate to the Visiting Room.

(d) The inmate will visit in waist restraints and handcuffs.

(e) The inmate and the visitor(s) may briefly embrace or shake hands at the beginning and end of the visit. No other physical contact will be allowed.

6) In the event there is a scheduled attorney visit, the following procedures will apply:

(a) Attorneys and approved visitors of the inmate will not be permitted to visit with the inmate simultaneously.

(b) For an attorney/client confidential visit, the attorney will be allowed to bring the following items:

(1) One pen or pencil;
(2) One note pad;
(3) Necessary legal materials.

(c) For attorney/client confidential visits, the inmate will be removed from the conference room and proceed with his attorney visit in the plexiglass visiting area under constant visual observation by the special visiting team.

7) All visiting for the inmate will cease once he/she is placed in the overnight cell in the chamber area. Attorneys may have access to their client by phone as requested.

g. The Lieutenant in Charge of the Chamber will:

1) Ensure that the execution chamber is ready.

2) Ensure no individuals enter the chamber area without specific approval of Warden.

h. The Condemned Row Correctional Counselor II will:

1) Maintain close daily contact with the inmate upon service of the execution warrant.

2) Interview and assess the inmate's behavior and attitude upon conclusion of visits and prior to returning to his cell.

2. 45 - 20 days prior to the execution:

a. The Warden will:

1) Approach those reputable citizens known to him/her that would be willing to serve as official witnesses to the execution. The Warden shall confirm the availability and willingness to participate of twelve (12) official witnesses and two (2) or more alternates.

2) Compile and submit to the Director of Corrections via the Deputy Director, Institutions the original

documents of the 20-day pre-execution report of the alienists pursuant to Penal Code 3700.5. The Director of Corrections shall forward the document to the Governor's Legal Affairs Secretary via the agency secretary, Youth and Adult Correctional Agency. The 20-day report shall be comprised of the following:

(a)     A current psychiatric report.

(b)     Comments of the chaplain attending the inmate.

(c)     A summary of the inmate's conduct and behavior.

(d)     A cover letter from the Warden addressing the above and any first-hand information obtained from observations, interviews, or communication with family and friends of the inmate.

The 20-day report is to be delivered to the Deputy Director, Institutions Division 28 days prior to the scheduled execution.

b.     The Psychiatrists (Alienists) will:

1)     Interview and examine the inmate within sufficient time so as to evaluate the findings and give written report to the Warden within the Warden's 20-day report deadline. The written reports shall include an interpretation of the examinations, interviews, and history stated in lay wording. Information available to one psychiatrist pertinent to the inmate's sanity shall be made available to the other two psychiatrists for evaluation and inclusion in the appropriate psychiatric reports.

2)     The Alienist panel will make an appointment with the Warden prior to submission of the 20-day report. The Alienist panel will review with the Warden the inmate's psychiatric report. This meeting will include all psychiatric staff who may have observations and information regarding the inmate. This information will be shared with the Warden.

3)     For imminent executions, the Warden will select a member of the Alienist panel who, along with the Chief Medical Officer, will ensure the following is complied with:

(a)    Any medication ordered for the inmate will have prior approval of the Chief Medical Officer or the selected Alienist panel member.

(b)    The selected Alienist panel member and the Chief Medical Officer will develop a 24-hour call schedule in which one of them will be available either by telephone or pager to approve or deny a recommended medication prescription for the inmate.

4)    An Alienist selected by the Warden will review the unit hourly check logs completed on the inmate on a daily basis notifying the Warden of any unusual behavior. The same procedure will be followed for the 15 minute check logs normally begun five (5) days prior to the scheduled execution.

c.    The Chaplain will:

1)    Interview the inmate as needed to assess his spiritual and emotional well-being. The chaplain attending the inmate's religious needs will determine the inmate's religious preferences and needs, next of kin, funeral or other requests, attitudes or thoughts on death and dying, and any observations as to his emotional stability such as acceptance of his sentence, etc. The chaplain will formulate his observations into a written report and submit it to the Warden within sufficient time to meet the Warden's 20-day report deadline.

d.    The Condemned Row Correctional Counselor II will:

1)    Assess the observations of the inmate's counselor and custody staff, and research the case history to determine the inmate's past and present conduct and behavior. This information will be submitted in writing to the Warden within sufficient time to meet the Warden's 20-day report deadline.

e.    The Public Information Officer will:

1)    Coordinate with the Assistant Director, Communications to announce to the media via recognized wire services that the execution is scheduled and any media representatives wishing to witness or otherwise cover the event must follow the instructions as outlined in the advisory. The Public Information Officer and Assistant Director, Communications will announce a 10-day filing period in which the news media may submit their written requests to witness the execution. Requests

must be for the execution at hand, and will not be kept on file. No request will be considered that is received after close of business of the tenth and final day.

2) Work with the Assistant Director, Communications to select up to seventeen (17) media witnesses to the execution. Consideration will be given to the broadest cross-section of media format and greatest circulation/viewers.

3. 30 - 7 Days Prior to an Execution:

a. Sanity Review Request:

Attorneys may submit in writing for the Warden's review, any current psychiatric information that they believe may have a bearing on evaluating the sanity of a condemned inmate with a scheduled execution date.

This information will be accepted 30 days prior to a scheduled execution, and up to 7 days prior to the scheduled execution. Information submitted sooner than 30 days preceding the scheduled execution will not be considered by the Warden under this procedure, but will be accepted for consideration by the panel of alienists. The panel of alienists will consider this information in preparation of the 20-day pre-execution sanity report.

The Warden will have available for review all psychiatric information pertaining to the condemned inmate known to San Quentin's psychiatric staff. This information will be reviewed along with all material submitted by the inmate's attorney. Upon reviewing the information, the Warden will determine if there exists a substantial showing of insanity.

The Warden will notify the condemned inmate's attorney in writing of the results of the requested sanity review. Should the Warden, with the assistance of the independent Department of Corrections Psychiatrist, find a substantial showing of insanity, the Warden will notify the District Attorney of Marin County in accordance with Penal Code Section 3701.

