1  STEVEN S. LUBLINER (SBN 164143)
   Law Offices of Steven S. Lubliner
2  P.O. Box 750639
   Petaluma, CA 94975
3  Telephone: (707) 789-0516
   Facsimile: (707) 789-0515
4
   Attorney for Plaintiff Donald J. Beardslee
5

6

7              IN THE UNITED STATES DISTRICT COURT

8           FOR THE NORTHERN DISTRICT OF CALIFORNIA

9  DONALD J. BEARDSLEE,                    )  Case No.:
                                           )
10            Plaintiff,                    )
                                           )  **DEATH PENALTY CASE:**
11      v.                                 )  **EXECUTION DATE SET**
                                           )
12  JEANNE S. WOODFORD, Director of        )  EXHIBITS IN SUPPORT OF
    the Department of Corrections, JILL L. )  PLAINTIFF'S MOTION FOR
13  BROWN, Acting Warden of the            )  TEMPORARY RESTRAINING
    California State Prison at San Quentin,)  ORDER, PRELIMINARY
14  and DOES 1-50.                         )  INJUNCTION AND ORDER TO
                                           )  SHOW CAUSE: VOLUME 1
15            Defendants.                   )
                                           )
16                                         )
                                           )  **EMERGENCY ACTION**
17                                         )  **REQUESTED**
                                           )
18

19

20

21

22

23

24

25

26

27

28
   EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION
   AND ORDER TO SHOW CAUSE

**INDEX OF EXHIBITS**

**Exhibit**

**VOLUME 1**

| | |
|---|---|
| Declaration of Dr. Mark Heath | A |
| San Quentin Operational Procedure No. 770 (6/13/03 revision), pp. 1-39. | B |
| Excerpt from California Department of Corrections web site re Lethal injection procedures. | C |
| Defendants' available execution logs for prisoners executed by lethal injection | D |
| Declaration of Margo A. Rocconi re Stephen Anderson execution | E |
| Toxicology reports from Kentucky lethal injections and extrapolations therefrom based on assumptions of defendants' prior expert. | F |
| Letter from Kentucky Department of Corrections describing Kentucky lethal injection procedure. | G |
| Toxicology reports from North Carolina lethal injections and extrapolations therefrom based on assumptions of defendants' prior expert. | H |
| Toxicology reports from South Carolina lethal injections and extrapolations therefrom based on assumptions of defendants' prior expert. | I |
| Deposition testimony of former San Quentin Warden, Daniel Vasquez | J |
| Chart of State Statutes governing the humane euthanasia of animals | K |
| Excerpts from 2000 Report of the American Veterinary Medical Association Panel on Euthanasia | L |
| Articles re complications in lethal injection execution of California inmate Stephen Anderson | M |
| Article re complications in lethal injection execution of California inmate Jaturun Siripongs | N |

EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE

1

### INDEX OF EXHIBITS (cont.)

2

**Exhibit**

3

4
New York Times article re Kentucky lethal injection litigation and   O
complications in execution of Kentucky inmate Edwards Harper.

5
Houston Chronicle article re complications in lethal injection   P
6
execution of Texas inmate Stephen McCoy.

7
Court TV article summarizing complications in lethal injection   Q
executions.
8

9
Declaration of Mark Dershwitz, M.D., Ph.D., submitted by defendants   R
in Kevin Cooper lethal injection litigation.

10

Affidavit of Cr. Carl Rosow, M.D., Ph.D., submitted by defendants in   S
11
Kevin Cooper lethal injection litigation.

12
Transcript of a portion of testimony of state's expert, Dr. Sperry, in   T
Georgia lethal injection litigation.
13

14
### VOLUME 2

15
Toxicology reports from Arizona lethal injections   U

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 'A'

1    Steven S. Lubliner (CA SBN 164143)
Law Offices of Steven S. Lubliner

2    P.O. Box 750639
Petaluma, CA 94975

3    Phone: (707) 789-0516
Fax: (707) 789-0515

4

    Attorney for Plaintiff DONALD J. BEARDSLEE

5

6

7

8    UNITED STATES DISTRICT COURT

9    NORTHERN DISTRICT OF CALIFORNIA

10

11

12    DONALD J. BEARDSLEE,    Case No. _____

13           Plaintiff,    **DECLARATION OF DR. MARK HEATH**

14      v.

15    JEANNE WOODFORD, Director of the
California Department of Corrections; JILL

16    BROWN, Acting Warden, San Quentin State
Prison, San Quentin, California; DOES 1-50,

17    Defendants

18           Defendants.

19

20

21

22

23

24

25

26

27

28

1   The undersigned, Dr. Mark Heath, hereby declares under penalty of perjury as
2   follows:

3   1.   I am an Assistant Professor of Clinical Anesthesiology at Columbia
4   University in New York City. I received my Medical Doctorate degree from the University
5   of North Carolina at Chapel Hill in 1986 and completed residency and fellowship training in
6   Anesthesiology in 1992 at Columbia University Medical Center. I am Board Certified in
7   Anesthesiology, and am licensed to practice Medicine in New York State. My work
8   consists of approximately equal parts of performing clinical anesthesiology, teaching
9   residents, fellows and medical students, and managing a neuroscience laboratory. As a
10  result of my training and research I am familiar and proficient with the use and
11  pharmacology of the chemicals used to perform lethal injection.

12  2.   Over the past several years, as a result of concerns about the
13  mechanics of lethal injection in some states, I have performed several hundred hours of
14  research into the techniques that are used during this procedure. I have been admitted as an
15  expert medical witness in courts in Georgia, Tennessee, Pennsylvania, Virginia, and
16  Louisiana. I have filed affidavits that have been reviewed by courts in the above states and
17  also Kentucky, New York, Alabama, Maryland, North Carolina, South Carolina, Ohio,
18  Oklahoma, Tennessee, Texas, and by the United States Supreme Court. During court
19  proceedings, I have heard testimony from prison wardens who are responsible for
20  conducting executions by lethal injection. I have testified before the Nebraska Senate
21  Judiciary Committee regarding proposed legislation to adopt lethal injection. I have
22  testified before the Pennsylvania Senate Judiciary Committee regarding proposed legislation
23  to remove pancuronium from Pennsylvania's lethal injection protocol. My research
24  regarding lethal injection has involved both extensive conversations with recognized experts
25  in the field and personal correspondence with the individuals responsible for introducing
26  lethal injection as a method of execution in Oklahoma (the first state to formulate the
27  procedure), and the United States. I have also appeared as an expert before this Court, by
28  way of declaration, in the case of Kevin Cooper, which was first heard in this Court

1    approximately a year ago.

