Steven S. Lubliner (CA SBN 164143)
Law Offices of Steven S. Lubliner
P.O. Box 750639
Petaluma, CA  94975
Phone:  (707) 789-0516
Fax:  (707) 789-0515

Attorney for Plaintiff DONALD J. BEARDSLEE

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DONALD J. BEARDSLEE,

        Plaintiff,

     v.

JEANNE WOODFORD, Director of the
California Department of Corrections; JILL L.
BROWN, Acting Warden, San Quentin State
Prison, San Quentin, CA and DOES 1-50;

        Defendants.

        )
        )
        )
        )
        )
        )
        )
        )
        )
        )
        )
        )
        )
        )

Case No.

**PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAING ORDER;
PRELIMINARY INJUNCTION, AND
ORDER TO SHOW CAUSE;
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF**

**EXECUTION IMMINENT**

**EXPEDITED REVIEW REQUESTED**

**TABLE OF CONTENTS**

PAGE

I.    INTRODUCTION                                                          1

II.   FACTUAL BACKGROUND                                                   2

III.  ARGUMENT                                                             3

A.    DEFENDANT'S CONDUCT IS ACTIONABLE UNDER                              3

      SECTION 1983.

      1.    A Challenge to a Method of Execution is Properly Brought as    3

            a Section 1983 Claim

      2.    42 U.S.C. § 1983 Provides Redress for Violations of the        4

            Eighth Amendment

      3.    This Court has Authority to Grant Injunctive Relief Under      4

            The Circumstances Raised in Mr. Beardslee's Complaint

            a. An Injunction is a Proper Remedy                            5

B.    SUBJECTING MR. BEARDSLEE TO CALIFORNIA'S                             6

      LETHAL INJECTION PROTOCOL VIOLATES HIS

      CONSTITUTIONAL RIGHT AGAINST CRUEL AND

      UNUSUAL PUNISHMENT.

      1.    Procedure 770 Lacks Sufficient Guidance And Qualification      7

            Requirements for Personnel Involved in the Execution Which

            Creates a Substantial Risk of Unnecessary Pain.

      2.    The Chemicals Used in Procedure 770 Create an Unreasonable     12

            Risk  of Cruel and Unusual Suffering.

            a.    Sodium Pentothal Creates a Serious Risk of Inadequate    12

                  Anesthesia

i

PAGE

1)     Toxicology Reports of Executed Prisoners in    14
Arizona, Kentucky, North Carolina and South
Carolina demonstrate that many death row
inmates were conscious during their executions,
thereby suffering the extreme pain caused by
Pancuronium bromide and potassium chloride

    a)     North Carolina toxicology results.    15

    b)     South Carolina toxicology results.    15

    c)     Kentucky toxicology results    16

    d)     Arizona toxicology results    18

b.    Defendants' Use of Pancuronium Bromide    19
Violates Evolving Standards of Decency as Evidenced
by the Consistency of the Legislative Trend Against
Using a Neuromuscular Blocking Agent to Euthanize
Animals, and the American Veterinary Medical
Associations' Prohibition Against Using Neuromuscular
Blocking Agents to Euthanize Animals.

3.    California has Inflicted Excruciating and Unnecessary Pain in    22
Previous Lethal Injection Executions

C.    THE ADMINISTRATION OF PANCURONIUM BROMIDE    24
VIOLATES MR. BEARDSLEE'S FIRST AMENDMENT RIGHT
TO FREE SPEECH.

1.    Introduction    24

2.    Governing Law    24

3.    Plaintiff Is Entitled to a Preliminary Injunction Against the    25
Administration of Pancuronium Bromide at His Execution.

ii

| | | PAGE |
|---|---|---|
| a) There is a Substantial Likelihood that Plaintiff Will Prevail on the Merits. | | 26 |
| 1) The Administration of Pancuronium Bromide Serves No Legitimate Penological Goal. | | 26 |
| 2) Plaintiff Has No Alternate Means of Exercising His Rights. | | 30 |
| 3) Any Impact on the Institution Does Not Justify the Restriction on Plaintiff's First Amendment Rights | | 30 |
| 4) This Is Not a Case Where Consideration of Available Alternatives is Appropriate | | 30 |
| b) Plaintiff Will Suffer Irreparable Injury if the Injunction is not Granted. | | 30 |
| c) The Balance of Hardships Favors Plaintiff | | 31 |
| d) Granting the Preliminary Injunction Will Not Disserve the Public Interest | | 31 |
| 4. Applying the Second "Martin" Test, Plaintiff Is Entitled to a Preliminary Injunction Against the Administration of Pancuronium Bromide at His Execution. | | 31 |
| IV. CONCLUSION | | 32 |

iii

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001).................................................25

*Atkins v. Virginia*, 536 U.S. 304 (2002) ............................................................7, 20

*California First Amendment Coalition v. Woodford*,
   2000 U.S. Dist. LEXIS 22189 (N.D. Cal. July 26, 2000) ...................27, 28, 30, 31

*California First Amendment Coalition v. Woodford*,
   299 F.3d 868 (9th Cir. 2002) .......................................................7, 27, 28, 29

*Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994) ...............................................29

*DeJonge v. Oregon*, 299 U.S. 353 (1937) .........................................................24

*Dennis v. Higgins*, 498 U.S. 439 (1991) .............................................................4

*Edwards v. South Carolina*, 372 U.S. 229 (1963)..............................................24

*Estelle v. Gamble*, 429 U.S. 97 (1976) ...............................................................4

*Farmer v. Brennan*, 511 U.S. 825 (1994).............................................................4

*Fierro v. Gomez*, 77 F.3d 301 (9th Cir. 1996)....................................3, 4, 6, 29

*Fierro v. Gomez*, 865 F.Supp. 1387 (N.D. Cal. 1994) .........................................6

*Furman v. Georgia*, 408 U.S. 238 (1973) .............................................................6

*Gomez v. United States District Court*, 503 U.S. 653 (1991) ..............................6

*In re Kemmler*, 136 U.S. 436 (1890 ....................................................................6

*Lockheed Missile & Space Co. v. Hughes Aircraft co.*,
   887 F.Supp. 1329 (N.D. Cal. 1995)..................................................................5

*Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947)................................6

*Martin v. International al Olympic Comm.*, 740 F.2d 670 (9th Cir. 1984)...............4, 5, 32

*Nelson v. Campbell*, ____U.S. ___, 124 S.Ct. 2117 (2004)..............................3, 4

*Pell v. Procunier*, 417 U.S. 817 (1974).............................................................25

*People v. Beardslee*. 43 Cal.3d 68 (1991) ...........................................................3

*Reed v. Faulkner*, 842 F.2d 960 (7th Cir. 1988)..............................................25

*Regents of the Univ. of California v. ABC, Inc.*, 747 F.2d 511 (9th Cir. 1984) ...................5

*Rich v. Woodford*, 210 F.3d 961 (9th Cir. 2000)............................................25

*Robinson v. California*, 370 U.S. 660 (1962)........................................................6

*Toussaint v. McCarthy*, 801 F.2d 1080 (9th Cir. 1986) ...................................26

iv

*Turner v. Saffley*, 482 U.S. 78 (1987)..........................................................24

*Walker v. Sumner*, 917 F.2d 382 (9th Cir. 1989)...............................................25

*Weems v. United States*, 217 U.S. 349 (1910) .................................................6

*Wilkerson v. Utah*, 99 U.S. 130, 135-36 (1879) ...............................................6

**Statutes**

42 U.S.C. § 1983 ...........................................................................3, 4, 32

Cal. Penal Code § 187 ..........................................................................2

Cal. Penal Code §§ 190.2 .......................................................................2

Conn. Gen.Stat. § 22-344a .....................................................................20

Del.Code Ann., Tit. 3, § 8001 .................................................................20

Fla. Stat. §§ 828.058 and 828.065 ............................................................19

Ga. Code Ann. § 4-11-5.1 ......................................................................19

Ill. Comp. Stat., ch. 70 § 2.09 .................................................................20

K.R.S. section 312.181 (17) ....................................................................20

Kan. Stat. Ann. § 47-1718 .....................................................................20

KAR 16:090 section 5(1) .......................................................................20

La. Rev. Stat. Ann. § 3:2465 ..................................................................20

Mass.Gen.Laws § 140:151A ...................................................................19

Md.Code Ann., Criminal Law, § 10-611 .....................................................19

Me.Rev.Stat. Ann. tit. 17, § 1044 .............................................................19

Missouri, 2 CSR 30-9.020(F)(5) ..............................................................20

N.J.S.A. 4:22-19.3 ..............................................................................19

N.Y.Agric. & Mkts § 374 ......................................................................19

Okla. Stat., Tit. 4, § 501 .......................................................................20

R.I. Gen. Laws § 4-1-34 .......................................................................20

S.C. Code Ann. § 47-3-420 ....................................................................20

Tenn.Code Ann. § 44-17-303 ..............................................................19, 20

Tex. Health & Safety Code, § 821.052 .......................................................20

**Rules**

Federal Rules of Civil Procedure, Rule 65 .....................................................1

Northern District Civil Local Rule 65-1 .......................................................1

v

**Regulations**

15 Cal. Code Regs. § 3084.5 ............................................................................................ 3

16. Cal. Admin. Code § 2039 ......................................................................................... 9

**Constitutional Provisions**

U.S. Constitution, Amendment I ................................................................................ 4, 24

U.S. Const., Amend. VIII ........................................................................................... 4, 6

PLAINTIFF'S MOTION FOR TRO AND PRELIMINARY INJUNCTION

## <u>NOTICE OF APPLICATION AND APPLICATION</u>

Plaintiff Donald Beardslee is scheduled to be executed on January 19, 2005.  Mr. Beardslee, though his counsel of record, seeks temporary and preliminary injunctive relief pending the resolution of this action to prevent defendants Jill L. Brown, Acting Warden of San Quentin, and Jeanne Woodford, Director of the California Department of Corrections, from executing Mr. Beardslee by means of lethal injection as it is currently administered in California.  Mr. Beardslee requests that the Court issue an order to show cause and a briefing schedule so that the hearing on this mater shall occur no later than December 23, or as soon thereafter as the Court may set given the need for expedited resolution of this matter with adequate time for appeal.