The Warden will accept requests for the Warden's review of psychiatric information regarding the inmate's sanity up to 7 days prior to the scheduled execution. The procedures that are put in place by San Quentin the week prior to the execution provide the Warden with current information regarding the inmate's behavior and psychiatric condition. These procedures include more intensified psychiatric staff contact with the inmate. In addition, the inmate's behavior is continuously monitored by unit staff for the final 5 days with documentation completed every 15 minutes. Should the

inmate display unusual or inappropriate behavior, the Warden will be notified immediately by institutional staff. The Warden will take necessary steps to evaluate any reported changes including utilizing the provisions of Penal Code Section 3701, if deemed appropriate. All referrals to the Marin County District Attorney's office, under the provisions of Penal Code Section 3701, will be reported to the Director of Corrections in writing via the Deputy Director of Institutions.

The Director will notify the Governor's Legal Affairs Secretary in writing of all referrals to the Marin County District Attorney's office under the provisions of Penal Code Section 3701.

4. 10 - 7 Days Prior to an Execution:

a. The Warden will:

1) Compile and send a final 7-day report (original documents) to the Director via the Deputy Director, Institutions which will in essence indicate whether or not there has been any change in the inmate's mental condition since the last 20-day report. For execution dates that do not appear to be imminent, the 7-day report will be delivered to the Deputy Director, Institutions Division, 14 days prior to the scheduled execution. For imminent executions, the 7-day report will be delivered 7 days prior to the execution. The Director of Corrections shall forward the 7-day report to the Governor's Legal Affairs Secretary via the Agency Secretary, Youth and Adult Correctional Agency. This report shall be a memorandum updating the formal 20-day report based upon current observations. Intermediate reports may be submitted by the Warden any time there is a change which may have an effect under Section 3700.5 of the Penal Code.

2) Review the inmate's selection of witnesses and spiritual advisor(s) as provided by the Associate Warden, Unit III, and notify the inmate in writing of his/her decision to approve or deny any or all witnesses. The requested witnesses/spiritual advisor(s) must meet normal visiting criteria.

b. The Associate Warden, Unit III will:

1) Ascertain if the condemned inmate wishes to invite up to five (5) witnesses and two (2) spiritual advisors. If so, provide the Warden with the names and addresses.

c. The Psychiatrists (Alienists) will:

1) Interview and evaluate the inmate in much the same manner as they did for the 20-day report, and submit their findings to the Warden in writing. They shall compare their current evaluations with their previous findings to determine any change in the inmate's mental condition. Their observations must be current (within 10 days preceding preparation of the report) and pertain to the inmate's mental state.

d. The Chaplain will:

1) Report the emotional state of the inmate, being especially sensitive to any change. The chaplain's observations will be submitted in writing to the Warden. These observations shall pertain to contacts made within 3 days preceding preparation of the report.

e. The Condemned Row Correctional Counselor II will:

1) Report any change in conduct or behavior in writing to the Warden.

f. The Legal Affairs Coordinator will:

1) Contact the next of kin or attorney by telephone to advise them that we will be asking their wishes concerning disposition of the inmate's remains.

2) If necessary, prepare a letter for the Warden's signature to next of kin requesting their intentions regarding the inmate's remains. Ascertain if they will claim the body. If so, advise the name and location of the contracting mortuary. If they do not intend to claim the body, the Legal Affairs Coordinator will have them so state and will notify the contracting mortuary.

g. The Public Information Officer will:

1) Send out written notice to all media representatives selected to be witnesses. Only those reporters, etc. in possession of an authentic original letter signed by the Warden and corresponding photo identification will be admitted to witness the execution.

2) Send out written notice to all media representatives selected to cover the execution event. Selection will be made of 125 total persons from legitimate media outlets. Only those bearing authentic original letters signed by the Warden will be admitted to the institution and the media center.

h.  The Lieutenant in Charge of the Chamber will:

1) Report in writing to the Warden that the following procedures have been accomplished:

(a) Staff assignments on the execution detail are ready.

(b) Preliminary chamber area readiness and operational checks have been made. (Needed maintenance work is requested immediately.)

(c) Ensure that chamber area has necessary supplies which will consist of both household and personal needs.

(d) Ensure that the required clothing will be available.

(e) Ensure that the necessary chemicals are not only available, but also properly controlled.

5.  5 Days Prior to Execution:

a.  The Associate Warden, Unit III will initiate the following procedure if execution is imminent:

1) Direct that the inmate be moved to the designated security housing area of Condemned Row where he will be under 24-hour a day observation of an officer assigned for that purpose. The officer will check the welfare of the inmate at fifteen (15) minute intervals and log each check.

The Warden may order the inmate to be moved to the designated security housing area of Condemned Row where he will be under 24 hour a day observation of an officer assigned for that purpose at any time following receipt of the death warrant when, in the opinion of the Warden, it is necessary to maintain the safety and security of the public, the institution and/or the inmate.

2) Direct that all non-legal property belonging to the inmate be removed from his cell and placed under the security of the officer stationed outside the security cell. The inmate will be given the use of items by the officer as he needs them, and then return them to the officer's care.

3) In the event of a stay at this juncture, the Associate Warden, Unit III will initiate return of the inmate to his former housing status.

b.   The Condemned Row Correctional Counselor II will initiate the following procedure if execution is imminent:

   1)   Interview the inmate to ascertain what request if any he may have for a last meal. The Correctional Counselor II will make the meal request known to the Food Manager and determine if Food Service will be able to fulfill the request. This answer will be reported back to the inmate, and either way, preparations made through the Food Manager for a last meal.

   2)   Interview the inmate to discern any special requests as to the disposition of his property. The inmate will package and label any property to be sent out of the institution. The Correctional Counselor II will maintain an inventory signed receipt of all the packaged property for mailing the first weekday following the execution. In the event of an indefinite stay, the property shall be returned by a signed (inmate) receipt by the Correctional Counselor II.

   3)   Arrange for the monitoring of all telephone calls made by the inmate via an institutional telephone. Legal calls will not be monitored but will be facilitated by staff. All calls will be logged on the pre-execution activity log. The Correctional Counselor II will ensure that the inmate has 24-hour access to a telephone for attorney contact.

   4)   Obtain clothing sizes from the inmate and ensure that appropriate clothing is available.