2         3.    My qualifications are further detailed in my curriculum vitae, a copy
3    of which is attached hereto as Exhibit A and incorporated by reference as if fully rewritten
4    herein.

5         4.    I have been asked by counsel for Donald Beardslee to review the
6    procedures concerning lethal injection in California and to render an opinion as to whether
7    or not they comply with appropriate medical standards for such a procedure, and to
8    determine the likelihood that the lethal injection procedure California employs creates
9    medically unacceptable risks of inflicting excruciating pain and suffering on inmates during
10   the lethal injection procedure. The opinions expressed in this Declaration are ones that I
11   hold to a reasonable degree of medical certainty.

12        5.    I have reviewed a version of the San Quentin Operational Procedure
13   770, revised date June 13, 2003 ("Procedure 770"). My understanding from counsel is that
14   there is a concern that parts of this document may have been withheld. I have also reviewed
15   the San Quentin website that describes the lethal injection procedures not contained in
16   Procedure 770, which is very unusual in that one would expect the medical process to be
17   fully contained within the official protocol if that protocol was to be followed. It may be
18   that the remainder of 770 that has not been released contains this information. There is a
19   reference in 770 to the lethal injection procedure, which is nowhere else described. The
20   disjointed promulgation of medical regulations, and placing such important features of the
21   process on the internet rather than in the official text, if true, raises concern about who is
22   determining what the process should entail, and whether they have any medical training and
23   are making decisions based on sound medical principles.

24        6.    In addition, I have reviewed the execution logs for Keith Daniel
25   Williams, William Bonin, Jaturun Siripongs, and Manuel Babbitt. I have also reviewed the
26   Declaration of Margo Rocconi, Esq., who witnessed the last execution at San Quentin, that
27   of Stephen Anderson, as well as the exhibits contained in the case *Kevin Cooper v.*
28   *Woodford*, No. C 04 436 JF, including the February 3, 2004 Declaration of Dr. Mark

                                    - 2 -            DECLARATION OF DR. MARK HEATH

1     Dershwitz and the January 12, 2004 Declaration of Dr. Carl Rosow. I have also reviewed
2     toxicology reports for several executed prisoners from Arizona, Kentucky, North Carolina,
3     and South Carolina. I have reviewed 16 California Code of Regulations Section 2039,
4     which pertains to the euthanasia training for those performing euthanasia on animals, as well
5     as statutes pertaining to euthanasia of animals from the following states: Florida, Georgia,
6     Maine, Maryland, Massachusetts, New Jersey, New York, Oklahoma, Tennessee, Texas,
7     Connecticut, Delaware, Illinois, Kansas, Kentucky, Louisiana, Missouri, Rhode Island and
8     South Carolina. I have also reviewed the American Veterinary Medical Association's 2000
9     Report of the Panel on Euthanasia.

10     **7.** Based upon my review of this material and my knowledge of and
11     experience in the field of anesthesiology, I have formed several conclusions with respect to
12     the California Department of Corrections' ("CDC") plans for carrying out lethal injections.
13     These concerns arise both from the details disclosed in the materials I have reviewed, and
14     from medically relevant, logical inferences drawn from the omission of details in those
15     materials (*e.g.*, details regarding the training of the personnel involved; details of all of the
16     medical equipment used; and details of the precise methods by which the personnel involved
17     use the equipment to carry out an execution by lethal injection).

18     **The Use of Sodium Pentothal**

19     8. A major concern I have based on what I know about California's
20     lethal injection protocol relates to the use of sodium pentothal. Sodium pentothal, which is a
21     brand name for the drug sodium thiopental, is an ultrashort-acting barbiturate with a short
22     shelf life in liquid form. Sodium pentothal is distributed in powder form to increase its shelf
23     life; it must be mixed into a liquid solution by trained personal before it can be injected.

24     9. When anesthesiologists use sodium pentothal, we do so for the
25     purposes of temporarily anesthetizing patients for sufficient time to intubate the trachea and
26     institute mechanical support of ventilation and respiration. Once this has been achieved,
27     additional drugs are administered to maintain a "surgical depth" or "surgical plane" of
28     anesthesia (*i.e.*, a level of anesthesia deep enough to ensure that a surgical patient feels no

DECLARATION OF DR. MARK HEATH

1   pain and is unconscious.)   The medical utility of sodium pentothal derives from its
2   ultrashort-acting properties: if unanticipated obstacles hinder or prevent successful
3   intubation, patients will quickly regain consciousness and is likely to quickly regain
4   consciousness and resume ventilation and respiration on their own.

5         10.   Significantly, the AVMA Panel states that when Potassium Chloride
6   is to be used in as a euthanasia agent, the animals must be under a surgical plane of
7   anesthesia and the personnel performing the euthanasia must be properly trained to assess
8   the depth of anesthesia.   The AVMA panel specifically states that the animal must be in a
9   surgical plane of anesthesia characterized not simply by loss of consciousness, but "loss of
10  reflex muscle response and loss of response to noxious stimuli".   Moreover, the California
11  Code of Regulations require that personnel who perform euthanasia must be properly
12  trained by veterinarians or registered veterinary nurses in the procedure.   No such
13  requirement exists in Procedure 770.   Additionally, the AVMA recommends that sodium
14  pentobarbital be used as an anesthetic, which is much longer lasting and more stable than
15  sodium pentothal.   Therefore, it appears to me that Procedure 770 fails to comport with the
16  AVMA standards set forth for euthanasia of animals.

17        11.   As with most drugs, a person's individual physical characteristics and
18  medical history, including any medications they may have taken, causes the inmate to react
19  differently to the chemicals.   California's failure to account for each inmate's physiological
20  attributes increases the probability that the inmate will not be unconscious when the other
21  chemicals are administered causing the inmate to suffer an excruciatingly painful death.