This application for a temporary restraining order is made pursuant to Federal Rules of Civil Procedure 65 and Civil Local Rule 65-1, and is brought on the grounds that Mr. Beardslee will sustain irreparable harm if injunctive relief is not immediately granted prohibiting the defendants from conducting Mr. Beardslee's execution in accordance with Procedure No. 770.  Mr. Beardslee is likely to prevail on the merits of the underlying action and the balance of hardships decidedly weighs in his favor.  This application is based on the verified complaint, the following memorandum of points and authorities, exhibits including the declaration of Dr. Mark Heath, as well as such evidence as may be presented to the Court on the hearing of this motion.

Pursuant to Federal Rule of Civil Procedure 65(b), the complaint has been provided to opposing counsel.

## I.   <u>INTRODUCTION</u>

On January 19, 2005, Donald Beardslee, a death row prisoner at San Quentin State Prison, is scheduled to die by lethal injection.  Recently, there has been much additional new evidence, most notably toxicology reports and autopsy reports from prisoners executed using the same chemicals employed in California's lethal injection procedure, which strongly demonstrates that Procedure 770 violates the Eight Amendment's prohibition against cruel and unusual punishment.

The State of California adopted lethal injection as an alternative to lethal gas executions in 1992, after Daniel Vasquez, the former warden of San Quentin, consulted with officials from Texas

1

1  regarding their lethal injection procedure. Warden Vasquez adopted a similar protocol as Texas'

2  even though he witnessed the botched execution of Justin Lee May, who gasped and coughed before

3  his body froze, and was aware of the Texas execution of Billy Wayne White, who, after 45 minutes,

4  and only with White's help, the executioners found a vein: in his scrotum. (Exhibit J-7, Excerpt of

5  Deposition of Daniel Vasquez in *Fierro v. Gomez*). Like Texas, the California lethal injection

6  protocol calls for the use of three drugs: sodium pentothal[1], a barbiturate; pancuronium bromide, a

7  neuromuscular blocking agent; and potassium chloride, which stops the heart. This procedure was

8  adopted without consulting any medical professionals to ensure that this method was humane.

9  As more and more prisoners are executed in California and other states using the same three

10  drug combination, more medical information has become available to demonstrate that lethal

11  injection, as it is carried out in California, cannot satisfy Eighth Amendment scrutiny. Several

12  executions in California, most notably those of William Bonin, Manuel Babbit, Jaturun Siripongs,

13  and Stephen Wayne Anderson, suggest that they were not properly sedated prior to being injected

14  with potassium chloride and they likely suffered an excruciatingly painful death.

15  Furthermore, information contained in toxicology and autopsy reports from prisoners

16  executed by lethal injection in other states shows that there is a significant likelihood that Mr.

17  Beardslee will be conscious during his execution and experience tremendous pain as a result. Mr.

18  Beardslee therefore requests that the Court issue an order enjoining execution by means of lethal

19  injection as it is currently administered in the State of California under Procedure 770.

20  ## II. <u>FACTUAL BACKGROUND</u>

21  In 1983, a jury in San Mateo County found Donald Beardslee guilty of two counts of First

22  Degree Murder (Cal. Penal Code § 187) and that the murders were committed under special

23  circumstances of multiple murder and the intentional killing of a witness. (Cal. Penal Code §§

24  190.2(a)(3); 190.2(a)(10). In 1984, a separate penalty jury sentenced Mr. Beardslee to death on one

25  of the two murder counts. The California Supreme Court, after striking two of the three special

26

27

28
---
[1] Sodium pentothal is the brand name for the drug Sodium Thiopental

2

1  circumstances found by the jury, upheld Mr. Beardslee's conviction and sentence. *People v.*
2  *Beardslee*. 43 Cal.3d 68 (1991).

3        On December 16, 2004, the Superior Court of San Mateo County issued a death warrant under
4  California Penal Code § 1227.  The court set Mr. Beardslee's execution date for January 19, 2005.
5  Mr. Beardslee will not elect a form of execution.  Thus under the procedures of this State, Mr.
6  Beardslee will die by means of lethal injection. Cal. Penal Code § 3604(b).

7        On November 24, 2004, Mr. Beardlsee served a copy of the California Department of
8  Corrections Form 602 Inmate Appeal to the Appeals Coordinator, having waived informal review
9  pursuant to 15 Cal. Code Regs. § 3084.5(a)(3)(D).  The California Department of Corrections denied
10  Mr. Beardslee's Third Level of Review on December 12, 2004.  Mr. Beardslee has therefore properly
11  exhausted his administrative remedies and is entitled to receive a ruling on the merits from this Court.

12  **III.**   **ARGUMENT**

13  **A.**   **DEFENDANT'S CONDUCT IS ACTIONABLE UNDER SECTION 1983**

14      **1.**   **A Challenge to a Method of Execution is Properly Brought as a Section**
15          **1983 Claim**

16        The United States Supreme Court, in *Nelson v. Campbell*, ___U.S. ___, 124
17  S.Ct. 2117 (2004), held that a last-minute challenge to the manner in which lethal injection is to be
18  carried out, specifically the use of a "cut down" procedure, was properly brought under 42 U.S.C. §
19  1983.  The court did not specifically address whether "method-of-execution" claims should be
20  brought under Section 1983.

21        In this Circuit, challenges to a method of execution are properly considered as Section 1983
22  claims.  *Fierro v. Gomez*, 77 F.3d 301, 306 (9th Cir. 1996), *opinion vacated on other grounds*, 519 U.S.
23  918 (1996).  Recently, the Northern District of California, in *Cooper v. Woodford*, No. C 04 436 JF
24  (Oct. 14, 2004) acknowledged that a challenge to lethal injection is properly brought as a Section 1983
25  claim when it dismissed, without prejudice, the challenge so that Mr. Cooper could exhaust his
26  administrative remedies.

27        Mr. Beardslee is not challenging the statutory provision which allows for lethal injection as a

28                          3

method of execution. He is challenging the specific provisions and protocols that address the manner in which lethal injection is used in California. For this reason, under *Nelson* and *Fierro*, Mr. Beardslee's challenge is properly brought as a claim pursuant to 42 U.S.C. § 1983.

### 2. 42 U.S.C. § 1983 Provides Redress for Violations of the Eighth Amendment

A challenge is properly brought under Section 1983 when the States violate the protection of "any rights, privileges, or immunities secured by the Constitution and laws". 42. U.S.C. § 1983. "Any citizen of the United States" may seek an action for damages and injunctive relief under Section 1983. The coverage of Section 1983 must be "liberally and beneficially construed". *Dennis v. Higgins*, 498 U.S. 439, 443 (1991) (quoting *Monell v. New York city Dept. of Social Services*, 436 U.S. 658, 684 (1978). The United States Supreme Court has, therefore, "given full effect to [section 1983's] broad language" by recognized that section 1983 provides a remedy "against all forms of official violation of federally protected rights". *Id.* at 444.

Mr. Beardslee's allegations described below raise violations of rights afforded to him by the First and Eighth Amendments to the United States Constitution, provisions for which section 1983 provides a remedy. *See Farmer v. Brennan*, 511 U.S. 825 (1994); *Estelle v. Gamble*, 429 U.S. 97 (1976).

### 3. This Court has Authority to Grant Injunctive Relief Under the Circumstances Raised in Mr. Beardslee's Complaint

Under Section 1983, a court may grant equitable relief for violations of the federal Constitution. In this Circuit, a party seeking a preliminary injunction must meet one of two tests. Under the first test, a court may issue a preliminary injunction when it finds: (1) a substantial likelihood that plaintiff will prevail on the merits; (2) a substantial threat that the plaintiff will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the plaintiff outweighs the threatened harm the injunction may do to defendant; and (4) that granting the preliminary injunction will not disserve the public interest. *Martin v. International al Olympic Comm.*, 740 F.2d 670-674-75 (9th Cir. 1984) (citing *William Inglis & Sons Baking Co. v. ITT*

4

*Continental Baking Co.*, 526 F.2d 86. 87 (9th Cir. 1975)).  Under the second test, a court may issue a preliminary injunction if the moving party demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions are raised and the balance of hardships tips heavily in the moving party's favor.  *Martin, supra* at 675.  The purpose of a preliminary injunction is to preserve the *status quo* pending the outcome of litigation.  *Regents of the Univ. of California v. ABC, Inc.*, 747 F.2d 511, 514 (9th Cir. 1984).

### a.  An Injunction is a Proper Remedy

The legal standard for issuing a temporary restraining order is the same as the standard for issuing a preliminary injunction.  *See Lockheed Missile & Space Co. v. Hughes Aircraft co.*, 887 F.Supp. 1329, 1323 (N.D. Cal. 1995).  Mr. Beardslee has satisfied the preliminary injunction requirements regarding the unconstitutionality of lethal injection as administered in California.  There is a substantial likelihood that Mr. Beardslee will prevail on the merits of his claim.  Second, Mr. Beardslee will suffer irreparable injury if the injunction is not granted.  Third, the injunction will do no harm to the defendants because they will be free to execute Mr. Beardslee at some future date should they ultimately prevail on the merits of this litigation.  Fourth, the public interest will be served by insuring that the ultimate punishment administered by the State is administered in a manner consistent with constitutional protections.  Mr. Beardslee has raised serious questions regarding the constitutionality of Procedure 770.

Without injunctive relief, a decision finding that California's lethal injection procedure is unconstitutional would come too late to prevent Mr. Beardslee from suffering excruciating and unnecessary pain during the execution process.  If this Court grants injunctive relief yet ultimately resolves the claims against Mr. Beardslee, defendants will be free to reset the execution date.  The preliminary injunction maintains the status quo and permits this Court to determine whether the State of California will subject Mr. Cooper to excruciating and unnecessary pain in the course of the execution.  Under these circumstances, the Court has authority to grant the requested relief.