   5)   Brief the Warden, Chief Deputy Warden, Associate Warden Unit III, and Facility Captain daily as to the inmate's needs, requests, and behavior.

c.   The Chief Deputy Warden will initiate the following procedure if execution is imminent:

   1)   The Chief Deputy Warden will implement the Execution Security Plan.

d.   The Warden will initiate the following procedure if execution is imminent:

   1)   Issue a Warden's bulletin to all staff residents advising them of likelihood of a gathering or demonstration at the East Gate.

e.   The Visiting Lieutenant will initiate the following procedure if execution is imminent:

1)    Announce to visitors and inmates via posted notice, San Quentin T.V. and any other resource available that visiting will be closed the day preceding the execution as well as the day of the execution.

2)    Ensure that the family visiting quarters will be vacant from day 5 through the day of the execution. Prospective visitors, inmates, and housing unit staff will be so informed.

3)    Ensure visiting for the condemned inmate is conducted as outlined in the procedure.

f.    Spiritual Advisors will be allowed access to the inmate as follows:

1)    State employed spiritual advisors selected by the inmate will be allowed to perform their spiritual functions at the cell front of the inmate's cell either on Second or Third Watch. The state employed spiritual advisor may visit the inmate in the holding cell of the execution chamber if requested by the condemned inmate.

2)    Non-state employed spiritual advisors may visit the inmate utilizing the procedure as outlined in this procedure. Grade B inmates will be on a non-contact basis. Non-state employed spiritual advisors will not be allowed to visit the inmate in the housing unit.

6.    4 Days Prior to an Execution:

a.    The Warden will initiate the following procedures if execution is imminent:

1)    Issue a letter to San Quentin Village residents, Marin Rod and Gun Club and the Post Office advising them of any likelihood of a gathering or demonstration at the East Gate.

2)    Direct that notices be passed during staff briefings and via the Count Gate television monitor, to inform staff of the East Gate closure on the evening prior to the day of the execution

b.    The Business Manager II will:

1)    Notify all contractors and vendors that we will not be accepting any services or goods from 1800 hours, 2 days prior to the execution through the execution day.

7.    3 Days Prior to an Execution:

a.    The Lieutenant in Charge of the Chamber will initiate the following procedure if execution is imminent:

    1)    Be responsible for the security of the area. A search of all materials that will come into contact with the condemned inmate will be made. All equipment will be in working order and functioning. All chemicals will be under appropriate control to prevent tampering.

        The following procedures will be followed without exception:

        (a)    The execution chamber area shall be closed to any and all persons not cleared by the Warden. The Lieutenant in Charge of the chamber has authorized access.

        (b)    The execution chamber area keys will not be issued to any person other than the Lieutenant in Charge of the Chamber or designee.

        (c)    All necessary traffic into the chamber areas will be cleared and directly supervised by the Lieutenant in Charge of the Chamber.

        (d)    The chamber area, holding area, and visiting area are cleaned and sanitized daily until the execution is carried out.

8.    Two Days Prior to an Execution:

    a.    The Lieutenant in Charge of the Chamber will assume the following responsibilities:

        1)    Conduct an equipment check of all materials necessary to perform the execution.

        2)    Check the expiration and/or sterilization dates of all applicable items.

        (a)    Outdated items (e.g. Normal Saline bags) shall be replaced immediately.

        (b)    Sterilized packs bearing a sterilization date in excess of thirty (30) days shall be replaced or re-sterilized immediately.

9.    Day Prior to an Execution:

    a.    The Chief Deputy Warden will:

1)      Place institution on lockdown at the appropriate time commensurate with the day and hour of the scheduled execution.

b.      The Warden and Associate Warden, Unit III will:

1)      Direct that at the appropriate time commensurate with the day and hour of the scheduled execution, the inmate be rehoused in the death watch cell adjacent to the execution chamber area.

2)      In the event the inmate has requested a spiritual advisor not employed by the Department of Corrections, the following procedure will be followed:

(a)      The spiritual advisor will be permitted to visit with the inmate in the visiting room until 1800 hours if the execution is scheduled for shortly after midnight. Confidential visits in the plexiglass booths are not permitted.

(b)      After visiting concludes, he/she will be given a completed unclothed body search in the appropriate restroom of the main visiting room.

(c)      The spiritual advisor will be escorted through the rear search area door past Four Post, where he/she will be afforded the opportunity to use the staff restroom.

(d)      The spiritual advisor will be permitted to bring the following items into the death watch area:

         (1)      Personal prayer book / Bible
         (2)      Communion pyx
         (3)      Sacramental wafers
         (4)      Other approved religious items

     All items will be searched.

(e)      If the spiritual advisor requests the use of the restroom, he/she will be escorted to Four Post. Another unclothed body search will be conducted before he/she is escorted back into the death watch cell.

(f)      The spiritual advisor will be permitted drinking water upon request.

(g)      The spiritual advisor will have no telephone access while in the death watch area.

- 16 -

(h)    At 2315 hours, or 45 minutes prior to the scheduled time of execution, the spiritual advisor will be escorted from the death watch cell area, through the front count gate.

(i)    If the spiritual advisor has also been designated as an inmate invited witness, he/she will escorted to a van until clearance to enter the witness area has been given. If he/she is not going to witness, the van will proceed to the West Gate where he/she will be processed out of the institution.

3)    The Warden will be notified prior to any otherwise authorized visitor entering the death watch area.

c.    The Lieutenant in Charge of the Chamber will:

1)    Obtain the lethal injection:

2)    Establish a death watch on a round-the-clock basis consisting of one (1) Correctional Sergeant and two (2) Correctional Officers.

3)    The Execution Team will arrive for pre-execution instructions. The Lieutenant in Charge will arrange for accommodations as necessary.

d.    The Captain, Central Services will:

1)    At the appropriate time commensurate with the day and hour of the scheduled execution, establish a support team to assist as needed to maintain the smooth operation of the institution

2)    At the appropriate time commensurate with the day and hour of the scheduled execution, establish a second support team. This staffing will continue as needed the day of the execution. The support teams shall be in addition to response teams.

3)    Ensure East Block visiting area, main visiting area, and employees' lounge are cleaned and sanitized.