22        12.   The benefits of sodium pentothal in the operating room engender
23  serious risks in the execution chamber.   Based on the information I have available to me
24  concerning California's execution protocol, a five (5) gram dose of sodium pentothal is
25  apparently administered in a single injection from a single syringe.   The California
26  Department of Corrections website states that 5 grams of sodium pentothal is a lethal dose.
27  I do not dispute this contention.   If the full 5 grams of sodium pentothal is properly
28  administered into the prisoner's bloodstream, it is more than sufficient to cause

-4-       DECLARATION OF DR. MARK HEATH

1  unconsciousness and, eventually, would cause death if no resuscitation efforts were made.

2  However, my research into executions performed in California and other states indicates that

3  executions have occurred where the full dose of sodium pentothal was not fully and properly

4  administered.

5            13.    It should be noted that many of the concerns raised in this affidavit

6  apply regardless of the dose of sodium pentothal that is set forth by the protocol. The level

7  of anesthesia, if any, achieved in the inmate depends on the amount that is successfully

8  administered, and there are many foreseeable situations in which the current protocol may

9  fail in successfully administering the intended dose. To list a few examples, the IV tubing

10  may leak or become disconnected; the guard administering the drug may forget or may not

11  know to pinch the IV tubing to direct the flow of the drug to the inmate; the individual

12  administering the drug may turn the 3-way stopcock in the wrong direction and thereby

13  direct the drug into the IV bag instead of to the inmate; the IV cannula may dislodge and fall

14  out of the inmate's arm or leg (and not be seen under the sheet); the IV cannula may be

15  infiltrated so that the drug enters the inmate's body, but does not enter the vein and is not

16  carried by the circulation to the brain; the drug may be improperly mixed, a risk that is

17  increased if improperly trained and credentialed personnel participate in the mixing or

18  handling of the drug; and, the drug may be diluted or diverted by personnel intending to use

19  it for purposes of substance abuse. Because of the use of pancuronium and the resultant

20  paralysis of the inmate, it is not possible for witnesses to provide the state or the court with

21  meaningful information that can firmly speak to whether or not any particular execution by

22  lethal injection was cruel and inhumane.

23            14.    This risk has been realized in at least one, and possibly three

24  California executions. The most recent execution, of Stephen Anderson, is described in the

25  Rocconi Declaration. The description is not consistent with successful administration in the

26  bloodstream of a bolus of 5 grams of sodium pentothal that the sodium pentothal and may

27  not have had the desired effect of sedating Mr. Anderson sufficiently, for reasons that

28  cannot be identified without further information. The "normal" or "typical" reaction to

1   sodium pentothal administration, as commonly seen in the operating room setting, is that the
2   patient's eyelids will drop and close, they may yawn or draw one or two deep breaths, they
3   may exhale visibly so that the cheeks puff out, and then they become motionless.   The
4   description provided by the Rocconi Declaration, which describes Mr. Anderson's chest and
5   stomach heaving for more than 30 seconds, does not comport with a successful
6   administration of a large dose of sodium pentothal.  The intermittent and irregular heaving
7   of the chest is not compatible with the profound depression of the central nervous system
8   that is the intent of the sodium pentothal administration. The apparent labored respiratory
9   activity strongly suggests that significant central nervous system activity persisted, and
10  indeed is consistent with (although does not prove with certainty) the appearance of a person
11  who was struggling against the development of paralysis induced by pancuronium.

12          15.     The administration of a second dose of pancuronium, as indicated in
13  the execution log of the Bonin execution of February 23, 1996, is a source of great concern.
14  The initial dose of pancuronium would be expected to paralyze an inmate for several hours.
15  Administration of additional pancuronium was presumably performed because of some
16  perceived problem or failure of the first round of drugs.  Was there a concern that the inmate
17  was not anesthetized?  If so, it is difficult to understand why additional pancuronium was
18  administered, because pancuronium is not an anesthetic drug and it would not address this
19  concern. I am aware that the protocols of other states such as Arizona and Georgia contain
20  provide for a backup dose of sodium pentothal, which is not part of the California Protocol.
21  If there was no concern about whether the inmate was conscious, why was any drug
22  administered?  The administration of redundant and inappropriate doses of pancuronium
23  raises enormous concerns about the discipline, logic, medical judgment, and rigor that was
24  applied to the conduct of this execution.

25          16.     The execution of Manuel Babbit also raises grave concerns about
26  whether he was properly sedated.  Although I have not seen any witness accounts of the
27  execution, a review of his execution log shows that his heart rate maintained a steady rate of
28  between 95 and 96 beats per minute a full 7 minutes after the sodium pentothal was

1   administered to him. If the full 5 gram dose of sodium pentothal was properly administered,

2   it is my expectation that there would be significant hemodynamic consequences including a

3   change of heart rate during this time period. Such changes in heart rate occurred with the

4   executions of Keith Daniel Williams, Jaturun Siripongs, and William Bonin in California,

5   according to the logs that I have reviewed. Moreover, the log indicates that he had

6   spasmodic movements of the upper chest after the pancuronium bromide was administered,

7   similar to what was noted during the Stephen Anderson execution, again raising the concern

8   that Mr. Babbit did not properly receive the full 5 grams of sodium pentothal and raises the

9   possibility that he was conscious during the administration of the pancuronium bromide.

10         17.   I have not seen any toxicology or autopsy reports of executed

11   California Prisoners. However, I have reviewed many such reports from prisoners executed

12   in other states.

13         18.   In my review of the toxicology reports completed after several North

14   Carolina executions, I noticed a great variation in the post-mortem barbiturate levels

15   reported. For example, the toxicology report concerning the October 1999 execution of

16   Arthur Boyd reports a post-mortem level of thiopental of 2.6 mg/L. The toxicology report

17   concerning the March 1999 execution of James Rich reports a post-mortem thiopental level

18   of 370 mg/L. The toxicology report concerning the December 2002 execution of Desmond

19   Carter reports only a "trace" post-mortem level of thiopental. 12) This 140-fold variation

20   in post-mortem barbiturate levels amplifies the concern that errors in the administration of

21   sodium thiopental may have occurred during North Carolina executions.