5

**B.**   <u>**SUBJECTING MR. BEARDSLEE TO CALIFORNIA'S LETHAL INJECTION PROTOCOL VIOLATES HIS CONSTITUTIONAL RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT.**</u>

The Eighth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, *Robinson v. California*, 370 U.S. 660 (1962), protects against cruel and unusual punishment.  U.S. Const., Amend. VIII.  The Eighth Amendment forbids the infliction of unnecessary pain in carrying out a death sentence.  *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947) (Reed, J. opinion); *Fierro v. Gomez*, 865 F.Supp. 1387, 1413 (N.D. Cal. 1994).  "Punishments are cruel when they involve…a lingering death."  *In re Kemmler*, 136 U.S. 436, 447 (1890).  A punishment offends the Constitution if it involves foreseeable infliction of suffering.  *Furman v. Georgia*, 408 U.S. 238, 273 (1973) (citing *Resweber*, *supra* at 463).

The United States Supreme Court, in determining whether a method of execution violates the Eighth Amendment, examines whether the method of execution: (1) comports with contemporary norms and standards of society; (2) offends the dignity of the person and society; (3) inflicts unnecessary physical pain; and (4) inflicts unnecessary psychological suffering.  *See Weems v. United States*, 217 U.S. 349 (1910); *In re Kemmler*, 136 U.S. at 447.  The United States Supreme Court has held that certain methods which were once considered humane have later been declared unconstitutional.  *See Wilkerson v. Utah*, 99 U.S. 130, 135-36 (1879) (citing drawing and quartering, and public dissection as examples of unnecessary cruelty which violated the Eighth Amendment); *In re Kemmler*, 136 U.S. at 446 (noting that burning at the stake, crucifixion and breaking on the wheel are unconstitutional methods of execution).

The Ninth Circuit declared that lethal gas was an unconstitutional method of execution.  *Fierro*, 77 F.3d at 306.  When the gas chamber was first developed in 1937, it was considered as a humane method of execution.  Many years of "history and moral development", however, changed that judgment.  *Gomez v. United States District Court*, 503 U.S. 653, 654-55 (1991) (Stevens, J. dissenting.)  As "the concepts of dignity and civility evolve, so too do the limits of what is considered cruel and unusual."  *Fierro*, 865 F.Supp. at 1409.  Although much of the change in attitude concerning the gas chamber came as a result of the use of cyanide gas in the Holocaust and the

6

1   development of cyanide agents as chemical weapons, *Gomez*, 503 U.S. 653, the change in public

2   opinion mostly came about because of the increased availability of information concerning the

3   application of the gas chamber and the suffering inflicted upon condemned prisoners.  A closer look

4   at California's lethal injection procedures reveal similar constitutional infirmities.

5        The California Department of Corrections lethal injection protocol, as stated in Procedure 770

6   (Exhibit B), violates the Eighth Amendment because it will subject Mr. Beardslee to an unreasonable

7   and unacceptable risk of unnecessary physical and psychological pain, and involves execution

8   procedures that offend contemporary norms and standards of society.  *See generally Atkins v.*

9   *Virginia*, 536 U.S. 304 (2002) and cases cited therein; *California First Amendment Coalition v.*

10  *Woodford*, 299 F.3d 868, 876 (9th Cir. 2002) ("To determine whether lethal injection executions are

11  fairly and humanely administered, or whether they ever can be, citizens must have reliable

12  information about the 'initial procedures' which are invasive, possibly painful and may give rise to

13  serious complication.").

14       **1.     Procedure 770 Lacks Sufficient Guidance And Qualification
            Requirements for Personnel Involved in the Execution Which <u>Creates a</u>**

15       **<u>Substantial Risk of Unnecessary Pain</u>**

16       The risk of inflicting severe and unnecessary pain upon Mr. Beardslee is particularly serious

17  in California because of the vague protocols and procedures contained in Procedure 770.  The

18  protocols fail to include any safeguards to insure that the execution is properly carried out, fail to

19  establish any qualifications for the personnel involved in the lethal injection procedure, and fail to

20  establish any guidelines for these personnel to rely upon during the procedure.  Procedure 770 makes

21  no mention of the following critical information to insure that the execution is carried out in a

22  constitutional manner:

23       • **The minimum qualifications and expertise required for the different personnel
            performing the takes in involved in the lethal injection procedure, beginning with**

24       **the insertion of the catheter;**

25       • **The methods for obtaining, storing, mixing, and appropriately labeling drugs,
            particularly sodium thiopental, which is a controlled substance; the minimum**

26       **qualifications and expertise required for the person who will determine the
            concentration and dosage of each drug to give, and the criteria that shall be used**

27       **in exercising this discretion;**

28

PLAINTIFF'S MOTION FOR TRO AND PRELIMINARY INJUNCTION

- **The manner in which the IV tubing, three-way vale, saline solution and other apparatus shall be modified or fixed in the event it is malfunctioning during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;**

- **The manner in which the prisoners heart shall be monitored and by whom prior to death being pronounced, and any provisions regarding who should attempt to fix any heart monitoring device should their be a malfunction;**

- **The manner in which the prisoner is determined to be properly sedated prior to the injection of the Pancuronium bromide and the minimum qualifications for the person who shall make this determination;**

- **The manner in which the IV catheters shall be inserted into the prisoner, including what size angiocath should be inserted, the minimum qualifications and expertise of the person who shall insert the angiocath and determine which size angiocath is needed, and the criteria that shall be used in exercising this discretion;**

- **The manner by which any other medical procedure or emergency shall be handled during the execution process, including whether a "cut-down" procedure shall be performed, the minimum qualifications and expertise of the person who shall perform such procedures and determine whether the procedures are necessary, and the criteria that shall be sued in exercising this discretion;**

- **The manner by which the lethal injection procedure can be safely halted once it's started for any reason, including a medical emergency which would cause a prisoner to suffer excruciating pain during the execution or a call from the Governor or other judicial personnel ordering a stay of execution, the minimum qualifications and expertise of the person who shall perform the procedures necessary to halt the execution and preserve the prisoner's life.**

Procedure 770 creates the unconstitutional risk of painful and botched executions because it was devised without guidance from medical professionals and fails to provide sufficient criteria for carrying out lethal injections. This is not a speculative risk, as was demonstrated in the difficulties with the executions of William Bonin, Keith Daniel Williams, Manuel Babbit, and Stephen Anderson.

Under California law, the personnel involved in euthanizing animals are provided more guidance and training than those involved in the execution of human prisoners. Only under the following circumstances may an individual other than a veterinarian or registered veterinary technician euthanize an animal with a barbiturate similar to sodium pentothal:

(a) In accordance with section 4827(d) of the Code, an employee of an animal control shelter or humane society and its agencies who is not a veterinarian or registered veterinary

8

technician (RVT) shall be deemed to have received proper training to administer, without the presence of a veterinarian, sodium pentobarbital for euthanasia of sick, injured, homeless or unwanted domestic pets or animals if the person has completed a curriculum of at least eight (8) hours as specified in the publication by the California Animal Control Directors Association and the State Humane Association of California entitled "Euthanasia Training Curriculum" dated October 24, 1997, that includes the following subjects:

> (1) History and reasons for euthanasia

> (2) Humane animal restraint techniques

> (3) Sodium pentobarbital injection methods and procedures

> (4) Verification of death

> (5) Safety training and stress management for personnel

> (6) Record keeping and regulation compliance for sodium pentobarbital

At least five (5) hours of the curriculum shall consist of hands-on training in humane animal restraint techniques and sodium pentobarbital injection procedures.

(b) The training curriculum shall be provided by a veterinarian, an RVT, or an individual who has been certified by the California Animal Control Directors Association and the State Humane Association of California to train persons in the humane use of sodium pentobarbital as specified in their publication entitled "Criteria for Certification of Animal Euthanasia Instructors in the State of California" dated September 1, 1997.

16. Cal. Admin. Code § 2039.  As explained further below, veterinarians use sodium pentobarbital, a longer lasting anesthetic than sodium thiopental, to help ensure that an animal is properly sedated before being euthanized.

Indeed, unlike the personnel mentioned in Procedure 770, veterinarians and those trained by them to perform animal euthanasia have specific requirements and guidance regarding using lethal injection in euthanasia.  The American Veterinary Medical Association [AVMA], in it's 2000 Report of the Panel on Euthanasia, makes the following caution when personnel are using a barbiturate and potassium chloride, the same drug used in Procedure 770, in animal euthanasia

> It is of utmost importance that personnel performing this technique are trained and knowledgeable in anesthetic techniques, and are competent is assessing depth appropriate for administration of potassium chloride intravenously.  Administration of potassium chloride intravenously requires animals to be in a surgical plane of anesthesia characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli.

(Exhibit L-4; "2000 Report of the AVMA Panel on Euthanasia", <u>Journal of American Veterinary Medicine</u>, Vol. 218, No. 5 (March 2001)).  Procedure 770 makes no mention of any protocols to

9

1  determine whether the prisoner is properly anesthetized.

2      Procedure 770 fails to provide any guidance or protocol to regarding the timing of the

3  administration of the drugs.  This creates a grave risk that the prisoner may be conscious during the

4  execution.

5      Procedure 770 fails to account for the individual prisoner's medical history, differing body

6  weights, tolerance to anesthetics, allergic reactions, past exposure to alcohol or addictive drugs, and

7  other factors which may determine the difficulty of inserting an angiocath properly into the prisoner.

8  It also fails to take into account a condemned prisoner's stress or fear during the execution, which

9  may make proper insertion of the angiocath more difficult.  (Exhibit A, ¶ 11:  Declaration of Dr.

10  Mark Heath.)  In fact, Procedure 770 actually creates a risk that the anesthetic will not be properly

11  metabolized by allowing the prisoner to ingest Valium or a similar sedative, which interferes with the

12  ability of sodium pentothal to act as a proper sedative.

13      As Dr. Heath explains in his declaration, the failure to ensure adequate application of the

14  sodium pentothal, regardless of whether sodium pentothal is an appropriate sedative for this

15  procedure given it's short lasting nature, results in a serious risk that Mr. Beardlsee will suffer

16  unnecessary and severe pain as a result.  For example, if Mr. Beardsee is not completely and fully

17  sedated prior to the administration of pancuronium bromide and either is conscious or regains

18  consciousness prior to the potassium chloride taking effect, he will be unable to move or

19  communicate in any way while experiencing excruciating pain.  Potassium chloride, when

20  administered intravenously, causes an excruciating burning sensation in the veins.  Moreover, the

21  pancuronium bromide will cause him to suffocate until his heart stops from the potassium chloride,

22  assuming it is administered properly.  It is for this reason that the AVMA urged that personnel using

23  potassium chloride in euthanasia must be fully qualified to determine whether an animal has reached

24  proper sedation, and provides guidance to determine whether such a level of sedation has been

25  achieved.