4)    At the appropriate time commensurate with the day and hour of the scheduled execution, inspect all areas.

e.    The Public Information Officer will:

1)    Activate the media center at the appropriate time commensurate with the day and hour of the scheduled execution in the In-Service Training hall. The Public Information Officer will activate the bank

of pay telephones, and otherwise address the needs of media representatives that may be operating out of the center. The assigned staff will release no information or offer any commentary unless specifically authorized by the Public Information Officer. The Public Information Officer will give regular updates to any media gathered, and notify the Assistant Director, Communications of this action.

2)    Work with the Assistant Director, Communications to prepare a biographical and general information sheet on the inmate for briefing notes for the media, including California Department of Corrections I.D. photo. A copy of this biographical and general information sheet will be sent to the Assistant Director of Communications.

3)    At the time designated by the Warden, identify the media witnesses and escort them to their waiting area room at In-Service-Training (IST). The Public Information Officer will instruct the media witnesses there will be no cameras, recorders, sketch pads, etc. These items will be deposited at the media center for later retrieval. No such equipment will be allowed in the witness gallery. Pencils and notepads will be provided. The Public Information Officer may utilize the metal detector at the Inspectoscope Gate, or any other search method deemed necessary and reasonable.

4)    The Warden through the Public Information Officer will designate a cut off time for the media to arrive as outlined in the Execution Security Plan.

f.    The Official Witnesses will:

2)    Meet in the designated area at the designated time for greeting by Warden.

10.    Day of an Execution:

a.    The Warden will:

1)    Assure all witnesses are appropriately accommodated.

2)    Usher the official witnesses to their assembly area and give final instructions as needed.

3)    Approximately one-half hour before the execution, take his/her position at the execution chamber.

4)      Direct that the witnesses be escorted into the witness area and take their designated places.

5)      At the designated time of the execution, after all witnesses are in their designated places, issue the first of the required four commands:

         (a)      Ready the inmate.

         (b)      Bring the inmate out.

         (c)      Strap the inmate into the injection chair.

         (d)      Place the catheters in each arm and start the saline solution.

6)      Once the saline solution is flowing, direct a member of the execution team stationed on the witness area side of the locked door leading to the execution anteroom to read a prepared a prepared statement detailing the court order mandating the execution.

7)      Order the administration of the lethal injection until inmate is pronounced dead.

8)      Upon verification by one of the attending physicians, a member of the execution team will read a prepared statement announcing the death of the inmate.

9)      Immediately following the execution, thank witnesses. Arrange for their safe departure from the institution with the Investigations Unit Captain.

10)      Approximately 1 hour after the execution, the Warden will issue a statement to the media.

b.      The Associate Warden, Unit III will:

1)      Approximately 2 hours prior to execution, meet with Warden.

c.      A State Physician will:

1)      Attend with another staff physician, and by monitoring the heart of the inmate, or by whatever means appropriate, determine and pronounce death.

d.      The Public Information Officer will:

1)      After receiving the order from the Warden, escort the media witnesses into the witness gallery.

2)      Immediately upon Declaration of Death, take note of the exact time and usher the media witnesses directly

to the media center where they will give pool commentary and recount to the other assembled media. The Public Information Officer will give no commentary until after the official statement by the Warden.

3) Accompany the Warden to the post execution press conference. Field questions that follow the Warden's statement.

4) As soon as possible after the issuance of the official statement, usher all media out of the prison grounds.

e. The Administrative Assistant to the Warden will:

1) Assist the Public Information Officer in escorting news media into media center.

2) Escort the official and other witnesses into the witness gallery.

3) Assign a Correctional Officer to escort witnesses invited by inmate and/or the inmate's legal team from the West Gate to the designated areas. The correctional officer will remain with these witnesses and assist in escorting to the witness gallery. It is customary that not all members of the legal team actually witness the execution, but are on grounds until the execution has been carried out.

## B. WITNESSES TO AN EXECUTION

1. Types of Witnesses:

a. Official Witnesses:
Official witnesses as defined in Section 3605 of the California Penal Code, will not have their names made public. Official Witnesses will be escorted into the viewing room first, and take seats at the rail.

b. Witnesses and Other Observers (staff, etc.)
Witnesses and observers will not have their names made public. Witnesses will be escorted into the viewing room second, taking their places upon the east risers.

c. News Media Witnesses
News media witnesses will be admitted according to Section D - NEWS MEDIA. News media witnesses will not have their names made public, unless they choose to do so. Media witnesses will be escorted into the viewing room third, taking their places upon the north risers.

d. Inmate Requested Witnesses

- 20 -

Inmate requested witnesses will be escorted into the viewing room fourth, taking their places upon the south risers.

2.  Allocation of Available Space:

The total capacity of the witness area of the execution chamber is fifty (50) persons. The distribution of those present shall be as follows:

| | |
|---|---|
| Attorney General | 1 |
| Staff | 4 |
| Official Witnesses | 12 |
| Governor's Witnesses | 4 |
| Director's Witnesses | 3 |
| YACA Witnesses | 2 |
| News Media Witnesses | 17 |
| Witnesses Requested by Inmate- | |
| Family and Friends | 5 |
| Spiritual Advisors | 2 |

TOTAL        50

3.  Request for Witnesses by the Condemned Inmate:

a.  All requests to witness an execution, including the inmate's request to have family or friends present, shall be directed in writing to the Warden. The Warden shall choose those persons who will be allowed to do so and will notify them, in writing, no later than seven (7) days before a scheduled execution, pursuant to Section 3605 of the Penal Code.

4.  Selection of News Media Witnesses (maximum 17):

a.  When an execution is scheduled, the Warden will request that the Assistant Director, Communications notify the media and establish a filing period in which to accept media requests to witness the execution. All media requests to witness each execution shall be directed in writing to the Communications Office, Headquarters. All letters of request will be date stamped upon receipt. They will only be considered for the scheduled execution and will not be kept "on file." Requests will only be accepted immediately prior to the date of execution and not after the filing period. Media is defined in Title 15, CCR Section 3000 and DOM subsection 13010.5.

b.  The Assistant Director-Communications shall consult with the Warden and his Public Information Officer and assist them in selection of the members of the news media to witness an execution. All media witnesses must agree to the use of a "pool" method and all members must agree to release information simultaneously to all other news agencies at a press conference held as soon as possible after the execution. The media witnesses will not be permitted

- 21 -

any cameras, tape recorders, or drawing implements, etc., in the witness area. Pencils and notepads will be provided.