22         19.   I have noticed a similar variation in post-mortem thiopental levels in

23   my review of toxicology reports from South Carolina and Arizona. In both states,

24   approximately a significant number of prisoners executed had post-mortem thiopental levels

25   that, according to Dr. Mark Dershwitz's analysis, raise the concern that they may have been

26   conscious during their executions. It is worth noting that Arizona's lethal injection protocol

27   is quite similar to California's in several respects, including the apparent administration of a

28   5 gram dose of sodium pentothal. At the time that I submitted my affidavit in the Cooper

1    case, the post-mortem thiopental levels of individuals executed in other states were not

2    available.  If the post-mortem thiopental levels are representative of the thiopental levels

3    present during the execution, there is a grave concern that many of these individuals were

4    conscious during their executions. Similarly, in reviewing the autopsy and toxicology

5    reports of Edward Harper, who was executed in Kentucky, based upon his post-mortem

6    thiopental blood levels, there was a serious concern that he was conscious during his

7    execution and therefore experienced excruciating pain before he died, assuming that the

8    post-mortem thiopental levels were representative of the levels present during the execution.

9                        **The Use of Pancuronium Bromide**

10                20.    A major concern about the protocol relates to the use of the drug

11   pancuronium bromide.  Pancuronium paralyzes all voluntary muscles, but does not affect

12   sensation, consciousness, cognition, or the ability to feel pain and suffocation.  According

13   the California Department of Corrections Web site, the levels of sodium pentothal and

14   potassium are to be given in doses sufficient to cause death.  Moreover, according to the

15   execution logs of the California prisoners, the substances are injected into the prisoner one

16   shortly after the other.  For this reason, it is my opinion held to a reasonable degree of

17   medical certainty that there would be no rational place in the protocol for pancuronium as

18   the lethal amount of potassium chloride is administered well before death would result from

19   the pancuronium alone.

20                21.    Pancuronium bromide is a neuromuscular blocking agent.  Its effect is

21   that it renders the muscles unable to contract but it does not affect the brain or the nerves.  It

22   is used in surgery to ensure that there is no movement and that the patient is securely

23   paralyzed so that surgery can be performed without contraction of the muscles.

24   Pancuronium bromide is not administered until the patient is adequately anesthetized.  The

25   anesthetic drugs must first be administered so that the patient is unconscious and does not

26   feel, see, or perceive the procedure.  This can be determined by a trained medical

27   professional, either a physician anesthesiologist or a nurse anesthetist, who provides close

28   and vigilant monitoring of the patient, their vital signs, and various diagnostic indicators of

                                    - 8 -          DECLARATION OF DR. MARK HEATH

1  anesthetic depth. Procedure 770, to the extent disclosed, fails to provide an assurance that
2  anesthetic depth will be properly assessed prior to the administration of pancuronium
3  bromide.

4          22.    If sodium pentothal is not properly administered in a dose sufficient
5  to cause death or at least the loss of consciousness for the duration of the execution
6  procedure, then it is my opinion held to a reasonable degree of medical certainty that the use
7  of pancuronium places the condemned inmate at risk for consciously experiencing paralysis,
8  suffocation and the excruciating pain of the intravenous injection of high dose potassium
9  chloride. Moreover, although there are other cardiotoxins that do not cause such pain, and
10  are used by veterinarians in performing euthanasia, California's protocol specifically
11  requires the use of potassium chloride.

12          23.    Based on the information available to me, it is my opinion held to a
13  reasonable degree of medical certainty that California's lethal injection protocol creates an
14  unacceptable risk that the inmate will not be anesthetized to the point of being unconscious
15  and unaware of pain for the duration of the execution procedure. If the inmate is not first
16  successfully anesthetized, then it is my opinion to a reasonable degree of medical certainty
17  that the pancuronium will paralyze all voluntary muscles and mask external, physical
18  indications of the excruciating pain being experienced by the inmate during the process of
19  suffocating (caused by the pancuronium) and having a cardiac arrest (caused by the
20  potassium chloride).

21          24.    If administered alone, a lethal dose of pancuronium would not
22  immediately cause a condemned inmate to lose consciousness. It would totally immobilize
23  the inmate by paralyzing all voluntary muscles and the diaphragm, causing the inmate to
24  suffocate to death while experiencing an intense, conscious desire to inhale. Ultimately,
25  consciousness would be lost, but it would not be lost as an immediate and direct result of the
26  pancuronium. Rather, the loss of consciousness would be due to suffocation, and would be
27  preceded by the torment and agony caused by suffocation. This period of tortuous
28  suffocation would be expected to last at least minute and would only be relieved by the

- 9 -        DECLARATION OF DR. MARK HEATH

1    onset of suffocation-induced unconsciousness.

2    25.    If taken alone, a lethal dose of potassium chloride would not
3    immediately cause a condemned inmate to lose consciousness. It would first cause
4    excruciating pain as it traveled through the venous system to the heart, and, once it reached
5    the heart, it would cause a painful cardiac arrest that would deprive the brain of oxygen and
6    rather quickly (but not immediately) cause death. If pancuronium were administered prior
7    to the potassium chloride any visible signs of pain or agony caused by the potassium would
8    be completely masked and undetectable to onlookers or witnesses. There is little scientific
9    information regarding the duration of pain a person might experience when injected with
10   potassium chloride. However, according to the execution logs, the time between the
11   beginning of the administration of potassium chloride until when a prisoner is pronounced
12   dead has taken at least two minutes, and in the execution of Jaturun Siripongs, it took 8
13   minutes. During this time, a prisoner who was not properly sedated would experience
14   excruciating pain in his chest and arm.