26      Procedure 770, inexplicably, calls for a saline flush between the administration of

27  pancuronium bromide and potassium chloride.  According to Dr. Heath, there is no rational medical

28

10

1  explanation for this procedure and, if anything, only increases the risk of improper administration of
2  the lethal injection. (Exhibit A, ¶ 37, Declaration of Dr. Mark Heath).

3      Procedure 770 provides for no monitoring of the flow of the fluids into the prisoner's vein.
4  Proper monitoring requires a clear view of the IV site and often requires a "palpitation" or touch of
5  the site to check for skin temperature and firmness of the surrounding tissue. Infiltration or diversion
6  of the fluid away from the vein could occur without being detectable by the eye. There is no
7  indication that anyone involved in the execution process is trained in this process.

8      Moreover, Procedure 770 explicitly states that after the IV is started, all personnel leave the
9  chamber. (Exh. B-39, Procedure 770.) Monitoring the flow of drugs at this point becomes extremely
10  difficult, if not impossible. The risk of improper flow, blockage or leakage of chemicals is multiplied
11  by the fact that, because the operation of the injection is so far away from the prisoner, extension sets
12  of tubing are needed between the tubes inserted into the prisoner and the tubes inserted to the
13  apparatus that releases the drugs. With all personnel behind closed doors, making sure that the
14  prisoner is properly anesthetized is virtually impossible and creates the unnecessary risk that the
15  prisoner will suffer pain and be conscious during the execution.

16      Procedure 770 also calls for a modification of the neoprene diaphragm on the "Y" injection
17  site for insertion of syringe tips instead of a needle. (Exh. B-36, Procedure 770.) There is no
18  mention that this is a medically approved procedure and further creates the risk of improper flow of
19  chemicals into the prisoner.

20      The process of lethal injection in California is complex and fraught with error. The
21  administration of a complex series of drugs by non-medical personnel has created numerous mistakes
22  in California and other states, including "blow outs" where veins have blown and blood has spattered
23  throughout the chamber, spending more than an hour trying to find a suitable vein, kinks in IV tubing
24  and, as discussed below, the real likelihood that many condemned prisoners were conscious during
25  the execution and suffered excruciating pain, but appeared "calm" because they were paralyzed by
26  the pancuronium bromide.

27

28                          11

2.      **The Chemicals Used in Procedure 770 Create an Unreasonable   Risk  of Cruel and Unusual Suffering.**

The California lethal injection protocol calls for the injection of three drugs in the following sequence:  sodium pentothal, pancuronium bromide, and potassium chloride.  (Exhibit C-2, CDC web site.)  Coupled with the documented problems and inherent risks in administering lethal injections by non-medically trained personnel, the use of these substances carries the risk of an inhumane execution.

a.      **Sodium Pentothal Creates a Serious Risk of Inadequate Anesthesia**

Sodium pentothal is an "ultra short" acting barbiturate.  It is used in Procedure 770 as an anesthetic, whereby death would result from the potassium chloride.  (Exhibit A, ¶¶ 8, 28, Declaration of Dr. Mark Heath.)  Procedure 770 calls for 5 grams of sodium pentothal to be administered as the first of the three drugs.  While 5 grams would be sufficient to keep a prisoner unconscious during the length of the execution if it is administered properly, due to it's short duration of effect, consciousness during the execution will occur if it is not administered properly.  (Exh. A, ¶ 12, Declaration of Dr. Mark Heath.)

In medical practice, sodium pentothal is used only as an "induction" medicine prior to a longer lasting anesthetic.  When properly administered, it renders the person unconscious in a matter of seconds.  (Exh. A, ¶¶ 8-9, Declaration of Dr. Mark Heath.)

Dr. Heath explains that sodium pentothal is often used for the purposes of temporarily anesthetizing a patient prior to intubating a patient's trachea and instituting a mechanical ventilator. Once this is achieved, additional drugs used to maintain a proper "surgical plane" or "surgical depth" are administered.  This is a depth of unconsciousness sufficient to ensure that a patient does not feel any pain and remains unconscious for the duration of the procedure.  The ultra-short acting properties of sodium pentothal are important to the intubation process because, if there are difficulties in intubation, the patient will quickly regain consciousness and resume respiaration on their own. (Exhibit __, Declaration of Dr. Mark Heath).  (Exh. A, ¶¶ 8-9.)

Dr. Heath further explains that, generally,  sodium pentothal would not be used to maintain a

12

1  patient in a surgical plane of anesthesia for any surgical procedure. (*Id*.)  Similarly, the AVMA

2  recommends that sodium pentobarbital be used in euthanizing animals instead of sodium pentothal

3  because it is "potent" and "long acting", and "stable in solution".  (Exhibit L-3, "2000 Report of the

4  AVMA Panel on Euthanasia").

5      Adding to the risk of inadequate anesthesia is the fact that sodium pentothal, unlike sodium

6  pentobarbital, is extremely unstable.  It is a drug that comes in a powder form and must be mixed into

7  a solution before it can be used.  Once mixed, it has an extremely short shelf life and will lose its

8  potency shortly after it is mixed.  (Exh. A, ¶ 8, Declaration of Dr. Mark Heath.  Moreover, if the

9  sodium pentothal comes into contact with pancuronium bromide, the sodium pentothal will

10  crystallize out of solution and become ineffective.  This is why an injection of saline solution is

11  called for in Procedure 770 between the sodium pentothal and pancuronium bromide.  These factors

12  create an additional risk of the prisoner not being properly anesthetized, particularly because no one

13  checks that the prisoner is unconscious before pancuronium bromide is administered.

14      Procedure 770 fails to consider medical conditions such as whether the prisoner is taking any

15  other medications which may interfere with sodium pentothal.  (Exhibit A, ¶ 11, Declaration of Dr.

16  Mark Heath.)  This creates a high probability that the prisoner will be conscious during the execution.

17  Moreover, Procedure 770 allows for the prisoner to ingest Valium prior to the administration of

18  sodium pentothal.  Valium is known to alter the sensitivity of the brain to sodium pentothal, which

19  increases the risk that the prisoner will suffer excruciating pain during the execution process.

20      This risk has been realized in at least one, and possibly three additional California executions.

21  Stephen Anderson was the last person executed in California, and his attorney, Margo Rocconi,

22  witnessed his execution.  She attests, in a declaration, that she witnessed Mr. Anderson's chest heave

23  more than 30 times during the 10 to 15 minutes it took to execute him.  (Exhibit E-2, E-3, Declaration

24  of Margo Rocconi.)  This description strongly indicates that the sodium pentothal did not properly

25  sedate Mr. Anderson.  Similar observations were made during the executions of William Bonin and

26  Jaturun Siripongs.  (Exhibit N-1, Siripongs article.)  Moreover, a review of the execution log of

27  Manuel Babbit suggests that he was not properly anesthetized, as his heart rate maintained a rate of

28  
13

95 beats per minute until it was stopped by the potassium chloride.  (Exh. D-4, Execution Log of Manuel Babbit).

This probably was also the case during the execution of Stephen McCoy in Texas.  McCoy reacted violently to the drugs; his chest heaved, he gasped for air, and appeared to be choking. (Exh.P, Kathy Fair, Witness to an Execution, HOUSTON CHRONICLE, May 27, 1989); (Exh. Q, Matt Bean, Lethal Injection-The Humane Alternative, COURT T.V.ONLINE, available at http://www.courttv.com/news/mcveigh_special/botched_c tv.html).

1)   **Toxicology Reports of Executed Prisoners  in Arizona, Kentucky, North Carolina and South Carolina demonstrate that many death row inmates were conscious during their executions, thereby suffering the extreme pain caused by Pancuronium bromide and potassium chloride**

Although no toxicology or autopsy reports exist for prisoners who have been executed by lethal injection in California, they exist for prisoners executed in many states, and are attached as exhibits.  Dr. Heath has reviewed these reports, and has indicated that there is a strong likelihood that, based upon the extremely low levels of sodium pentothal found in the prisoners blood post-mortem, these individuals were conscious during the administration of potassium chloride and suffered extreme and unnecessary pain as a result.

According to Dr. Dershwitz,  a Professor of Anesthesiology at the University of Massachusetts who submitted a declaration to this Court in *Cooper v. Rimmer*, most people would be rendered unconscious by approximately 13 mcg/ml (mcg/ml is the same as mg/L) of sodium thiopental[2] in their blood, meaning that the two grams of pentothal administered during lethal injections in Kentucky, North Carolina, and South Carolina, and the 5 grams administered in California, is sufficient to render a person unconscious (assuming that the it reaches the person's bloodstream).  (See Exh. R-3, R-23, Declaration of Dr. Dershwitz in *Cooper v. Rimmer* ).  To demonstrate this, Dr. Dershwitz has provided a graph that determines the likelihood of consciousness based upon the concentration of thiopental in the bloodstream.  (See *Id.* Dr. Dershwitz's Exhibit C)

---

[2] Dr. Dershwitz uses the scientific name thiopental instead of the brand name sodium pentothal.

14

1  This graph, however, shows that condemned prisoners in North Carolina South Carolina, and Arizona

2  probably were conscious during their execution, despite the administration of two grams of

3  thiopental.

**a)  North Carolina toxicology results**.

5  By applying Dr. Dershwitz's theoretical model to prisoners executed in North Carolina for

6  whom blood levels of thiopental are available, it becomes quite clear that that at least three inmates

7  had a 100% probability of consciousness during their execution. When North Carolina executed

8  Desmond Keith Carter, the Medical Examiner ascertained that Mr. Carter's blood contained only

9  "trace" amounts of thiopental.  (See Exhibit H-2, Toxicology Report of Desmond Keith Carter).