5. Procedures for Selecting Victim Family Witnesses:

    a. The highest priority will be given to include victims' family members who request to witness the execution procedure. If a large number of victims exist, the selection criteria shall attempt to include at least one family member per victim.

6. Procedures for Processing Witnesses:

    a. All witnesses need to arrive at the institution's West Gate at the time designated by the Warden. Parking will be in the designated parking area. All witnesses will be processed through the Inspectoscope Gate.

        1) No blue jeans, i.e., jeans-style blue, black, or gray pants or Levi's.

        2) No cameras or recording equipment. Pencils and notepads will be furnished to media witnesses.

    b. All witnesses must have a photo I.D.

6. Witnesses Accommodation Prior to Execution:

    a. After processing, witnesses will be escorted to their designated areas until time to move to the execution chamber. At a time announced by the Warden, the witnesses will be escorted to the witness area and directed to their designated places.

7. Witness Accommodation After Execution:

    a. After the announcement of death, the official and other witnesses will be escorted to a designated area. The inmate's witnesses will be transported to their transportation at the West Gate.

    b. The media witnesses will be transported to the media staging area to await the Warden's press conference approximately one hour after a scheduled execution.

D. NEWS MEDIA

1. Responsibility:

The Public Information Officer, under the direction of the Warden, in conjunction with the Assistant Director of Communications, is responsible for coordination of news media personnel pursuant to an execution.

2.    Media Access to the Institution:

Members of legitimate media, as defined in Title 15, CCR Section 3000 and DOM subsection 13010.5, will be allowed on San Quentin grounds on the day and time specified by the Warden. Requests must be made to the Assistant Director, Communications, in writing. A maximum of 125 non-witness news media personnel will be permitted to remain in the IST hall during and after the execution to await the Warden's post execution press conference. News media representatives who receive a letter of authorization from the Warden will be admitted to the institution, provided they are properly credentialed and attired.

3.    Coordination of Non-witness News Media:

a.    All non-witness media members need to arrive at the institution's West Gate on the day and time specified by the Warden. Parking will be in the designated parking area. Media broadcast vans will be admitted to the institution grounds on a space-available basis and prior written approval of the Warden. Requests for such accommodations should be made when requesting to cover the event. All media members must have a photo I.D. and a letter signed by the Assistant Director of Communications.

The media members will be admitted and processed at the West Gate and escorted to the IST Building by the Administrative Assistant.

b.    After the execution, the media witnesses will join the non-witness media as soon as possible at the IST Building for the media press conference, where they will relate what they witnessed to the media non-witnesses. The Warden's press conference will follow at about one hour after an execution. At the conclusion of the Warden's press conference, all media personnel will be escorted to the West Gate, including broadcast vans.

4.    Condition for Admittance of News Media Representatives:

a.    No "blue jeans" are allowed. "Blue jeans" are defined as any denim trousers colored any shade of blue, black, or gray.

b.    Cameras (still and video), recording equipment and other equipment will be allowed, subject to search.

c.    All media broadcast vans will be parked in the parking area adjacent to the IST building. Cameras and recording equipment will only be allowed in the IST Building and in the parking area.

d.    Satellite link-up vans may be allowed into the lower staff parking lot next to the visiting lot by prior arrangement.

5.  Interviews with Condemned Inmates:

    All interviews will be consistent with departmental policy.

6.  Information Releases:

    a.  The names of the 12 official witness will not be released.

    b.  The names of execution team members will not be released, nor will they be available for interviews or photographs.

    c.  The Public Information Officer, at the direction of the Warden and Assistant Director, Communications, will be responsible for all news releases prior to, during and after an execution and for the developing of all necessary press and information releases.

    d.  The Warden, with the assistance of the Assistant Director, Communications and Public Information Officer, will hold a press conference approximately one hour after a scheduled execution. No other interview will be given by the Warden after the news conference is completed.

E.  EXECUTION CHAMBER OPERATION

1.  Personnel:

    a.  Responsibilities:

        1)  WARDEN:  The Warden shall have the overall responsibility for the execution and will work and train closely with all personnel responsible for all phases of the procedure. The Warden shall select the execution team.

        2)  CHIEF DEPUTY WARDEN:  The Chief Deputy Warden shall be responsible for the security of the institution and will be in command of the Emergency Operations Center (EOC).  The Chief Deputy Warden will be in command of SERT/NMT and other special security forces.

        3)  ASSOCIATE WARDEN, UNIT III:  The Associate Warden, Unit III shall accompany the Warden on the day of the scheduled execution into the chamber anteroom.

        4)  CAPTAIN CENTRAL OPERATIONS:  The Captain, Central Operations shall coordinate institutional operations.  Responsible for sanitation of visiting areas, lounge areas, and entry road areas.

- 24 -

5) <u>PUBLIC INFORMATION OFFICER</u>: Public Information Officer shall be responsible for all news releases prior to, during, and after an execution.

6) <u>ADMINISTRATIVE ASSISTANT</u>: Administrative Assistant is responsible for escorting the non-witness media members to the In-Service-Training building and providing security for the special media vans.

7) <u>LIEUTENANT IN CHARGE OF THE EXECUTION CHAMBER</u>: The Lieutenant in Charge of the execution chamber is responsible for the direct supervision of the execution team, as well as functioning as a liaison with the Warden. He/she is responsible for the necessary security integrity of the chamber areas and related functions. Responsible for the sanitation of chamber and adjacent areas.

8) <u>RECORDER</u>: A designated team member shall keep accurate records of time that each phase of the execution takes place.

9) <u>THE DEATH WATCH CELL SERGEANT AND OFFICERS</u>: The Death Watch Cell Sergeant and officers assigned to the overnight detail are responsible for the security of the condemned inmate(s) throughout the night until execution time, under the direction of the Lieutenant in Charge of the Chamber. If the condemned inmate is female, one of the officers shall be female.