15   26.    It is my understanding that California's execution protocol requires
16   the presence of media witnesses to the execution, and permits the presence of witness
17   chosen by the inmate and chosen by the victim's surviving family members. It is my
18   opinion based on a reasonable degree of medical certainty that pancuronium, when properly
19   and successfully administered, effectively nullifies the ability of witnesses to discern
20   whether or not the condemned prisoner is experiencing a peaceful or agonizing death.
21   Regardless of the experience of the condemned prisoner, whether he or she is deeply
22   unconscious or experiencing the excruciation of suffocation, paralysis, and potassium
23   injection, he or she will appear to witnesses to be serene and peaceful due to the relaxation
24   and immobilization of the facial and other skeletal muscles. It goes without saying that the
25   administration of pancuronium bromide will render the inmate unable to communicate to his
26   executioners and the assembled the witnesses the fact that he has not been properly sedated
27   and that he is being tortured.

28   27.    Based on my research into issues related to lethal execution, I know

- 10 -                      DECLARATION OF DR. MARK HEATH

1   that there was a time when pancuronium was an acceptable drug for use by veterinarians in
2   the euthanasia of household pets such as dogs and cats; but that the use of pancuronium is
3   now prohibited by many states for precisely the reasons outlined above.   Veterinary
4   standards forbid creating the risk that household pets would die while pancuronium masks
5   the type of excruciating pain human beings are exposed to in California's execution
6   protocol.  The use of pancuronium fails to comport with even the minimum "standard of
7   decency" regarding the euthanasia of household pets.  In my medical opinion, based on a
8   reasonable degree of medical certainty, the use of pancuronium in the lethal injection
9   protocol for executing human beings violates standards of decency designed to prevent the
10   infliction of excruciating pain and suffering on human beings.

11           28.    As stated by the Department of Corrections, and I agree, the doses of
12   sodium pentothal and potassium chloride are lethal doses.  Therefore, it is unnecessary to
13   administer pancuronium bromide in the course of an execution when it is quickly followed
14   by a lethal dose of potassium chloride.  It serves no legitimate purpose and only places a
15   chemical veil on the process that prevents an adequate assessment of whether or not the
16   condemned is suffering in agony, and greatly increases the risks that such agony will ensue.
17   Removal of pancuronium from the protocol would eliminate the risk of conscious paralysis
18   from occurring.  It would also eliminate the risk that an inhumane execution would appear
19   humane to witnesses.

20                   **The Lack of Adequate Administration Protocols**

21           29.    According to Procedure 770, once the IV lines are inserted into the
22   inmate, the execution chamber is closed and the prisoner is alone in the chamber prior to the
23   administration of the sodium pentothal.  Procedure 770 suggests that prison personnel will
24   be in a separate room separated by a window.  The lack of any qualified personnel present in
25   the chamber during the execution makes it virtually impossible to ensure that the sodium
26   pentothal is properly flowing into the inmate and that he is properly sedated prior to the
27   administration of the pancuronium bromide.

28           30.    Moreover, as a result of the prisoner being remote and distant from

                              - 11 -        DECLARATION OF DR. MARK HEATH

1   the executioner during the execution, Procedure 770 employs the use of multiple 72 inch

2   extension sets of tubing.  This unnecessarily increases the risk of leakage and/or pinching of

3   the tubes, and therefore creates a greater risk that the inmate will not be properly sedated.

4   Any reasonable standard of care would require a system to be in place to ensure that the

5   prisoner is properly anesthetized.

6          31.     Procedure 770 provides no specifications regarding the timing of the

7   administration of the drugs, thereby compounding the risks I am describing in this

8   Declaration.  This concern is greatly amplified by the use of an ultrashort-acting barbiturate.

9   This concern is borne out by a review of the execution records from San Quentin.  In each of

10  the executions, the time between administrations varied for no apparent reason.  The lack of

11  a defined schedule for the administration of the three drugs compounds the risk the paralytic

12  agent will be active while the sedative effect of the sodium pentothal wears off.

13         32.     California's lethal injection protocol does not account for procedures

14  designed to ensure the proper preparation of the drugs used.  I have not seen details

15  regarding the credentials, certification, experience, or proficiency of the personnel who will

16  be responsible for the mixing of the sodium pentothal from powder form, or for the drawing

17  up of the drugs into the syringes.  Preparation of drugs, particularly for intravenous use, is a

18  technical task requiring significant training in pharmaceutical concepts and calculations.  It

19  is my opinion based on a reasonable degree of medical certainty, and based on my review of

20  lethal execution procedures in states that have disclosed more detailed information than

21  what I have seen about California's procedures, that there exist many risks associated with

22  drug preparation that, if not properly accounted for, further elevate the risk that an inmate

23  will consciously experience excruciating pain during the lethal injection procedures.

24         33.     The information available to me provides inadequate detail regarding

25  the training, credentials, certification, experience, or proficiency of any prison employee,

26  nurse or paramedic who performs the execution procedure.  The absence of such detail

27  raises critical questions about the degree to which condemned inmates risk suffering

28  excruciating pain during the lethal injection procedure.  It is my opinion based on a

                                    - 12 -

1   reasonable degree of medical certainty that the correct and safe management of intravenous
2   drug and fluid administration requires a significant level of professional acumen, and can
3   not be adequately performed by personnel lacking the requisite training and experience.
4   The great majority of nurses are not trained in the use of ultrashort-acting barbiturates;
5   indeed, this class of drugs is essentially only used by nurses who have significant experience
6   in intensive care units and as nurse anesthetists.   Very few paramedics are trained or
7   experienced in the use of ultrashort-acting barbiturates.  Based on my medical training and
8   experience, and based upon my research of lethal injection procedures and practices,
9   inadequacies in these areas elevate the risk that the lethal injection procedure will cause the
10  condemned to suffer excruciating pain during the execution process.

11          34.     Procedure 770 also dictates that "the lip of the neoprene diaphragm
12  on the "Y" injection site shall be rolled back so that it can easily be removed for insertion of
13  syringe tips instead of a needle".  Although Procedure 770 does not articulate what type of
14  "Y" site equipment is being used so I am unable to specify if this procedure is likely to
15  cause a disruption in the intravenous flow of drugs, I am unaware of any such medically-
16  approved use of this equipment, and would not alter the site myself in such a fashion.
17  Normal medical practice is to insert the needle or needle-less injection device through the
18  diaphragm, thereby assuring a tight and adequate connection. This departure from standard
19  practice is not explained, nor is it clear how this deviation was developed, or why.