10  Assigning 2.6 mg/L for "trace amounts" and plotting this value on Dr. Dershwitz's Exhibit C

11  produces a probability of consciousness for Mr. Carter of 100%.  (See Exhibit H-4, Toxicology

12  Report of Desmond Keith Carter's Postmortem Blood Concentration of Thiopental as Plotted on Dr.

13  Dershwitz's Exhibit D).  In the same fashion, plotting the 2.6 mg/L of thiopental found in Mr. Arthur

14  Martin Boyd's blood, (Exhibit H-4, Toxicology Report of Arthur Martin Boyd), likewise, produces a

15  100% probability of consciousness. See (Exhibit H-5, Toxicology Report of Arthur Martin Boyd's

16  Postmortem Blood Concentration of Thiopental as Plotted on Dr. Dershwitz's Exhibit D).  Plotting

17  Michael Earl Sexton's thiopental blood value of 3.7 mg/L, (See Exhibit H-5A, Toxicology Report of

18  Michael Earl Sexton) produces a 100% probability that he was conscious.  (See Exhibit H-5,

19  Toxicology Report of Michael Earl Sexton's Postmortem Blood Concentration of Thiopental as

20  Plotted on Dr. Dershwitz's Exhibit D).  Plotting Ronald Wayne Frye's thiopental blood value of 8.2

21  mg/L, (See Exhibit H-7, Toxicology Report of Ronald Wayne Frye), produces a 40% probability that

22  he was conscious. (See Exhibit 6", Toxicology Report of Ronald Wayne Frye's Postmortem Blood

23  Concentration of Thiopental as Plotted on Dr. Dershwitz's Exhibit C).

**b)  South Carolina toxicology results.**

25  The toxicology results in South Carolina indicate that at least two death row inmates executed

26  in South Carolina had a 100% likelihood of consciousness while many others probably were

27  conscious during their executions. There was a 50% probability that Larry Gilbert (thiopental blood

28  15

1   level 7.1 mg/L ) (Exhibit I-10 , Toxicology Report of Larry Gilbert); Louis Truesdale (thiopental

2   blood level 7.5 mg/L) (Exhibit I-14, Toxicology Report of Louis Truesdale), and Richard Johnson

3   (thiopental blood level 7.8 mg/L) (Exhibit I-17, Toxicology Report of Richard Johnson) were

4   conscious when injected with Pancuronium Bromide and Potassium Chloride.  Michael Passaro,

5   thiopental level 6.1 mg/L (Exhibit I-6, Toxicology Report of Michael Passaro), Ronald Howard,

6   where virtually NO thiopental level was detected in his blood (Exhibit I-21, Toxicology Report of

7   Ronald Howard), and Kevin Dean Young, thiopental level 3.4 mg/L (Exhibit I-2, Toxicology Report

8   of Kevin Dean Young), had a greater likelihood of consciousness during their executions.

9   Plotting Mr. Howard's Sodium Thiopental blood levels onto Dr. Dershwitz's Exhibit C

10   reveals a 100% probability that Mr. Howard was conscious throughout his execution.  (See Exhibit I-

11   20, Toxicology Report of Ronald Howard Postmortem Blood Concentration of Thiopental as Plotted

12   on Dr. Dershwitz's Exhibit D).  Similarly, Mr. Young's thiopental level establishes a 100%

13   probability that he too was conscious throughout his execution.  (See Exhibit I-1 Toxicology Report

14   of Kevin Dean Young Postmortem Blood Concentration of Thiopental as Plotted on Dr. Dershwitz's

15   Exhibit D).  Moreover, there is a 90% probability that Michael Passaro was conscious throughout his

16   execution. (See Exhibit I-5, Toxicology Report of Michael Passaro Postmortem Blood Concentration

17   of Thiopental as Plotted on Dr. Dershwitz's Exhibit D; see also Exhibit I-9 Toxicology Report of

18   Larry Gilbert Postmortem Blood Concentration of Thiopental as Plotted on Dr. Dershwitz's Exhibit

19   C); Exhibit I-13, Toxicology Report of Louis Truesdale Postmortem Blood Concentration of

20   Thiopental as Plotted on Dr. Dershwitz's Exhibit C; Exhibit I-16, Toxicology Report of  Richard

21   Johnson Postmortem Blood Concentration of Thiopental as Plotted on Dr. Dershwitz's Exhibit D).

22   In short, approximately, one quarter of all individuals subjected to lethal injection in South

23   Carolina were conscious while they were suffocating from Pancuronium bromide and suffering the

24   agony of a potassium chloride induced heart attack.

25                                   c)        Kentucky toxicology results

26   Edward Harper was the first person executed by lethal injection in Kentucky. Toxicology

27   reports show that there is between a 67% and a 100% likelihood that Harper was fully conscious

28                                                         16

1    when the Pancuronium bromide and potassium chloride ravaged his organs.

2          After Harper's execution, the Medical Examiner's Office took blood samples from three

3    locations in his body: two locations in the vein, and one in the heart.  (See Exhibit F-21, Toxicology

4    and Autopsy Reports for Edward Harper).  The thiopental level in each blood sample drawn from the

5    vein was 3 mg/L.  (See Exhibit F-12, Toxicology Report of Edward Harper specimen blood-right

6    axilla; Exhibit F-13, Toxicology Report of Edward Harper specimen blood-vena cava.  The thiopental

7    level in the heart was 6.5 mg/L, approximately twice the concentration of the blood.  (See Exhibit F-

8    14, Toxicology Report of Edward Harper specimen blood-heart).

9          Plotting the 6.5 mg/L of thiopental on Dr. Dershwitz's Exhibit D reveals approximately a

10   67% likelihood of consciousness.  (See Exhibit F-17, Toxicology Report of Edward Harper

11   Postmortem Blood Concentration of Thiopental in heart as Plotted on Dr. Dershwitz's Exhibit D).

12   Plotting the 3 mg/L of thiopental on Dr. Dershwitz's Exhibit C reveals a 100% probability of

13   consciousness.  (See Exhibit F-15, Toxicology Report of Edward Harper Postmortem Blood

14   Concentration of Thiopental in right axilla as Plotted on Dr. Dershwitz's Exhibit C; Exhibit F-16,

15   Toxicology Report of Edward Harper Postmortem Blood Concentration of Thiopental in vena cava as

16   Plotted on Dr. Dershwitz's Exhibit C).  Therefore, the most reliable indicator of consciousness,

17   according to Dr. Dershwitz, shows that it is a virtual certainty that Harper was conscious during his

18   execution by lethal injection.  But, no matter how one looks at the varying thiopental concentrations,

19   there is at least a 2/3 likelihood that Harper was conscious when the Pancuronium bromide and

20   potassium chloride ravaged his system.  A 2/3 likelihood of failure is unacceptable in all facets of

21   society and surely is too high to be tolerated under the state and federal constitutions.

22          While these startling numbers demonstrate at least a 67% probability that Harper was

23   conscious during his execution, the numbers alone do not explain why a low level of thiopental was

24   found in Harper's bloodstream.  Comparing the thiopental concentration to the concentration of

25   Pancuronium bromide in Harper's bloodstream, however, sheds light on this issue.  According to the

26   toxicology reports, the Pancuronium bromide concentration in Harper's blood was 18 mg/L in the

27   right axilla, 30 mg/L in the vena cava, and 39 mg/L in the heart.  (See Exhibit F-12, Toxicology

28                                             17

report of Edward Harper Postmortem Blood Concentration of Thiopental in right axilla; Exhibit F-13, Toxicology report of Edward Harper Postmortem Blood Concentration of Thiopental in vena cava; Exhibit F-14, Toxicology report of Edward Harper Postmortem Blood Concentration of Thiopental in heart).   Considering the low thiopental concentrations reported in Harper's toxicology reports and the quantity of Pancuronium bromide administered, these numbers are surprising.   Kentucky, like California, administers 50 mg/L of Pancuronium bromide.   (See Exhibit G-1, Letter from Department of Corrections, dated May 14, 2002).   While these two chemicals are different, the quantity of each drug in the bloodstream should be proportional to the amount administered.   In other words, the concentration of Pancuronium bromide in Harper's body was, depending on what part of the body the blood was drawn from, between approximately 40% and 80% of the quantity administered.   One would expect that the same percentage of thiopental would be in Harper's bloodstream.   But this was not the case.   Instead, the concentration of thiopental in Harper's bloodstream was a miniscule fraction of the concentration administered.   The logical conclusion that can be drawn from this is that the full two grams of thiopental never reached Harper's bloodstream, but a relatively large dose of Pancuronium bromide did reach his bloodstream.   Therefore, it is virtually certain that Harper consciously felt the excruciatingly painful effect of Pancuronium bromide and potassium chloride ravaging his internal organs.   Indeed, Dr. Dershwitz himself, when informed of Mr. Harper's thiopental levels in his post-mortem toxicology reports, called this evidence "potentially troubling", noting that "the blood level should be a lot higher than seven" mg/l.   (Exhibit O-3, "On Death Row, a Battle over the Fatal Cocktail", by Adam Liptak, NEW YORK TIMES, August 16, 2004).

<b>d)      Arizona toxicology results</b>

Twenty people have been executed by lethal injection in Arizona.   Of these prisoners, 7 of them have had toxicology reports stating the level of sodium pentothal found in the bloodstream. (Exhs. U-4, 14, 16, 18, 19, 22, Arizona Toxicology Reports) Of these 7 individuals, using Dr. Dershwitz's Exhibit C, three of them:  Anthony Chaney, John Brewer, and James Clark, had a 100% chance of being conscious during the execution.   Another three, Jimmie Jeffers, Jose Ceja, and Ignacio Ortiz, show approximately a 70% to 80% chance of being conscious during the execution.

18

1   Only one prisoner, Louis Mata, was likely to be unconscious during the entire execution process.

2   The Arizona reports are particularly significant because, according to Dr. Heath, who has reviewed

3   the Arizona lethal injection protocols, Arizona administers 5 grams of sodium pentothal to the

4   condemned prisoner—the same amount as California.

5         These results indicate the high likelihood that Mr. Beardslee will be conscious during the

6   execution.  As Dr. Heath explains, the fact that Kentucky, North Carolina, and South Carolina

7   administer 2 grams of sodium thiopental as opposed to 5 grams would not by itself account for these

8   extremely low levels in the toxicology results.  What they suggest is that prison officials are not

9   properly trained to administer anesthesia in prisoners, and that they will likely suffer an

10  excruciatingly painful death as a result.