10) <u>WITNESS AREA OFFICERS</u>: The witness area officers shall station themselves in the witness area during an execution

11) <u>OTHER EXECUTION TEAM OFFICERS</u>: The other execution team officers shall perform duties as assigned by the Lieutenant in Charge of the Chamber.

2. Facility: —

a. Description of Execution Chamber:

1) The lethal execution chamber for the State of California is a self-contained unit located at the California State Prison at San Quentin. The chamber area consists of the witness area, two (2) holding cells, the chemical room, kitchen/officers' area, anteroom and execution chamber.

2) The witness area is accessible directly by a door located between the main visiting room and the East Block visiting room. This area can be isolated from

the rest of the chamber. Visibility during an execution is through five (5) windows. Capacity of this area is fifty (50) persons.

3) The two (2) holding cells each contain a toilet and sufficient room for a mattress.

4) The chemical room contains storage cabinets, work bench, and two (2) chemical mixing pots as well as pipe work and valves. This room is utilized during executions by lethal gas.

5) The kitchen/officers' area has a small sink, cabinet and counter area as well as a resting area for staff members.

6) The anteroom contains several valves and the chamber immersion lever, used during execution by lethal gas. Access to the witness area, or to North Block is through two (2) separate solid iron doors. Also in this area are direct telephone line utilized by the State Supreme Court and Attorney General's office.

3.    Execution Chamber Maintenance:

A constant state of readiness and the proper safe operation of the execution chamber requires periodic inspection and maintenance of the chamber throughout the year.

The door to the execution chamber is to remain locked in the open position when not in use or testing.

To prevent corrosion, there is a natural draft to exhaust stack which keeps the chamber dry and free of any drain odor.

Total body fluid precautions will be instituted for infection control.

4.    Lethal Injection Execution:

a.    Chemicals needed for execution:

1) Sodium Pentothal, 5.0 Gm, plus one unopened backup.

2) Normal Saline, 20 cc.

3) Pancuronium Bromide (Pavulon), 50 mgm per 50 cc.

Five (5) 10 cc. ampules of 10 mgm each in each of three (3) syringes

Total injection; 100 cc/100 mgm., or 2 syringes. One extra made up as stand-by.

4)      Potassium Chloride, 50 milequiv. per 50 cc.

Five (5) 10 cc. ampules of 10 milequiv. in each of three (3) syringes

Total injection; 100 cc/100 mgm., or 2 syringes. One extra made up as stand-by.

b.      Equipment and Materials:

1)      One (1) Sodium Pentothal, 5 gm., w/diluent

2)      Twenty (20) Pancuronium Bromide, 10 mgm. ampules (Pavulon)

3)      Twenty (20) Potassium Chloride, 10 milequiv. ampules

4)      Ten (10) Syringes, 50 cc

5)      Ten (10) Syringes, 20 cc

6)      Ten (10) Needles 18 Ga., 1"

7)      Five (5) Angiocaths, 20 Ga., 1"

8)      Five (5) Angiocaths, 18 Ga., 1"

9)      Five (5) Angiocaths, 16 Ga., 1 3/4"

10)     Four (4) Normal Saline, IV bags, 1000 cc

11)     Twelve (12) Extension sets, 72" long

12)     One (1) Box alcohol preps

13).    Four (4) Rolls adhesive tape, 1"

14)     Four (4) Rolls adhesive tape, 2"

15)     Four (4) Rolls adhesive tape, 3"

16)     One (1) Pair scissors, Bandage, pr.

17)     Six (6) Tourniquets

18)     Box gloves, surgical, Size 7, sterile

19)     Box gloves, surgical, Size 9, sterile

20)     Box surgical masks

- 27 -

21) Three (3) Flashlights, w/batteries

22) Ten (10) Chux

23) Two (2) Arm Boards

24) Six (6) 3 Way Stopcocks

25) Restraint Gear
Department approved handcuffs and leg irons.

26) Cardiac Monitor
Two (2) sets

27) Wall Clocks
Two (2)

28) Cleaning Supplies
As required for ongoing maintenance of chamber and onsite facilities.

29) Light Bulbs – assorted wattage

30) Hand soap

31) Paper Towels

32) Toilet Paper

33) Mop-up Towels

34) Visiting Room Buffer
Used on regular basis to wax floors, etc.

c.  Inmate(s) Needs on Overnight Status:

1) Bed Mattress

2) Blanket

3) Pillow

4) Electric Heater and extension cord

5) AM/FM Radio

6) Television

7)    Inmate Clothing (3 sets)

State issue trousers
State issue undershorts
State issue undershirt
State issue socks
State issue blue shirt

In the event the condemned is a female, the clothing consists of brassiere, panties, and blue dress.

Female clothing will be provided by the Central California Women's Facility (and delivered with the condemned female 48 hours prior to actual execution date.)

8)    Towels

9)    Chess and Checkers set

10)   Coffee and/or Approved Drinks (non-alcoholic)

11)   Last Dinner Meal (as reasonable as possible)

ASCERTAIN DISPOSITION OF PERSONAL PROPERTY FROM CONDEMNED INMATE AFTER HIS/HER PLACEMENT IN OVERNIGHT CELL (DONATION, MAIL TO RELATIVE, ETC.)

d.    Procedures:

1)    Two (2) Weeks Prior to Scheduled Execution:

(a)    The Lieutenant in Charge of the Chamber will notify the Warden that the following procedures have been accomplished:

—    Specific staff assignments to the execution detail have been made.

Preliminary chamber area readiness and operational testing procedures have been made. Necessary maintenance work will be performed in the presence of the Lieutenant in Charge of the Chamber or his/her designate (Chamber Operator/Chemical Operator.)

Ensure the chamber areas have full complements of necessary household and personal needs of the condemned inmate and all required clothing is available.

- 29 -

Ensure the direct telephone lines utilized by the State Supreme Court and the Attorney General's office are on-line and working.

Inventory all chemicals and equipment necessary in chamber operation are available and under proper storage.

2)   One (1) Week Prior to Scheduled Execution:

   (a)   The Lieutenant in Charge of the Chamber will inspect the chamber areas for the following:

Ensure all maintenance work requested has been completed and the chamber is ready.