20          35.     The altering of established medical procedures without adequate
21  medical review and research, by untrained personnel, causes great concern about the
22  structure of the lethal injection protocol and its medical legitimacy.  There is no indication
23  of how Procedure 770 was developed, who was consulted, what procedures were considered
24  and why.   It may be something the Warden thinks about and develops alone, or in
25  consultation with other corrections personnel, some of whom may or may not have any
26  medical training, or any specialized knowledge of anesthetic literature and practice.
27  Appropriate mechanisms for medical review, and standardization of the implementation and
28  amendment process, are critical features in any medical protocol so that the medical

1  professionals and the public can be assured that proper and humane procedures are in place

2  and being followed. Otherwise, the process is prone to ad hoc administration and error, if

3  not gross negligence, or worse, an alteration of the process so as to inflict as much agony as

4  possible. With lethal injection, such concerns are highly elevated.

5        36.    This    concern    over    medically    deficient    administration    was

6  demonstrated two of the five California executions for which records and other information

7  are available. In the execution of William Bonin, it took the staff assigned anywhere

8  between 18 and 27 minutes to fashion the IV lines (the records are unclear as to this point).

9  This is an unusually long period of time for an experienced and properly trained

10  professional. In the execution of Stephen Anderson on January 29, 2002, one of the persons

11  who attempted to secure an IV was unable to do so without causing significant bleeding and

12  the need to remove his gloves. Again, this indicates that the process is a difficult one and

13  that it is necessary that the persons doing it are properly trained and experienced. As is

14  widely recognized in the medical community, administration of intravenous medications and

15  the management of intravenous systems are complex endeavors. I have also reviewed

16  declaration of Warden Calderon who quite eloquently describe the stresses and challenges

17  of how insertion of IV catheters can become a complex, challenging and stressful endeavor.

18        37.    The procedures listed on the CDC website, unnecessarily, calls for a

19  saline solution to be administered between the pancuronium bromide and the potassium

20  chloride. I do not see a medical purpose for this to be included in the procedure, and

21  question whether it is necessary to achieve the goal of a humane execution. Moreover, it

22  can create a risk of critical errors including medication errors caused by syringe "mix-ups".

23        38.    There are no procedures contained within Procedure 770 for the

24  resuscitation of the inmate once the sodium pentothal is administered. This would foreclose

25  the possibility of legal relief. It would also mean that if something in the process were to go

26  wrong, and the process needed to be aborted or altered, it would be too late to be effective,

27  and a coma may result. Any time up until the potassium chloride is administered, the

28  prisoner could be readily resuscitated given the appropriately trained personnel and routine

DECLARATION OF DR. MARK HEATH

1  resuscitation medication and equipment. If this were to occur after the potassium chloride
2  was administered, a resuscitation would be more challenging but still possible.
3  Resuscitation would therefore require equipment close-by, and properly credentialed
4  personnel, neither of which are specified in Procedure 770.

5  **The Lack of Adequate Procedures for Foreseeable Difficulties**

6  39.    The information available to me about California's lethal injection
7  execution protocol contains no reference to plans for dealing with the foreseeable
8  circumstance wherein peripheral intravenous access cannot be obtained in the arm or leg.
9  Based on my medical training and experience, and based on my research into lethal injection
10 procedures and practices, it is my opinion to a reasonable degree of medical certainty that
11 any reliable, humane lethal injection procedure must account for the foreseeable
12 circumstance of a condemned inmate having physical characteristics that prevent
13 intravenous access from being obtained by a needle piercing the skin and entering a
14 superficial vein suitable for the reliable delivery of drugs. There have been lethal injections
15 in which this problem has arisen from a variety of circumstances.    Some of these
16 circumstances could be due to as obesity, steroidal use, history of intravenous drug use and
17 medical procedures such as chemotherapy, suggesting a need for a lethal injection protocol
18 to contain a medical response so that personnel are not left to guess at the proper procedures
19 to be undertaken. This is a critical failing of Procedure 770, which in general inadequately
20 prepares for difficulties in this highly involved process.

21 40.    In this setting, state lethal injection protocols typically specify the use
22 of a "cut-down" procedure to access a vein adequate for the reliable infusion of the lethal
23 drugs.    No equipment or supplies for performing a cut-down procedure are listed in the
24 California lethal injection protocol, nor is there information regarding the training,
25 experience, expertise, credentials, certification, or proficiency of the personnel who would
26 perform such a "cut down" procedure. In this regard, California's lethal injection protocol is
27 deficient in comparison to those of other states that I have reviewed.    This complicated
28 medical procedure requires equipment and skill that are not accounted for in Procedure 770.

- 15 -                    DECLARATION OF DR. MARK HEATH

1   It has a very high probability of not proceeding properly in the absence of adequately trained

2   and experienced personnel, and without the necessary equipment.  If done improperly, the

3   "cut-down" process can result in very serious complications including severe hemorrhage

4   (bleeding), pneumothorax (collapse of a lung which may cause suffocation), and severe

5   pain.  It is well documented that lethal injection procedures in other states have at times

6   required the use of a central intravenous line.  California has not, to my knowledge, released

7   information about the need for central intravenous access during prior executions, and

8   therefore it is not possible to make any assessment about whether the necessary safeguards

9   have been set in place to ensure that the procedure is reasonably humane.

10          41.    It is my further opinion that to assure a lethal injection without

11  substantial risks of inflicting severe pain and suffering, there must be proper procedures that

12  are clear and consistent: there must be qualified personnel to ensure that anesthesia has been

13  achieved prior the administration of pancuronium bromide and potassium chloride, there

14  must be qualified personnel to select chemicals and dosages, set up and load the syringes,

15  administer "pre-injections," insert the IV catheter, and perform the other tasks required by

16  such procedures; and there must be adequate inspection and testing of the equipment and

17  apparatus by qualified personnel.  The California Department of Correction's written

18  procedures for implementing lethal injection, to the extent that they have been made

19  available, provide for none of the above.