11        **b.**   **Defendants' Use of Pancuronium Bromide Violates Evolving**
             **Standards of Decency as Evidenced by the Consistency of the Legislative**

12               **Trend Against Using a Neuromuscular Blocking Agent to Euthanize**
             **Animals, and the American Veterinary Medical Associations' Prohibition**

13               **Against Using Neuromuscular Blocking Agents to Euthanize Animals.**

14  

15        Recent research in, and subsequent legislation regarding animal euthanasia proves that

16  Defendants' use of pancuronium bromide in its execution procedures violates evolving standards of

17  decency.  Specifically, Defendants intend to use paralyzing agents which if used on animals would

18  violate veterinarians' ethical standards, Kentucky law, and the law of eighteen other states.

19        In 1981, states began banning neuromuscular agents as a means of euthanizing animals.

20  Currently, at least nineteen states have passed laws that either expressly or implicitly preclude the use

21  of a sedative in conjunction with a neuromuscular blocking agent. The states that expressly forbid

22  such practice (thiopental in combination with pancuronium bromide) are the following:  Florida, Fla.

23  Stat. §§ 828.058 and 828.065 (enacted in 1984); Georgia, Ga. Code Ann. § 4-11-5.1 (enacted in

24  1990); Maine, Me.Rev.Stat. Ann. tit. 17, § 1044 (enacted in 1987); Maryland, Md.Code Ann.,

25  Criminal Law, § 10-611 (enacted in 2002); Massachusetts, Mass.Gen.Laws § 140:151A (enacted in

26  1985); New Jersey, N.J.S.A. 4:22-19.3 (enacted in 1987); New York, N.Y.Agric. & Mkts § 374

27  (enacted in 1987); Oklahoma, Okla. Stat., Tit. 4, § 501 (enacted in 1981); Tennessee, Tenn.Code

28

Ann. § 44-17-303 (enacted in 2001); and, Texas, Tex. Health & Safety Code, § 821.052(a).  The following states implicitly ban such practices.; see Connecticut, Conn. Gen.Stat. § 22-344a; Delaware, Del.Code Ann., Tit. 3, § 8001; Illinois, 510 Ill. Comp. Stat., ch. 70 § 2.09; Kansas, Kan. Stat. Ann. § 47-1718(a); Kentucky, K.R.S. section 312.181 (17) and KAR 16:090 section 5(1); Louisiana, La. Rev. Stat. Ann. § 3:2465; Missouri, 2 CSR 30-9.020(F)(5); Rhode Island, R.I. Gen. Laws § 4-1-34; and, S.C. Code Ann. § 47-3-420; (see also Exhibit K,  Chart Of State Statutes Banning Pancuronium Bromide In The Euthanasia Of Animals).  Furthermore, in 2000, the leading professional association of veterinarians, the American Veterinary Medical Association, promulgated guidelines for euthanasia which stated that use of a sedative with a neuromuscular blocking agent "is not an acceptable euthanasia agent." (See Exh. L-3, "2000 Report of the American Veterinary Medical Association Panel on Euthanasia")

Given the consistency in the statutory regulations prohibiting the use of neuromuscular blocking agents (including pancuronium bromide) in the euthanasia of animals, and the American Veterinary Medical Associations' express condemnation against such practice, Defendants' use of pancuronium bromide during lethal injections is outside the bounds of evolving standards of decency. *Atkins v. Virginia*, 536 U.S. 304, 315 (2002) ("It is not so much the number of these States that is significant, but the consistency of the direction of change.").  These recent alterations of euthanasia protocol for pets underscore the inhumanity of using pancuronium bromide to execute human beings. A euthanasia practice widely considered unfit for a dog is certainly unfit for humans as well, especially in light of the fact that Defendants recognize that they can easily accomplish the same result using a combination of chemicals that does not include pancuronium bromide.  (See Exhibit S-1, S-2, Declaration of Dr. Carl Rosow submitted by Respondent in *Cooper v. Rimmer*); (Exhibit T-2, Testimony of Dr. Kris Sperry[3] in State v. Nance, Superior Court, Indictment No. 95-B-2461-4).  It can hardly be disputed that if certain euthanasia techniques are banned as overly cruel to animals, those same practices must violate our current standards of decency regarding the execution of

---

[3]    Dr. Kris Sperry testified on behalf of the State of Georgia at an evidentiary hearing concerning the constitutionality of lethal injection on its face.

20

1    humans. Pancuronium bromide is one such banned chemical.

2         The reason for the widespread condemnation of pancuronium bromide as a euthanasia agent

3    for animals can be explained by examining what effect the drug has on humans. As Dr. Heath

4    explains, pancuronium bromide is a neuromuscular blocking agent which operates by attaching to the

5    receptor sites in voluntary muscle tissue to prevent, or "block" nerve signals from interacting with the

6    muscle tissues. (Exhibit A, ¶ 21, Declaration of Dr. Mark Heath). It therefore renders these muscles,

7    which include those lining the chest cavity, unable to contract but it does NOT stop the heart muscle

8    from working. Nor does it affect the brain or nerves. By affecting the muscles in the chest as well as

9    the diaphragm, it causes asphyxiation and suffocation, though by no means quickly. (Exhibit A., ¶ 24,

10   Declaration or Dr. Mark Heath

11        If a person is not properly anesthetized when injected with pancuronium bromide, he will

12   remain conscious while being completely paralyzed. The person will be absolutely unable, therefore,

13   to communicate with anyone about the fact that he is conscious either verbally or with any body

14   movements. This is a particularly egregious risk under Procedure 770, where there is no one making

15   any determination as to whether the prisoner is conscious or not. In fact, as Dr. Heath explains,

16   pancuronium bromide can interfere with an **anesthesiologists** ability to monitor a person's degree of

17   unconsciousness. (Exhibit A, ¶ 21, Declaration of Dr. Mark Heath). Obviously, it completely

18   prohibits a non-trained person from doing so, even if Procedure 770 provided for some protocol to

19   monitor a prisoner's consciousness.

20        In addition to the fact that pancuronium bromide makes it more difficult for an

21   anesthesiologist to determine whether a patient is unconscious and within a proper surgical plane of

22   anesthesia, it creates a "chemical veil" by preventing lay observers, including the press, the prisoner's

23   attorneys, victims family members, prisoner's family members, and all other witnesses at the

24   execution, from seeing if the condemned prisoner is experiencing any pain or suffering. Indeed,

25   without knowing the effect of pancuronium bromide, those witnessing the execution would not know

26   that there is a "veil" preventing them from seeing the prisoner's behavior because it is an invisible

27   chemical, thus creating a veil over the veil itself. (Exhibit A, ¶ 28, Declaration of Dr. Mark Heath.

28                                                    21

1    According to government experts, Pavulon is used to prevent witnesses from observing

2    outwardly aesthetically unpleasant reactions to the chemicals (including twitches, convulsions, and

3    seizures) so that "a witness to an execution could not distinguish between a 'peaceful' or 'agonizing'

4    death based upon reflex movements." See Exh S-2, Declaration of Dr. Carl Rosow submitted by

5    Respondent in *Cooper v. Rimer*);  (Exh. T-2, Testimony of Dr. Kris Sperry in State v. Nance,

6    Superior Court, Indictment No. 95-B-2461-4). As a result, witnesses to a lethal injection and the

7    public in general will never realize that a cruel fraud is being perpetrated upon them - - instead of

8    witnessing an inmate quiet and motionless while being "put to sleep," they witness the cover-up of a

9    deliberate act of excruciating torture during which the inmate may be fully conscious.

10   Because potassium chloride, the third drug administered under Procedure 770, causes a rapid

11   cessation of the heartbeat and relatively quick death thereafter, pancuronium bromide serves no

12   purpose when administered prior to the potassium chloride as it does not result in the prisoner's death

13   under this protocol.  Indeed, the execution logs of the prisoners executed in California make it

14   perfectly clear that death does not result in after the administration of the potassium chloride, given

15   how long it takes for death to be pronounced.  Pancuronium bromide only serves to increase the risk

16   of a prisoner being unable to indicate that he is not properly anesthetized, thus creating an

17   unconstitutional risk that he will be executed inhumanely.

18       **3.    California has Inflicted Excruciating and Unnecessary Pain in Previous**
19            **Lethal Injection Executions**

20   On February 23, 1996, William Bonin became the first person in California to be executed by

21   lethal injection.  It took the execution staff 27 minutes to insert the IV tube, and Warden Calderon,

22   who oversaw the execution, described that the staff had problems finding a vein.  (Exhibit D-1;

23   Execution Log of William Bonin).  The log indicates that that the EKG monitor was not working

24   properly, and that he had irregularities in his heart and breathing.  Also, inexplicably, a second

25   administration of pancuronium bromide was ordered a minute after the first was administered.  Ibid.

26   On May 3, 1996, Keith Daniel Williams was executed by lethal injection.  Again, there were

27   delays caused by problems inserting the IV tubes.  (Exhibit D-2, Execution Log of Keith Daniel

28

22

Williams).

On February, 9, 1999, Jaturun Siripongs was executed by lethal injection. Newspaper reports indicate that Siripongs head tilted back after the pancuronium bromide was administered, and then he twitched several times, gasped for air, and his diaphragm continued to heave intermittently until he was pronounce dead. (Exhibit N-1, Articles from San Francisco Chronicle and San Francisco Examiner).

On May 4, 1999, Manuel Babbit was executed by lethal injection. A minute after the pancuronium bromide was administered, the execution log shows that he had shallow respirations and brief spasmodic movements of his upper abdomen. His heart remained at a steady rate of 95 to 96 beats per minute until the potassium chloride stopped his heart. (Exhibit D-4, Execution Log of Manuel Babbitt). This, as Dr. Heath explains, suggested that Babbit was conscious at this point. (Exhibit A, ¶ 16, Declaration of Dr. Mark Heath).

On January 29, 2002, Stephen Wayne Anderson was executed, the last person executed by lethal injection in California to date. The execution took over a half hour to complete. His attorney, Margo Rocconi, who witnessed the execution, reported that his "chest and stomach heaved more than 30 times" (Exhibit E-2, Declaration of Margo Rocconi). Newspaper accounts of journalists who witnessed the execution reported similarly. (Exh M, Newspaper Articles Regarding Execution of Stephen Anderson). Dr. Heath explains that this suggests that Mr. Anderson was not fully sedated prior to the administration of the pancuronium bromide and was struggling against the paralytic effects of the drug. (Exhibit A,. par. 14, , Declaration of Dr. Mark Heath).