Preliminary and operational tests are again performed to ensure readiness of chamber areas. The prison Correctional Plant Manager (CPM), and/or Maintenance Supervisor (Execution Team Liaison) will be present during this operational check of the chamber.

Ascertain all necessary clothing, personal items, overnight detail equipment, etc., are properly available and operational. The Lieutenant in Charge of the Chamber will notify the Warden of this inspection. At this point, all equipment should be operational and functioning properly.

All necessary supplies should be in the chamber area or where designated and ready for use.

The entire area should be in a high state of cleanliness and ready for outside witnesses.

3)   Three (3) Days Prior to Scheduled Execution:

   (a)   The following procedure will be strictly adhered to without exception:

The execution chamber area will be closed to any and all persons not specifically cleared by the Warden. The Lieutenant in Charge of the Chamber and necessary team members are authorized access.

All traffic into the chamber areas will be approved by the Lieutenant in Charge of the Chamber, who will directly supervise necessary traffic into the area.

The Lieutenant in Charge of the Chamber will conduct the following pre-execution inventory and equipment check:

(1)     Members of the injection team shall conduct an equipment check of all materials necessary to perform the execution.

(2)     The inventory shall be conducted not less than twenty-four (24) hours, and not more than ninety-six (96) hours, before the scheduled execution.

(3)     Expiration and/or sterilization dates of all applicable items shall be checked on each individual item.

      (a)     Outdated items (e.g. Normal Saline bags) shall be replaced immediately.

      (b)     Sterilized packs bearing a sterilization date in excess of thirty (30) days shall be replaced or re-sterilized immediately.

At this time, the Lieutenant in Charge will be responsible for the security of the chamber. A search of all materials that will come into contact with the condemned inmate(s) will be made by the Execution Team. All equipment will be in working order and functioning properly.

All chemicals will be stored under appropriate controls to prevent tampering.

**NOTE:** In the event the condemned inmate is female, she will be transported from the Central California Women's Facility not earlier than three (3) days prior to the scheduled execution date. The condemned female will be placed upon arrival in the overnight cell and necessary coverage and supervision of the condemned inmate as outlined in this procedure for male inmates will be arranged by the Lieutenant in Charge of the Chamber.

4)     <u>**One (1) Day Prior to Scheduled Execution:**</u>

The Execution Team members as designated by the Lieutenant in Charge of the Chamber will perform the following:

(a)  Obtaining Drugs:

(1)  During the afternoon immediately preceding an execution by lethal injection, a member of the injection team shall proceed to the pharmacy to obtain the necessary agents (drugs) for the procedure.

(2)  When the drugs have been issued, and quantities verified, they shall be placed in the Lethal Injection Drug Box, and the box locked.

(3)  A member of the injection team shall maintain personal, physical custody of the locked drug box until such time as it is opened for use, or for return if not used.

(b)  Chamber Kitchen:

Check linen - includes officer cot and sheets, pillow, pillowcase and six (6) towels. Contact the laundry if additional supplies are needed.

Contact the Food Manager for foodstuffs; fruit, coffee, sugar, milk, and ice.

(c)  Overnight Cells:

Thoroughly search cells, depending on number of executions set for the next day.

Obtain overnight cell furnishings. For each cell to be used, obtain one (1) mattress, one (1) blanket, and one (1) pillow from the storage closet located in the witness room.

Very thoroughly search each item. Place in overnight cell, spreading the blanket over the mattress. Place the pillow at the head of the mattress. LOCK THE CELL DOORS.

(d)  **At the appropriate time commensurate with the day and time of the execution:**

(1)  Lieutenant in Charge of the chamber will contact the Warden for last minute information.

(e) **At the appropriate time commensurate with the day and time of the scheduled execution:**

(1) The appropriate number of supervisorial and custody staff as determined by the Associate Warden of Unit III will arrive at the condemned row office. One of the detail officers searches the clothing to be worn by the condemned inmate. The unit lieutenant makes the necessary notation in the condemned row log book. The escort team then enters the condemned tier and proceeds to the cell of the condemned inmate. While in the cell, the inmate is given an unclothed body search and then placed in mechanical restraints. The inmate, wearing his underclothing, is escorted to the holding cell where he is retained pending an unclothed body search which includes a metal detector scan.

(2) Following this, he is given a complete new outfit of clothing that was previously searched by the officer. This clothing consists of undershirt, shorts, socks, blue jeans, blue shirt, and canvas slippers. All items of clothing are regulation for the institution. After the inmate is clothed, he is placed in restraint equipment. He is then escorted to the elevator via the condemned unit door, by the aforementioned officers, then to the lower floor of the cell block and to the door leading to the overnight cell area. A lieutenant, as per previous arrangements, is stationed on the opposite side of the door in the overnight cell area, with the necessary key which he passes to the officer through the door aperture. The door is unlocked and the officers escort the condemned inmate into one of the overnight cells, and the restraint equipment is removed.

(3) One officer will be posted at the door leading to the overnight cell area after the condemned inmate is placed in the

cell. This position will be posted during the third watch and first watch preceding the execution.

(4) Equipment required for this position is one (1) handheld radio and key ring.

(5) Commencing immediately upon posting, the officer will make a visual security check through the door aperture leading to the overnight cell and will continue the security checks every 30 minutes.

(6) The Lieutenant in Charge of the chamber asks the inmate who his spiritual advisor is, then informs the condemned inmate of the time his dinner will be served.

(7) The Lieutenant informs the inmate that he will return to see him later in the evening, or sooner if the inmate desires. At this point, the inmate is introduced to the sergeant and two (2) officers who will be with him throughout the night. All staff, except the overnight detail, leave the chamber area, and the Lieutenant in Charge of the chamber reports directly to the Warden.

(f) **At the appropriate time commensurate with the day and time of the scheduled execution:**

(1) Dinner is brought to the area by a sergeant and the supervising cook. The dinner normally is the meal requested by the inmate insofar as is reasonable and possible to obtain. Coffee is available throughout the night.