20                                    **Conclusion**

21          42.    Based on my research into methods of lethal injection used by various

22  states and the federal government, and based on my training and experience as a medical

23  doctor specializing in anesthesiology, it is my opinion based on a reasonable degree of

24  medical certainty that, given the apparent absence of a central role for a properly trained

25  medical or veterinary professional in California's execution procedure, the chemicals used,

26  the lack of adequately defined roles and procedures, and the failure to properly account for

27  foreseeable risks, the lethal injection procedure California employs creates medically

28  unacceptable risks of inflicting excruciating pain and suffering on inmates during the lethal

1   injection procedure.

2          43.     In addition, in order to more fully and fairly assess the impact of

3   Procedure 770's failings, it is necessary to obtain all the records and logs used, and all

4   official witness statements from prior executions, as well as the full rules and regulations

5   devised by CDC for lethal injection. This would include identifying the qualifications,

6   experience and training of those persons who apply the IVs and who administer and monitor

7   the injection.

8       I declare under penalty of perjury under the laws of the state of California and the

9   United States of America that the foregoing is true and correct. Executed this 19th day of

10   December, 2004 in New York City, New York.

11

12   Dated: December 19, 2004

13

14                                 Dr. Mark Heath

15

16

17

18

19

20

21

22

23

24

25

26

27

28

         DECLARATION OF DR. MARK HEATH

Curriculum Vitae

1) Date of preparation: December 19, 2004

2) Name: Mark J. S. Heath

Birth date: March 28, 1960
Birthplace: New York, NY
Citizenship: United States, United Kingdom

3) Academic Training:

Harvard University                                   B.A., Biology, 1983

University of North Carolina, Chapel Hill            M.D., 1987

Medical License                                      New York: 177101-1

4) Traineeship:

1987 – 1988   Internship, Internal Medicine, George Washington University Hospital, Washington, DC.

1988 – 1991   Residency, Anesthesiology, Columbia College of Physicians and Surgeons, New York, NY

1991 – 1993   Fellowship, Anesthesiology, Columbia College of Physicians and Surgeons, New York, NY

5) Board Qualification:

Diplomate, American Board of Anesthesiology, October 1991.
Testamur, Examination of Special Competence in Perioperative
     Transesophageal Echocardiography (PTEeXAM), 2001.

6) Military Service: None

7) Professional Organizations:

American Society of Anesthesiologists
International Anesthesia Research Society
Society of Cardiovascular Anesthesiology

8) Academic Appointments:

1993 – 2002   Assistant Professor of Anesthesiology, Columbia University, New York, NY

2002 - present   Assistant Professor of Clinical Anesthesiology, Columbia University, New York, NY

9)      Hospital/Clinical Appointments:

        1993 – present        Assistant Attending Anesthesiologist, Presbyterian
                                        Hospital, New York, NY.

10)     Honors:

        Magna cum laude, Harvard University
        Alpha Omega Alpha, University of North Carolina at Chapel Hill
        First Prize, New York State Society of Anesthesiologists Resident
        Presentations, 1991

11)     Fellowship and Grant Support:

        Foundation for Anesthesia Education and Research, Research Starter
        Grant Award, Principal Investigator, funding 7/92 - 7/93, $15,000.

        Foundation for Anesthesia Education and Research Young Investigator
        Award, Principal Investigator, funding 7/93 - 7/96, $70,000.

        NIH     KO8 "Inducible knockout of the NK1 receptor"
                Principal Investigator, KO8 funding 12/98 - 11/02,
                $431,947 over three years
                (no-cost extension to continue through 11/30/2002)

        NIH     RO1 "Tachykinin regulation of anxiety and stress responses"
                Principal Investigator, funding 9/1/2002 – 8/30/2007
                $1,287,000 over 5 years

12)     Departmental and University Committees:

        Research Allocation Panel (1996 – 2001)
        Institutional Review Board (Alternate Boards 1-2, full member Board 3)
        (2003 - present)

13)     Teaching:

        Lecturer and clinical teacher: Anesthesiology Residency Program,
        Columbia University and Presbyterian Hospital, New York, NY

        Advanced Cardiac Life Support Training

        *Anesthetic considerations of LVAD implantation.*  Recurrent
        lecture at Columbia University LVAD implantation course.

        <u>Invited Lecturer</u>:

        *NK1 receptor functions in pain and neural development*, Cornell
        University December 1994

*Anxiety, stress, and the NK1 receptor*, University of Chicago, Department of Anesthesia and Critical Care, July 2000

*Anesthetic Considerations of LVAD Implantation*, University of Chicago, Department of Anesthesia and Critical Care, July 2000

*NK1 receptor function in stress and anxiety*, St. John's University Department of Medicinal Chemistry, March 2002

*Making a brave mouse (and making a mouse brave)*, Mt.Sinai School of Medicine, May 2002

*Problems with anesthesia during lethal injection procedures*, Geneva, Switzerland. Duke University School of Law Conference, "International Law, Human Rights, and the Death Penalty: Towards an International Understanding of the Fundamental Principles of Just Punishment", July 2002.

*NK1 receptor function in stress and anxiety*, Visiting Professor, NYU School of Medicine, New York, New York. October 2002.

*Anesthetic Depth, Paralysis, and other medical problems with lethal injecton protocols: evidence and concerns*, Federal Capital Habeas Unit Annual Conference, Jacksonville, Florida. May 2004.

*Medical Scrutinyof Lethal Injection Procedures.* National Association for the Advancement of Colored People Capital Defender Conference, Airlie Conference Center, Warrenton, Virginia. July 2004.

*Anesthetic considerations of LVAD implantation.* Recurrent lecture at Columbia University LVAD implantation course.


14)    Grant Review Committees:    None

15)    Publications:

**Original peer reviewed articles**
\*        Santarelli, L., Gobbi, G., Debs, P.C., Sibille, E. L., Blier, P., Hen, R., **Heath, M.J.S.** (2001). Genetic and pharmacological disruption of neurokinin 1 receptor function decreases anxiety-related behaviors and increases serotonergic function. <u>**Proc. Nat. Acad. Sci.**</u>, 98(4), 1912 – 1917.