While toxicology reports do not exist for any prisoners executed in California, the reports of the above indications suggest that these prisoners suffered unnecessary and excruciating pain during their executions, in violation of the Eighth Amendment.

**C.**     **THE ADMINISTRATION OF PANCURONIUM BROMIDE VIOLATES MR. BEARDSLEE'S FIRST AMENDMENT RIGHT TO FREE SPEECH.**

**1.**     __Introduction__

The effectiveness of California's lethal injection protocol and protocols similar to it around the country is a current public controversy.  Mr. Beardslee has educated himself about the lethal injection controversy.  Mr. Beardslee is convinced that he will be awake and conscious to experience the burning torture of a lethal injection of potassium chloride.

If Mr. Beardslee's execution goes forward, and in the event that he has not been properly anaesthetized, he wants to be able to communicate that fact and the fact that he is experiencing excruciating pain.  Mr. Beardslee wants to communicate this information so that defendants, the Governor, the Legislature, the public and those acting on behalf of other death row inmates can evaluate whether California's execution protocol violates the Eighth Amendment prohibition against cruel and unusual punishment.  Mr. Beardslee also wants to communicate the information that the execution protocol failed in his particular case so that 1) the public can be educated about the lethal injection procedure's very real possibility for torturing the condemned, and 2) defendants can be alerted to the failure so that they can identify where the system broke down in order to ensure that the mistake is not repeated in future executions.

The administration of pancuronium bromide during the execution procedure will paralyze Mr. Beardslee's voluntary muscles.  Because he will be unable to speak or move, he will be unable to communicate the fact that he has not been properly anaesthetized and that he is experiencing excruciating pain.

**2.  __Governing Law__**

The First Amendment to the United States Constitution prohibits laws "abridging the freedom of speech."  The free speech clause of the First Amendment applies to the states through the Due Process clause of the Fourteenth Amendment.  *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963), *DeJonge v. Oregon*, 299 U.S. 353, 364 (1937).

24

1    "Prison walls do not form a barrier separating prison inmates from the protections of the

2    Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987).  Nonetheless, because of the unique

3    characteristics of the prison setting, restrictions on inmates' constitutional rights are not subject to

4    strict scrutiny.  A restriction on inmates' constitutional rights is valid "if it is reasonably related to

5    legitimate penological interests."  *Id*. at 89.  A court must consider 1) whether there is a valid rational

6    connection between the regulation and the assertedly legitimate penological goal, 2) whether the

7    inmate has alternate means of exercising the right at issue, 3) the impact that exercise of the right has

8    on the institution, and 4) the availability of alternatives to the restriction.  *Id*. at 89-91.  When First

9    Amendment rights are restricted, the legitimacy of the government's stated objective depends on

10   whether the restriction is content neutral.  *Id*. at 90.  A restriction will not be upheld if it is an

11   "exaggerated response" to the otherwise legitimate penological goals.  *Id*. at 87, *Pell v. Procunier*, 417

12   U.S. 817, 827 (1974).

13   Deference to the judgment of prison administrators "does not mean abdication" of judgment.

14   *Walker v. Sumner*, 917 F.2d 382, 385 (9th Cir. 1989).  "[P]rison authorities cannot avoid scrutiny under

15   Turner by reflexive, rote assertions."  *Armstrong v. Davis*, 275 F.3d 849, 874 (9th Cir. 2001), *cert.*

16   *denied*, 537 U.S. 812 (2002). Defendants can not salvage unconstitutional conduct by the "piling of

17   conjecture upon conjecture[.]"  *Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 1988).

18   "Prison authorities cannot rely on general or conclusory assertions to
     support their policies. Rather, they must first identify the specific
19   penological interests involved and then demonstrate both that those
     specific interests are the actual bases for their policies and that the
20   policies are reasonably related to the furtherance of the identified
     interests. An evidentiary showing is required as to each point."  *Id*. at
21   386.

22   Thus, relief should not be denied based on speculative security concerns.  See *Rich v. Woodford*, 210

23   F.3d 961, 963 (9th Cir. 2000) (Reinhardt, J., dissenting) (criticizing "transparent weakness of the state's

24   purported concerns.")

25

26

27

28                                           25

**3.**     **Plaintiff Is Entitled to a Preliminary Injunction Against the Administration of Pancuronium Bromide at His Execution.**

As noted above, a court may issue a preliminary injunction where it finds:  (1) a substantial likelihood that plaintiff will prevail on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant; and (4) that granting the preliminary injunction will not disserve the public interest.  Mr. Beardslee meets this test.

**a)**     **There is a Substantial Likelihood that Plaintiff Will Prevail on the Merits.**

There can be no question that the administration of pancuronium bromide will prevent Mr. Beardslee from communicating that the execution process has not functioned as stated and that he is being tortured.  (Exh. A, para. 26, Declaration of Dr. Mark Heath.)  Defendants will not be able to defend their conduct under the *Turner* factors.

**1)**     **The Administration of Pancuronium Bromide Serves No Legitimate Penological Goal.**

No legitimate penological purpose can be served by paralyzing Mr. Beardslee and preventing him from communicating that the execution process has not functioned as stated and that he is being tortured.  This restriction on Mr. Beardslee's speech is impermissibly content based.  If the execution protocol works properly, Mr. Beardslee will be unconscious for the duration of the execution and, obviously, will have nothing to bring to anyone's attention.  If the protocol does not work properly, Mr. Beardslee will want to communicate that fact but will not be able to.  Clearly, the only purpose that will be served by paralyzing Mr. Beardslee during his execution is to conceal the reality and horror of executions by lethal injection from the public.  This is an illegitimate goal.

Unlike other federal constitutional rights, which must be balanced against security and other concerns when applied to prisoners, violations of the Eighth Amendment can never be justified.  "The Eighth Amendment is not a 'maybe' or 'sometimes' proposition."  *Toussaint v. McCarthy*, 801 F.2d 1080, 1093 (9th Cir. 1986), *cert. denied*, 107 S.Ct. 2462 (1987).  The principle that violations of the

26

1    Eighth Amendment can never be countenanced would be meaningless if prison officials could conceal

2    them by restricting inmates' First Amendment rights.  Defendants cannot justify paralyzing Mr.

3    Beardslee on the execution table on the grounds that they have the right to conceal Eighth Amendment

4    violations or, indeed, any problem in the execution procedure.  Both the Ninth Circuit and this Court

5    have validated these principles in *the First Amendment Coalition* case,  in which the record established

6    that Defendants imposed restrictions on the viewing of the lethal injection process to minimize the risk

7    that the witnesses would see unpleasant things that might make them critical of the process.

8            In *California First Amendment Coalition v. Woodford*, 2000 U.S. Dist. LEXIS 22189 (N.D.

9    Cal. July 26, 2000), after a bench trial, the Honorable Vaughn Walker held that defendants' violated

10   the First Amendment rights of the public and the press by not allowing the witnesses to view the lethal

11   injection process until after the prisoner had been strapped into place and intravenous shunts inserted.

12   Judge Walker held that the witnesses should be allowed to witness the entire proceeding from the time

13   the prisoner was first led into the execution room.  The Ninth Circuit affirmed the judgment.

14   *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002).

15           In ruling against defendants, Judge Walker emphasized that enforcement of the Eighth

16   Amendment cannot exist without the protections of the First Amendment:

17                  "The public's perception of the amount of suffering endured by the
                    condemned and the duration of the execution is necessary in determining
18                  whether a particular execution protocol is acceptable under [the]
                    evolutionary standard.  Courts evaluating the constitutionality of
19                  methods of execution rely in part on eyewitness testimony. . . . This
                    eyewitness testimony is crucial to the review of execution protocols
20                  which the courts frequently undertake. While courts rarely invalidate a
                    state's execution procedure, ongoing challenges and threats of challenge
21                  motivate states to modify their procedures. For example, lethal gas and
                    electrocution have been vigorously challenged in recent years. In
22                  response to these challenges, most states have either moved to the use of
                    lethal injection or make it available as an alternative to gas, electrocution
23                  or hanging. . . . Although lethal injection is generally regarded as the
                    most humane and painless execution method presently available,
24                  technology and society's perceptions may evolve in the future. If there
                    are serious difficulties in administering lethal injections, society may
25                  cease to view it as an acceptable means of execution and support a return
                    to lethal gas or electrocution or push for development of another
26                  execution method. Or a majority of the public may decide that no
                    method of execution is acceptable. Eyewitness testimony is crucial to the
27                  public's evaluation of how this extreme punishment is performed. . . .

28                                              27

1

Demonstrating the need for witnesses at executions is the fact that although there had only been five executions by means of lethal injection in California by the time of trial, the execution record of one of these individuals had inexplicably vanished." *Id*. at **24-26.

2

3   The Ninth Circuit echoed these policy concerns in affirming.

4

"Independent public scrutiny—made possible by the public and media witnesses to an execution—plays a significant role in the proper functioning of capital punishment. . . . To determine whether lethal injection executions are fairly and humanely administered, or whether they ever can be, citizens must have reliable information about the "initial procedures," which are invasive, possibly painful and may give rise to serious complications." *California First Amendment Coalition v. Woodford*, 299 F.3d at 876.

5

6

7

8

9   It further recognized that if First Amendment rights are not protected, defendants will have a monopoly

10  on framing the issues and defining the debate around lethal injection.

11

"An informed public debate is the main purpose for granting a right of access to governmental proceedings.  Prison officials simply do not have the same incentives to describe fully the potential shortcomings of lethal injection executions.  As Warden Calderon's memo demonstrates, a prison official's perception of the execution process may be vastly different—and markedly less critical—than that of the public." *Id*. at 884.

12

13

14

15  A hearer, of course, implies a speaker.  Mr. Beardslee is entitled to communicate to the witnesses—

16  and, by inference, the public at large—that the execution protocol has not functioned as stated and that

17  he is being tortured.  The chemical veil put in place unconstitutionally prevents him from doing so.