(g) **At the appropriate time commensurate with the day and time of the scheduled execution:**

(1) The inmate is usually visited by the spiritual advisor of his choice and the Warden. The Lieutenant in Charge of the chamber returns during the evening to check with the overnight sergeant and officers and stays as

required. He remains on duty through the execution. All visitors in the overnight cell area must be approved by the Warden.

(2) The condemned inmate is allowed reasonable last requests. Normally, these requests include the following:

* Special items of food and soft drinks;

* Special programs on the radio or television set;

* Funds on the books be transferred as he might designate;

* He will be allowed to walk to the chamber without assistance;

* He will be allowed to send out last letters;

* The reporters and newspapers not mention his family, etc.

(3) Requests, other than normally routine, are processed through the Warden or the Officer of the Day.

(4) Routine requests are handled by the Lieutenant in Charge of the chamber or the respective Watch Commander on duty.

(5) The Watch Commander will make routine checks with the overnight officers during their respective shifts.

(6) The telephone located in the chamber kitchenette is restricted to the Warden, Lieutenant in Charge of the chamber, the Administrative Officer of the Day, and the Watch Commander on duty.

5) **DAY OF SCHEDULED EXECUTION:**

(a) <u>**Approximately 3 hours prior to the execution:**</u>

(1) The state employee spiritual advisor may arrive at the overnight cell and, if requested to do so by the condemned

inmate, remains until after the execution. On other occasions, he may give communion and then return 1 hour prior to the execution to remain until after the execution.

(b)   **Approximately 2 hours prior to the execution, the following procedure will be followed:**

(1)   Members of the injection team shall enter the injection room and immediately reinventory the supplies and equipment to insure that all is in readiness, and if applicable, obtain replacement items from the pharmacy.

(c)   **Approximately 1 hour prior to execution, the following procedure will be followed:**

The IV set-up will proceed as follows:

(1)   The connecting needle of Administration Set shall be inserted into outlet of the bag of Normal Saline IV solution.

(2)   The on-off clamp located between the "Y" injection site and the needle adapter shall be removed and discarded. The flow of solution shall be controlled by the Flo-Trol clamp located above the "Y" site.

    (a)   The lip of the neoprene diaphram on the "Y" injection site shall be rolled back so that it can easily be removed for insertion of syringe tips instead of a needle.

    (b)   A 72-inch Extension Set shall be connected to the needle adapter of the Administration Set.

NOTE:   For the set-up for administration into the distal arm, a second Extension Set shall be required due to the additional distance.

(3)   An Angiocath (no smaller than 20 Ga. X 2") shall be connected to the needle adapter of the Extension Set. Optimal

injection flow may be achieved with a 14 Ga. or 16 Ga. Angiocath, if the veins will permit the use of the larger size.

(4)     The tubing shall be cleared of air and the Angiocath recovered. The set-up is ready for use.

(5)     Steps 1 through 6 shall be repeated for the second set-up.

(6)     The syringes containing the drugs shall be prepared and loaded in the following order:

   (a)     Two 35-cc syringes, each containing 20 cc of sterile Normal Saline. Label syringes "NS".

   (b)     Three 50-cc syringes, each containing 50 milequiv of Potassium Chloride in 50 cc. Label syringes "3".

   (c)     Three 50-cc syringes, each containing 50 mgm of Pancuronium Bromide in 50 cc. Label syringes "2".

   (d)     One 35-cc syringe containing 5.0 Grams of Sodium Pentothal. (Kit contents to be dissolved in 20-25 cc of the accompanying diluent to attain complete, clear suspension.) The Sodium Pentothal, being a Federally controlled drug, shall be prepared last, when it appears that it shall actually be used. Label syringe "1".

   (7)     A pre-medication is available if requested by the inmate. Valium, or its equivalent, a skeletal relaxant, will be administered if requested by the inmate and approved by the Health Care Manager.

It is noted that three syringes of Pavulon and three of Potassium Chloride are prepared, even though the injection procedure only calls

for two of each. The extra syringes are to be prepared as "stand-bys", in the event one of the others is dropped in handling during the injection procedure. This will take place prior to moving the inmate into the execution chamber.

Chamber operator calls outside telephone operator for time check and sets the clock. Takes position on right side of chamber door. Opens chamber door upon Warden's signal to do so.

(d)  **Approximately 45 minutes prior to execution, the following procedure will be followed:**

   (1)  The Warden and two (2) physicians arrive at the execution chamber via the outside entrance. The Warden talks briefly with the condemned inmate.

   (2)  The condemned inmate remains in the cell, accompanied by the spiritual advisor, until signaled by the Warden that the appointed time has arrived.

(e)  **Approximately 10 minutes prior to execution, the following procedure will be followed:**

   (1)  The Warden orders that the witnesses be brought into the witness area and take their designated places.

   (2)  Escorting officers bring in the witnesses and then leave the area, to wait outside until after the execution when they will again escort the witnesses to their designated areas.

(f)  **When the appointed time for the execution has arrived and the signal to commence has been given by the Warden:**

   (1)  The inmate is moved into the execution chamber and secured onto the table. The heart monitor equipment is then connected to the monitor. The physician will verify the heart beat registers on the monitor.

(2)     The following execution procedure is started:

The angiocath shall be inserted into a usable vein by a person qualified, trained, or otherwise authorized by law to initiate such a procedure. The flow of **Normal Saline** shall be started and administered at a slow rate of flow.

The above procedure shall be repeated on a secondary location on the inmate. This line shall be held in reserve as a contingency line in case of a malfunction or blockage in the first line.

NOTE:     At this point, the administration sets shall be running at a slow rate of flow, and ready for the injection of syringes containing the injection agents. Observation of both set-ups to insure that the rate of flow is uninterrupted shall be maintained. **NO FURTHER ACTION** shall be taken until the pre-arranged signal to start the injection of lethal agents is given the Warden.

After the IV is started, injection team members vacate the chamber.

(3)     All officers vacate the chamber, the door is closed by the chamber operator and sealed by the Lieutenant.

(4)     The chamber operator then turns on the exhaust fan.

(5)     Total anonymity of the injection team members in the injection room shall be maintained. At **NO TIME** shall they be addressed by name, or asked anything that would require an oral response.     The members of the injection team shall remove all jewelry and wear long sleeve shirts to cover any identifiable marks, tattoos, or scars.