\*        King, T.E. [δ], **Heath M. J. S**[δ], Debs, P, Davis, MB, Hen, R, Barr, G. (2000). The development of nociceptive responses in neurokinin-1 receptor knockout mice. Neuroreport.;11(3), 587-91   δ authors contributed equally to this work

\*        **Heath, M. J. S.**, Lints, T., Lee, C. J., Dodd, J.  (1995).  Functional expression of the tachykinin $NK_1$ receptor by floor plate cells in the embryonic rat spinal cord and brainstem. <u>**Journal of Physiology**</u> 486.1, 139 -148.

\*        **Heath, M. J. S.**, Womack M. D., MacDermott, A. B. (1994).  Subsance P elevates intracellular calcium in both neurons and glial cells from the dorsal horn of the spinal cord. <u>**Journal of Neurophysiology**</u> 72(3), 1192 - 1197.

McGehee, D. S., **Heath, M. J. S**., Gelber, S., DeVay, P., Role, L.W.  (1995) Nicotine enhancement of fast excitatory synaptic transmission in the CNS by presynaptic receptors. <u>**Science**</u> 269, 1692 - 1696.

Morales D, Madigan J, Cullinane S, Chen J, **Heath, M. J. S**., Oz M, Oliver JA, Landry DW. (1999). Reversal by vasopressin of intractable hypotension in the late phase of hemorrhagic shock. Circulation. Jul 20;100(3):226-9.

LoTurco, J. J., Owens, D. F., **Heath, M. J. S**., Davis, M. B. E., Krigstein, A. R. (1995). GABA and glutamate depolarize cortical progenitor cells and inhibit DNA synthesis. <u>**Neuron**</u> 15, 1287 - 1298.

Kyrozis A., Goldstein P. A., **Heath, M. J. S.**, MacDermott, A. B. (1995).  Calcium entry through a subpopulation of AMPA receptors desensitized neighboring NMDA receptors in rat dorsal horn neurons. <u>**Journal of Physiology**</u> 485.2, 373 - 381.

McGehee, D.S., Aldersberg, M. , Liu, K.-P., Hsuing, S., **Heath, M.J.S.** , Tamir, H.  (1997). Mechanism of extracellular $Ca^{2+}$-receptor stimulated hormone release from sheep thyroid parafollicular cells. <u>**Journal of Physiology**</u>: 502,1, 31 - 44.

Kao, J., Houck, K., Fan, Y., Haehnel, I., Ligutti, S. K., Kayton, M. L., Grikscheit, T., Chabot, J., Nowygrod, R., Greenberg, S., Kuang, W.J., Leung, D. W., Hayward, J. R., Kisiel, W., **Heath, M. J. S.**, Brett, J., Stern, D. (1994).  Characterization of a novel tumor-derived cytokine.  <u>**Journal of Biological Chemistry**</u> 269, 25106 - 25119.

Dodd, J., Jahr, C.E., Hamilton, P.N., **Heath, M.J.S.**, Matthew, W.D., Jessell, T.M.  (1983). Cytochemical and physiological properties of sensory and dorsal horn neurons that transmit cutaneous sensation. <u>**Cold Spring Harbor Symposia of Quantitative Biology**</u> 48, 685 -695.

Pinsky, D.J., Naka, Y., Liao, H., Oz, M. O., Wagner, D. D., Mayadas, T. N., Johnson, R. C., Hynes, R. O., **Heath, M.J.S.**, Lawson, C.A., Stern, D.M. Hypoxia-induced exocytosis of endothelial cell Weibel-Palade bodies. **Journal of  Clinical Investigation** 97(2), 493 - 500.

**Case reports**                  none

**Review, chapters, editorials**

*        **Heath, M. J. S.**, Dickstein,  M. L. (2000).  Perioperative management of the left ventricular assist device recipient. Prog Cardiovasc Dis.;43(1):47-54.

*        Dickstein, M.L., Mets B, **Heath M.J.S.** (2000).  Anesthetic considerations during left ventricular assist device implantation.  Cardiac Assist Devices pp 63 – 74.

*        **Heath, M. J. S.** and Hen, R. (1995). Genetic insights into serotonin function. **Current  Biology** 5.9, 997 -999.

*        **Heath, M.J.S.**, Mathews D. (1990).  Care of the Organ Donor.  **Anesthesiology Report** 3, 344-348.

*        **Heath, M. J. S.,**  Basic physiology and pharmacology of the central synapse. (1998) **Anesthesiology Clinics of North America** 15(3), 473 - 485.

**Abstracts**

Heath, M.J.S., Davis, M., Santarelli L., Hen H. (2002).  Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus.  IARS American-Japan Congress A-15.

Heath, M.J.S., Davis, M., Santarelli L., Hen H. (2002).  Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus.  Anesthesiology 95:A-811.

Heath, M.J.S., Davis, M., Santarelli L., Hen H.  (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212

Heath, M.J.S., Davis, M., Santarelli L., Hen H.  (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212.

Heath, M.J.S., Santarelli L, Hen H. (2001)  The NK1 receptor is necessary for the stress-evoked expression of c-Fos in the paraventricular nucleus of the hypothalamus.  Anesthesia and Analgesia 92; S233.

Heath, M.J.S., Santarelli L, Debs P, Hen H. (2000).  Reduced anxiety and stress responses in mice lacking the NK1 receptor.  Anesthesiology 93: 3A A-755.

**Heath, M.J.S.,** King, T., Debs, P.C., Davis M., Hen R., Barr G. (2000).  NK1 receptor gene disruption alters the development of nociception.  Anesthesia and Analgesia; 90; S315.

**Heath, M.J.S.,** Lee, J.H., Debs, P.C., Davis, M. (1997).   Delineation of spinal cord glial subpopulations expressing the NK1 receptor.  Anesthesiology; 87; 3A; A639.

**Heath, M.J.S.,** MacDermott A.B. (1992).  Substance P elevates intracellular calcium in dorsal horn cells with neuronal and glial properties.  Society for Neuroscience Abstracts; 18; 123.1.

**Heath, M.J.S.,** Lee C.J., Dodd J. (1994).  Ontogeny of NK1 receptor-like immunoreactivity in the rat spinal cord.  Society for Neuroscience Abstracts; 20; 115.16.

**Heath, M.J.S.,** Berman M.F. (1991) Isoflurane modulation of calcium channel currents in spinal cord dorsal horn neurons.  Anesthesiology 75; 3A; A1037.