18      Evidence from the First Amendment Coalition case counsel in favor of a finding that the

19  administration of pancuronium bromide is intended to mask the horror of a "botched" execution and

20  prevent Mr. Beardslee from communicating that he is being tortured. As Judge Walker found,

21

"In a memorandum written to the Department of Corrections administration, then-Warden Arthur Calderon stated that one reason defendants oppose the same degree of media access for lethal injection executions as in executions by lethal gas is that in the event of a hostile and combative inmate, it will be necessary to use additional force and staff to subdue, escort and secure the inmate to the gurney.  It is important that we are perceived as using only the minimal amount of force necessary to accomplish the task.  In reality, it may take a great deal of force.  This would most certainly be misinterpreted by the media and inmate invited witnesses who don't appreciate the situation we are faced with." *California First Amendment Coalition v. Woodford* at *11.

22

23

24

25

26

27  Judge Walker found that the desire to control the public debate was not a legitimate penological

28

28

1 purpose or security concern. *Id*. at *16. The Ninth Circuit affirmed, upholding Judge Walker's finding

2 that "the procedure was motivated at least in party by a desire to conceal the harsh reality of executions

3 from the public." *California First Amendment Coalition v. Woodford*, 299 F.3d at 880. In light of this

4 finding, any attempt by defendants to justify the administration of pancuronium bromide as anything

5 other than a "chemical veil" over the proceedings must be viewed with skepticism.

6      Defendants cannot justify its use on the grounds that it will play a critical role in causing Mr.

7 Beardslee's death. Procedure 770 does not state any such thing. Potassium chloride, which is

8 administered last and stops the heart, is, clearly and logically, the substance that causes death. (Exhibit

9 A, ¶ 20, Declaration of Dr. Mark Heath).

10      The fact that pancuronium bromide prevents the condemned person from breathing and might

11 by itself prove fatal does not require a contrary conclusion. The Ninth Circuit has twice stated its

12 views that death by prolonged asphyxiation lasting over a minute is cruel and unusual punishment. In

13 *Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994), the Court rejected an Eighth Amendment challenge to

14 Washington's hanging protocol. The Court identified "the risks of death by asphyxiation and

15 decapitation" as implicating Eighth Amendment concerns. *Id*. at 683. The evidence at the district

16 court had shown that if the hanging did not result in trauma to the neck structures and spinal cord,

17 resulting in rapid unconsciousness, the hanged man would be asphyxiated and would be conscious for

18 one to two minutes. *Id*. at 684. The Court upheld the district court's finding that Washington's

19 hanging protocol did not violate the Eighth Amendment because the protocol had minimized the risk

20 of asphyxiation as much as possible. Id. at 687 & n. 17. In *Fierro v. Gomez*, 77 F.3d at 308, the Ninth

21 Circuit, stating that "Campbell had suggested that asphyxiation would be an impermissibly cruel

22 method of execution[,]" held that execution by lethal gas was cruel and unusual punishment because

23 the condemned person would be conscious for one to several minutes while he suffocated. In light of

24 these cases, pancuronium bromide's role in the execution process cannot be used to justify the

25 infringement on Mr. Beardslee's First Amendment rights.

26      Finally, defendants cannot justify the infringement on Mr. Beardslee's rights in the name of

27 security. Any such justification would be a fabrication because nothing in the protocol suggests that

28                    29

1  the substance is administered with security in mind.

2          **2)      Plaintiff Has No Alternate Means of
            Exercising His Rights.**

3

4          Mr. Beardslee easily satisfies this prong of *Turner*.  The only chance Mr. Beardslee will have to

5  communicate about the conduct of his execution is during it; afterwards, he will be dead.  As Judge

6  Walker recognized, "The condemned inmate, the only non-government witness to any Eighth and

7  Fourteenth Amendment violations that might occur prior to the observation permitted by Procedure

8  770, cannot communicate with the media or the public at the conclusion of his execution."  *California*

9  *First Amendment Coalition v. Woodford*, *supra*, at **22-23.

10         **3)      Any Impact on the Institution Does Not
            Justify the Restriction on Plaintiff's
            First Amendment Rights**

11

12         The only impact on the prison that removing pancuronium bromide from the execution protocol

13 will have is that the execution team will have one less substance to procure and three fewer syringes to

14 prepare.

15         **4)      This Is Not a Case Where Consideration
            of Available Alternatives is Appropriate**

16

17         It remains to be seen what pretextual justifications (not in the protocol) defendants come up

18 with to justify the administration of pancuronium bromide.  The absence of evidence in the protocol,

19 combined with defendants admissions in the First Amendment Coalition case, lead inescapably to the

20 conclusion that the substance is administered to prevent the condemned person from communicating

21 that he is being tortured.  Because this restriction on Mr. Beardslee's First Amendment rights is not

22 related to a legitimate penological goal, there is no point in inquiring whether or not defendants could

23 achieve their goal in a less burdensome manner.

24         **b)      Plaintiff Will Suffer Irreparable Injury if the
            Injunction is not Granted.**

25         Mr. Beardslee is adamant in his belief that he will not be properly sedated before the potassium

26 chloride is administered.  If this Court refuses to enjoin his execution as violative of the Eighth

27

28                                      30

1  Amendment, Mr. Beardslee wants to have his execution play a meaningful role in shaping public

2  debate on the lethal injection procedure.  That cannot happen if he is paralyzed and unable to

3  communicate that he has not been rendered unconscious should that come to pass.

4       Mr. Beardslee will only be executed once.  The only chance that he will have to communicate

5  that the execution protocol has not functioned as stated is during his execution.  If he does not do it

6  then, his First Amendment rights will be forever lost.

7                **c)**     **The Balance of Hardships Favors Plaintiff**

8       Mr. Beardslee is not here challenging the propriety of his death sentence.  He is seeking to

9  exercise his First Amendment rights during the execution to communicate as needed to shape public

10  debate about the constitutionality and humanity of lethal injection.  He is bringing his challenge

11  pursuant to principles that this Court and the Ninth Circuit have validated.  If the execution proceeds

12  without the merits being fully joined, Mr. Beardslee will suffer irreparable injury.

13       Defendants will not suffer any cognizable hardship if the preliminary injunction is granted.

14  While the execution will be delayed, it was within Defendants' power to have the execution proceed as

15  scheduled by consenting to withhold pancuronium bromide when Mr. Beardslee exhausted his

16  administrative remedies.  The balance of hardships clearly favors Mr. Beardslee**.**

17                **d)**     **Granting the Preliminary Injunction Will Not Disserve the Public**

18                    **Interest**.

19       *California First Amendment Coalition v. Woodford* recognized that detecting Eighth

20  Amendment violations requires the protection of First Amendment rights.  Therefore, granting the

21  preliminary injunction to litigate the propriety of Defendants placing a chemical veil over the

22  execution proceedings **serves** the public interest.  Because Mr. Beardslee's First Amendment claim

23  does not challenge the legality or finality of the State's judgment but only the means by which it is

24  carried out, the usual concern with undue delay is not present here.

25          **4.**     **Applying the Second "Martin" Test, Plaintiff Is Entitled to a Preliminary**

26                 **Injunction Against the Administration of Pancuronium Bromide at His**
               **Execution.**

27       A court may issue a preliminary injunction if the moving party demonstrates either:  (1) a

28

31

1 combination of probable success on the merits and the possibility of irreparable injury; or (2) that

2 serious questions are raised and the balance of hardships tips heavily in the moving party's favor.

3 *Martin v. International Olympic Committee*, 740 F.2d 670, 675 (9th Cir. 1984).

4 Mr. Beardslee has already shown probable success on the merits, irreparable injury and

5 that the balance of hardships weighs in his favor. The "serious question" prong is easily satisfied.

6 There are few more serious questions today than those involving capital punishment. The idea that a

7 state would mask potential problems with its execution protocol by injecting a condemned man with a

8 paralyzing chemical so that he could not complain if anything went wrong should strike even ardent

9 death penalty supporters as an extremely serious matter.

10 For the foregoing reasons, this Court should issue an order preliminarily enjoining Defendants

11 from violating Mr. Beardslee's First Amendment rights by administering pancuronium bromide during

12 the execution process.

13 **IV      CONCLUSION**

14 Donald Beardslee, through this action, is not seeking to overturn his conviction and sentence.

15 He is demanding the protection of his civil rights to which he is entitled to under the Constitution. To

16 avoid the risk that Mr. Beardlsee's execution will result in unnecessary pain and suffering in violation

17 of the Eighth Amendment to the Constitution, as well as his rights under the First Amendment, he is

18 entitled to redress under 42 U.S.C. § 1983.

19 According, Mr. Beardslee requests that the Court issue a temporary, preliminary and permanent

20 injunction preventing defendants from executing him by means of lethal injection under the method

21 and procedures currently in effect in the State of California.

22 DATED: December 20, 2004

23 Respectfully submitted:

24

25

26 s/Steven S. Lubliner
Steven S. Lubliner

27 Attorney for Donald Beardslee

28

32

# PROOF OF SERVICE

I, Steven S. Lubliner, certify and declare under penalty of perjury that I: am a citizen of the United States; am over the age of 18 years; am in practice at the address indicated; am a member of the State Bar of California, the Bar of this Court and the Bar of the Northern District of California; am not a party to or interested in the cause entitled upon the document to which this Proof of Service is affixed; and that I served a true and correct copy of the following document(s) in the manner indicated below:

PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER; PRELIMINARY INJUNCTION, AND ORDER TO SHOW CAUSE; MEMORANDUM OF AUTHORITIES IN SUPPORT THEREOF.

EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER; PRELIMINARY INJUNCTION, AND ORDER TO SHOW CAUSE

[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER; PRELIMINARY INJUNCTION, AND ORDER TO SHOW CAUSE

( )   by today depositing, at Petaluma, California, the said document(s) in the United States mail in a sealed envelope, with first-class postage thereon fully prepaid (and/or):

(x)   by today personally delivering the said document(s) to the person(s) indicated below in a manner provided by law, by leaving the said document(s) at the office(s) or usual place(s) of business, during usual business hours, of the said person(s) with a clerk or other person who was apparently in charge thereof and at least 18 years of age, whom I informed of the contents.

Dane R. Gillette
Senior Assistant Attorney General
Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-3664

Executed in Petaluma, California on December 20, 2004

S/Steven S. Lubliner _____