Steven S. Lubliner (CA SBN 164143)
Law Offices of Steven S. Lubliner
P.O. Box 750639
Petaluma, CA  94975
Phone:  (707) 789-0516
Fax:  (707) 789-0515

Attorney for Plaintiff DONALD J. BEARDSLEE

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DONALD J. BEARDSLEE, | ) Case No. C 04-5381 (JF) |
| Plaintiff, | ) |
| | ) **PLAINTIFF'S REPLY BRIEF IN** |
| v. | ) **SUPPORT OF MOTION FOR** |
| | ) **TEMPORARY RESTRAINING ORDER;** |
| | ) **PRELIMINARY INJUNCTION, AND** |
| JEANNE WOODFORD, Director of the | ) **ORDER TO SHOW CAUSE** |
| California Department of Corrections; JILL L. | ) |
| BROWN, Acting Warden, San Quentin State | ) **Hearing Date:  January 6, 2005** |
| Prison, San Quentin, CA and DOES 1-50; | ) **Time:  10:30 a.m.** |
| | ) **Courtroom:  3** |
| Defendants. | ) |
| | ) **EXECUTION DATE SET** |
| | ) |
| | ) |
| | ) |
| | ) |

PLAINTIFF'S MOTION FOR TRO AND PRELIMINARY INJUNCTION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**PAGE**

I.   PLAINTIFF IS ENTITLED TO PRELIMINARY RELIEF TO PURSUE

HIS EIGHTH AMENDMENT CLAIM ON THE MERITS          1

   A.  Plaintiff Has Not Unduly Delayed In Filing This Action.          1

   B.  Plaintiff's Eighth Amendment Claim is Properly Brought in

       This Proceeding.          3

   C.  Neither *Cooper* Nor Any Of The Cases Cited Therein Control

       This Case.          4

   D.  Plaintiff's Evidence Entitles Him to Preliminary Relief.          9

II.  PLAINTIFF IS ENTITLED TO PRELIMINARY RELIEF TO PURSUE

HIS FIRST AMENDMENT CLAIM ON THE MERITS          12

III. CONCLUSION          15

i

1

## TABLE OF AUTHORITIES

2

**Cases**

3    *Atkins v. Virginia*, 536 U.S. 304 (2002) ............................................................. 2

4    *California First Amendment Coalition v. Woodford*,

5         2000 U.S. Dist. LEXIS 22189 (N.D. Cal. July 26, 2000) .............................. 12, 14, 15

6    *California First Amendment Coalition v. Woodford*,

         299 F.3d 868 (9th Cir. 2002) ........................................................................ 12, 14, 15

7    *Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994) ................................................ 4, 8, 9

8    *Ching v. United States*, 298 F.3d 174 (2nd Cir. 2002) ...................................... 4

9    *Cooper v. Rimmer*, 2004 U.S. Dis. LEXIS 1624 (N.D. Cal. February 6, 2004) ......... 1, 7, 9

10   *Cooper v. Rimmer*, 379 F.3d 1029 (9th Cir. 2004)............................................ 4, 5, 9

11   *Estelle v. Gamble*, 429 U.S. 97 (1976) ............................................................. 2

12   *Fierro v. Gomez*, 77 F.3d 301 (9th Cir. 1996)................................................... 3, 8

     *Fierro v. Terhune*, 147 F.3d 1159 (9th Cir. 1998) ............................................ 1

13   *LaGrand v. Stewart*, 133 F.3d 1253 (9th Cir. 1998) ........................................ 5, 6, 7

14   *Penry v. Lynaugh*, 492 U.S. 302 (1989) .......................................................... 2

15   *People v. Holt*, 15 Cal. 4th 619 (1997)............................................................. 6

16   *People v. Snow*, 30 Cal. 4th 43 (2003) ............................................................ 6

17   *Poland v. Stewart*, 117 F.3d 1094 (9th Cir. 1997) ........................................... 5, 6, 7

18   *Reid v. Johnson*, 333 F. Supp. 2d 543 (D. Va. 2004) ...................................... 10

19   *Rich v. Woodford*, 210 F.3d 961 (9th Cir. 2000)............................................. 10

20   *Sims v. State*, 754 So.2d 657 (Fla. 2000)......................................................... 5, 8

     *State v. Webb*, 252 Conn. 128 (2000).............................................................. 5, 6, 7, 8

21   *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998) ........................................ 4

22   *Turner v. Saffley*, 482 U.S. 78 (1987)............................................................... 12, 14

23   **Statutes**

24   28 U.S.C. § 2244 ............................................................................................... 4

25   28 U.S.C. § 2255 ............................................................................................... 4

     42 U.S.C. § 1983 ............................................................................................... 3

26   California Penal Code § 3604............................................................................. 2

27

28

1

**Rules**

Federal Rules of Civil Procedure, Rule 23 ...........................................................................3

**Regulations**

15 Cal. Code Regs. § 3084.3 ...............................................................................................1

iii

1

2   I.      **PLAINTIFF IS ENTITLED TO PRELIMINARY RELIEF TO PURSUE HIS**

3           **EIGHTH AMENDMENT CLAIM ON THE MERITS**

4

5           A. **Plaintiff Has Not Unduly Delayed In Filing This Action.**

6           Notwithstanding the fact that Plaintiff exhausted his administrative remedies and sought

7   to have this motion heard on December 23, 2004, Defendants argue that Plaintiff has unduly delayed in

8   bringing this lawsuit.  The point is meritless.  Unlike Kevin Cooper, Plaintiff did not file his action just

9   eight days before his scheduled execution.  Indeed, rather than wait until the last minute, Plaintiff filed

10  it—fully exhausted—while he still had a viable avenue of relief pending, the Ninth Circuit having

11  granted a motion to expand the certificate of appealability in Plaintiff's federal habeas case.[1]

12          Plaintiff acknowledges that this Court found that Kevin Cooper could have brought an

13  Eighth Amendment challenge to California's lethal injection procedure years earlier than he did.

14

15  *Cooper v. Rimmer* 2004 U.S. Dist. LEXIS 1624 (N.D.Cal. February 6, 2004) ("*Cooper I*")  Plaintiff

16  respectfully urges this Court to reconsider its view of the matter.  First, this Court, in *Cooper v.*

17  *Woodford*, No. C 04 436 JF (October 14, 2004) held that Petitioner was required to exhaust

18  administrative remedies, which Plaintiff has done.  It is unclear whether Plaintiff could have done so

19  earlier as the Department of Corrections does not permit challenges to "anticipated action[s]."  15 CCR

20  § 3084.3(c)(3).  This would logically restrict Plaintiff from filing any administrative challenge before

21  his appeals had been exhausted and the state was able to move forward with setting an execution date.

22

23          Furthermore, under *Fierro v. Terhune,* 147 F.3d 1158 (9th Cir. 1998), a plaintiff lacks

24  standing to challenge a method of execution under 42 U.S.C. § 1983 until after an execution date is set

25

26  _____

27  [1] The panel requested briefing on the merits and heard oral argument in Pasadena on December 28, 2004.

28                                                    1
    PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR TRO AND
    PRELIMINARY INJUNCTION

1    and he is given the opportunity to choose his execution method under California Penal Code § 3604(b).

2    It would not have made sense for Plaintiff (or Cooper) to bring this litigation years ago.

3    Penal Code § 3604(a) provides in pertinent part that the inmate's death shall be caused "by an

4    intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, by

5    standards established under the direction of the Department of Corrections."  The Department's

6    standards, of course, can change over time.  Plaintiff's challenge is being brought under the June 2003

7    revision of Procedure 770, *which is not made available to death row inmates*.  It makes no sense to

8    require an inmate to bring suit until he has a sense of how the state is going to put him to death.[2]

9

10    Because William Bonin, the first man to die by lethal injection, was not executed until

11    February 1996, Plaintiff could not have made as strong a showing on the merits years ago as he can

12    today with the data he has gathered from intervening executions.  Indeed, this Court in *Cooper* cited a

13    number of cases where lethal injection challenges were rejected because the plaintiff did not present

14    evidence of problems that had occurred in executions conducted by the state that sentenced him.  As

15    Dr. Heath states, much of Plaintiff's evidence was not available at the time *Cooper* was being litigated,

16    and much of it was unavailable to Plaintiff until just weeks ago.  Additionally, given that the Eighth

17    Amendment inquiry focuses in part on "evolving standards of decency[,]" *Estelle v. Gamble*, 429 U.S.

18    97, 102 (1976), there is no reason to require a condemned man to bring an Eighth Amendment

19    challenge as soon as he is sentenced.[3]  *See, e.g., Atkins v. Virginia*, 536 U.S. 304 (2002) (reversing

20    prior holding in *Penry v. Lynaugh*, 492 U.S. 302 (1989) to hold that the Eighth Amendment forbids

21    execution of the mentally retarded because of the developments over 13 years regarding the national

22

23

24    [2] It is arguably no more than a "sense" given how much critical information is omitted from Procedure
      770, information that Defendants have refused to turn over without a court order.

25    [3] Plaintiff doubts that Defendants would agree to litigate such claims over and over early in the capital
      appeals process, risking an adverse finding in the process.  Defendants would surely argue that such

26    claims are not ripe for decision.  *Cf.  Campbell v. Wood*, 18 F.3d 662, 680-81 (9th Cir. 1994)
      (Washington defendants unsuccessfully argued that Eighth Amendment habeas challenge to default

27    execution method of hanging was not ripe because inmate ultimately could choose lethal gas).

2

28    PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR TRO AND
      PRELIMINARY INJUNCTION

consensus of executing retarded prisoners). Were in inmate to lose such a claim early on, nothing would stop him from bringing it again when his execution loomed in light of intervening changes in societal attitudes.

Looked at another way, it is inconceivable that this Court would certify this litigation as a class action for injunctive relief under Federal Rule of Civil Procedure 23(b)(2) with Plaintiff as the class representative. The class would necessarily include inmates who might not be executed for 20 years. Their executions could be conducted under a different protocol with different chemicals and in a societal environment that might have evolved in their favor. An adverse judgment now almost certainly would have no preclusive effect. Similarly, had William Bonin filed an action in the early 1990s seeking to represent a class that included Plaintiff, the suit could not have proceeded for the same reasons. If Plaintiff could not have been bound by an Eighth Amendment class action filed in the mid-1990s, there is no reason to say he should have pursued such a claim on his own at that time.

Defendants evince no concern for the resources of this Court. This Court dismissed Kevin Cooper's claims so that he could exhaust administratively. Plaintiff assumes that since Cooper still has potentially meritorious DNA claims for substantive relief pending, this Court is not anxious to have Cooper's lethal injection case—or hundreds of others—on its docket any time soon. This Court should hold that the timing of this lawsuit does not weigh against the granting of an injunction.

**B. Plaintiff's Eighth Amendment Claim is Properly Brought in This Proceeding.**

In this Circuit, challenges to a method of execution are properly considered as section 1983 claims. *Fierro v. Gomez*, 77 F.3d 301, 306 (9th Cir. 1996), *opinion vacated on other grounds*, 519 U.S. 918 (1996). As this Court recognized in *Cooper I*, it is bound by the determination in *Fierro* in the absence of Supreme Court authority to the contrary, which Defendants concede is lacking.

Defendants argue that since Plaintiff, taking the shotgun approach that the harsh rules

3

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR TRO AND
PRELIMINARY INJUNCTION

against successor petitions require, attempted to preserve an Eighth Amendment claim that could not be supported at the time it was pleaded that the section 1983 action is barred.  Defendants do not raise this point with respect to Plaintiff's First Amendment claim.  Defendants are wrong with respect to Plaintiff's Eighth Amendment claim.

Arguing 28 U.S.C. § 2244(b) only shows why this claim is properly brought as a section 1983 action.  Section 2244(b) authorizes successor petitions based on newly discovered evidence only if the evidence goes to guilt or innocence.  Obviously, that is not at issue here.  Further, Judge Armstrong did not rule on Plaintiff's lethal injection claim.  In *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), the U.S. Supreme Court held that a claim is not barred by 2244(b) as successive when it was dismissed without prejudice in the first petition; in the context of section 2255 motions, the Second Circuit held that a claim is not barred as successive when it was not litigated to conclusion. *Ching v. United States*, 298 F.3d 174 (2nd Cir. 2002).  There is no bar to proceeding.

### C.  Neither *Cooper* Nor Any Of The Cases Cited Therein Control This Case.

Defendants also attempt to nip this case in the bud by arguing that this Court and the Ninth Circuit have previously upheld California's lethal injection procedure against Eighth Amendment challenges.  That is not true.  The constitutionality of California's lethal injection procedure has never been subjected to a full trial on the merits like Washington's hanging protocol was.  *See Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994).

This Court denied Cooper preliminary relief, and the Ninth Circuit affirmed.  *Cooper v. Rimmer*, 379 F.3d 1029 (9th Cir. 2004) ("*Cooper II*").  In his concurrence, Judge Browning emphasized that the Ninth Circuit's affirmance was not a decision on the merits.

> "Appellate review of the grant or denial of preliminary injunctive relief requires consideration of the merits of the underlying issue, but it does not decide them. . . . We review for abuse of discretion the district court's decision to grant or deny a preliminary injunction or temporary restraining

4

order. . . . 'Our review is limited and deferential.' . . .  We determine only whether 'the district court employed the appropriate legal standards governing the issuance of a preliminary injunction, and correctly apprehended the law with respect to the issues underlying the litigation.' . . . Our review of the district court's merits decision -- if it is appealed -- will be more rigorous. . . . Neither the district court nor the parties should read today's decision as more than a preliminary assessment of the merits."  *Id.* at 1033-34, Browning, J., concurring.

Thus, this Court is not bound by the Ninth Circuit's decision in the Cooper case.

In <u>Cooper</u>, the Ninth Circuit observed, "We have previously upheld the constitutionality of lethal injection as a method of execution" in two Arizona cases.  *Cooper II* at 1033.[4]  Because those decisions were not reached on comparable records, neither *LaGrand v. Stewart*, 133 F.3d 1253, 1265 (9th Cir. 1998) nor *Poland v. Stewart*, 117 F.3d 1094, 1104-05 (9th Cir. 1997) dictates the outcome here.  In *Poland*, the inmate had submitted evidence of problems that had occurred in other states, all of which "involved either problems in finding a suitable vein or violent reactions to the drugs." *Poland v. Stewart*, 117 F.3d at 1105.  The Ninth Circuit deemed it significant that Poland did not submit evidence of problems that had occurred using Arizona's protocol.  "We know from proceedings before this court that there have been several executions in Arizona which have utilized lethal injection as the method of execution. *Since Poland has submitted no contrary evidence, we assume that no problems were encountered*." *Ibid.,* emphasis added.  Plaintiff has submitted evidence about *California executions* that, according to Plaintiff's expert, shows that California's execution procedure does not render inmates unconscious.  Further, Poland did not challenge the use of pancuronium bromide to cause death by asphyxiation as an Eighth Amendment violation.

In *LaGrand*, the district court rejected an Eighth Amendment challenge as speculative

---

[4] This Court recognized that *Poland* and *LaGrand* contain no more than general approval of lethal injection since it distinguished these cases from cases out of Connecticut and Florida where, in this Court's view, the state courts "held on a fully-developed record that such protocols are constitutional." *Cooper I* at * 9, citing *State v. Webb*, 252 Conn. 128, *cert. denied*, 531 U.S. 835 (2000); *Sims v. State*, 754 So.2d 657 (Fla.), *cert. denied*, 528 U.S. 1183 (2000).

5

1    in light of the evidence.  "The eyewitness reports of the executions of the two Arizona inmates who

2    have been executed by this method support the finding that the condemned lose consciousness within

3    seconds, and death occurs with minimal pain within one to two minutes."  *LaGrand v. Stewart*, 883 F.

4    Supp. 469, 470-71 (D.Ariz.1995).  The Ninth Circuit affirmed.  As in *Poland*, it held that none of the

5    problematic executions involved Arizona.  *LaGrand v. Stewart*, 133 F.3d 1253, 1264-65 (9th Cir.

6    1998).  Again, plaintiff's case is different, and, again, LaGrand did not challenge the use of

7    pancuronium bromide to cause death by asphyxiation as an Eighth Amendment violation.

8            None of the state court cases cited by this Court in the Cooper case are persuasive.  The

9    California Supreme Court opinion in *People v. Snow*, 30 Cal. 4th 43, cert. denied, 124 S. Ct. 922

10   (2003) is not persuasive.  *Snow* dismissed a lethal injection challenge in a sentence as "noncognizable

11   on appeal and lacking merit."  *Id.* at 127-28.  For the proposition that such claims lack merit, *Snow*

12   cited *People v. Holt* (1997) 15 Cal.4th 619 (1997), another direct appeal case, which had dismissed an

13   Eighth Amendment challenge in a sentence as "based on anecdotal evidence of the administration of

14   lethal injection in other states[.]"  *People v. Holt*, 15 Cal. 4th at 702.  Again, Plaintiff's case is different.

15

16           The Connecticut opinion in *Webb*, cited by this Court, does not dictate the result here

17   because it dealt with a very different factual record.  Most of the defense evidence put on at the

18   Connecticut hearing concerned research into the procedure and the training of personnel, matters on

19   which Procedure 770 is silent and about which Defendants have refused to provide Plaintiff with

20   information.  *Webb* also does not control because the facts set out in the opinion suggest that

21   Connecticut takes greater care to minimize the possibility of human error than California does.[5]

22

23           According to *Webb*, Connecticut uses a manifold system, not a syringe system like

24   California.

25

26

27   _____

     [5] Plaintiff takes no position on the constitutionality of Connecticut's lethal injection procedures.

28   PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR TRO AND
     PRELIMINARY INJUNCTION

                                                    6

"[S]tate officials conferred with officials of at least six other states that employed lethal injection. The state ultimately selected a manifold system for the administration of the agents. Although other states utilize a manual process, which requires that each chemical agent be administered individually through separate syringes, the task force selected the manifold system because that system minimized the potential for problems associated with the administration of the agents. The manifold locks the agents in a particular order and, as a result, eliminates the risk of inserting a syringe in an improper sequence. [Corrections Commissioner] Matos also described the type of catheter selected by the state, which was designed and intended for delivering fluids sequentially and rapidly."
*State v. Webb*, 252 Conn. at 134.[6]

In addition to this safeguard, Connecticut provided for professional oversight at certain critical stages. Intravenous lines would be established by "[a] person or persons, properly trained to the satisfaction of a Connecticut licensed and practicing physician[.]" *Ibid.*.  No such requirement appears in California's Procedure 770.  A psychologist "screened department employees who would participate in the procedure[.]" *Id.* at 133.  Again, no such safeguard appears in Procedure 770.  The Court in *Webb* relied on the training standards and the use of the manifold system in rejecting the defendant's argument that the procedure entailed serious risks of malfunctioning.  *Id.* at 142-44.  Thus, *Webb* cannot be used to defend Procedure 770.

Plaintiff here has made a much stronger showing than the defendant in *Webb*.  Connecticut apparently had not conducted any executions under its protocol at the time it decided *Webb*.  *Id.* at 131-33.  Notably absent from *Webb* is any discussion of troubling data from other executions conducted using the manifold—or any other—system or protocol.  Thus, *Webb* spoke of being unable to eliminate the risk of accident without any useful context.  Further, *Webb*, like *Cooper*, *Poland* and *LaGrand*, did not consider whether asphyxiation caused by the administration of pancuronium bromide is in itself an Eighth Amendment violation.  *Webb* does not control.

_____

[6] It would be interesting to discover whether or not Connecticut conferred with California officials before deciding to use the manifold process rather than syringes.

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR TRO AND PRELIMINARY INJUNCTION

*Sims v. State of Florida*, 754 So.2d 657 (Fla.2000) also is not persuasive. *Sims* was decided on February 16, 2000; the lethal injection law had only gone into effect on January 14, 2000. *Sims*, 754 So.2d at 664. Thus, as in *Webb*, Florida had not yet conducted any executions using the lethal injection procedure that the State Supreme Court upheld. Again, that is not the case in California.

Apart from its reliance on questionable authority, the decisions of this Court and the Ninth Circuit in the Cooper case are distinguishable for other reasons. In discussing the propriety of administering the paralyzing neurotoxin pancuronium bromide (Pavulon), this Court ruled:

> "Nor has Plaintiff met his burden of showing that the use of Pavulon is inhumane and unnecessary. According to Defendants and their experts, a principal purpose of Pavulon is to stop an inmate's breathing. Plaintiff has not articulated a compelling argument that this is not a legitimate state interest in the context of an execution." *Cooper I* at *9.

Plaintiff <u>has</u> articulated a compelling argument here: that causing death by asphyxiation is in itself cruel and unusual punishment under the authority of *Campbell v. Wood*, 18 F.3d 662, 684, 687 & n.17 (9th Cir. 1994) and *Fierro v. Gomez*, 77 F.3d 301, 308 (9th Cir. 1996), *opinion vacated on other grounds*, 519 U.S. 918 (1996). This constitutional concern trumps any theoretical interest the state has in stopping the condemned man's breathing. Defendants do not argue to the contrary.

Kevin Cooper did not make this legal argument, either in his complaint or motion papers. Additionally, Cooper's papers focused only on the log from the Bonin execution and the double dose of pancuronium bromide; he did not focus on how the data on the logs strongly suggest that the inmates were conscious throughout the procedure. Thus, plaintiff has made a much stronger showing, factually and legally, than Cooper did, and this Court should judge his case accordingly.

The Ninth Circuit made several observations in *Cooper* that do not withstand scrutiny. Citing <u>Campbell</u>, the Court stated that "[t]he risk of accident cannot and need not be eliminated from

8

the execution process in order to survive constitutional review." *Cooper II* at 1033.  Washington had

conducted one apparently "successful" hanging under the challenged protocol at the time *Campbell*

was decided.  *Campbell v. Wood*, 18 F.3d at 685.  Connecticut had not conducted any lethal injections

under its protocol at the time its supreme court observed in *Webb* that the risk of accident cannot be

eliminated, nor had Florida when *Sims* held that the risks to the condemned were minimal.  Platitudes

about the risk of accident are appropriate to the essentially facial challenges presented by these cases,

but they are not appropriate in the face of the high percentage of "accidents" that have been

documented in California.  When the number of "accidents" reaches the level that it has in California,

the inherent reliability—and constitutionality—of the procedure must be called into question.

       The Ninth Circuit observed in *Cooper* that "[e]xecution by lethal injection is now used

by 37 of the 38 states with the death penalty, objectively indicating a national consensus." *Cooper II* at

1033.  This obligation conflicts with *Campbell*, where the Ninth Circuit refused to condemn hanging as

a method of execution because most states had discontinued it.  "The number of states using hanging is

evidence of public perception, *but sheds no light on the actual pain that may or may not attend the*

*practice*.  We cannot conclude that judicial hanging is incompatible with evolving standards of decency

simply because few states continue the practice." *Campbell v. Wood*, 18 F.3d at 682.  It follows that

the nationwide adoption of some form of lethal injection process does not prove that California's

procedure is constitutional.  As this Court correctly recognized, "Punishments involving "torture or a

lingering death" violate the Eighth Amendment . . . and when analyzing a particular method of

execution, it is appropriate to focus 'on the objective evidence of the pain involved[.]'" *Cooper I* at

*6, citations omitted.  Broadly stated, there can be no national consensus on torture.

### D.  <u>Plaintiff's Evidence Entitles Him to Preliminary Relief</u>.

       Defendants' argument that Plaintiff has not cast doubt on the reliability of the lethal

9

injection process lacks merit.  Plaintiff has shown that the logs from several executions in California, most notably those of William Bonin, Manuel Babbit, Jaturun Siripongs, and Stephen Wayne Anderson, suggest that the condemned men were not properly sedated prior to being injected with potassium chloride and that they likely suffered an excruciatingly painful death.  Plaintiff has also come forward with information contained in toxicology and autopsy reports from prisoners executed by lethal injection in other states, which shows that there is a significant likelihood that Mr. Beardslee will be conscious during his execution and experience tremendous pain as a result**.**

Citing *Reid v. Johnson*, 333 F. Supp. 2d 543 (D.Va. 2004), Defendants argue that the toxicology reports are not probative without more information about when and how they were conducted.  This is remarkable given that it was their expert in *Cooper*, Dr. Dershwitz, who first suggested, without elaboration, that thiopental levels in blood were relevant.

> "From my pharmacokinetic analysis I have generated a graph, attached as Exhibit B.  This pharmacokinetic graph shows the concentration of thiopental in the blood in an average man as a function of time . . . From my pharmacodynamic analysis, I have generated a graph, attached as Exhibit C.  This pharmacodynamic graph shows the probability that an average man will be conscious as a function of the blood concentration of thiopental.  In other words, the graph shows the likelihood of consciousness in the presence of varying blood concentrations of thiopental."  (Exhibit R-3, Dershwitz Declaration from *Cooper*.)

Defendants conveniently ignore that when Dr. Dershwitz was informed of Kentucky inmate Edward Harper's thiopental levels as revealed in his post-mortem toxicology reports, he called this evidence "potentially troubling," noting that "the blood level should be a lot higher[.]" mg/l.  (Exhibit O-3, "On Death Row, a Battle over the Fatal Cocktail", by Adam Liptak, NEW YORK TIMES, August 16, 2004).  Presumably, if Defendants and Dr. Dershwitz had something to say about the methodology of analyzing thiopental levels, he would have said it in *Cooper*, and he would say it here.

10

Defendants ignore that the Kentucky data in the Harper case, which Dr. Dershwitz found troubling, shows the levels in blood drawn from three different parts of the body.  (Exh. F-2, F-12-14, Kentucky logs.)  The North Carolina documents show what day the blood was collected.  (Exh. H-2, 4, 5A, 7, North Carolina Toxicology Reports.)  The Arizona documents show "troubling" cases where the blood was drawn right after the execution (Exh. U-14, 26 (Brewer execution)) and the morning after the execution (Exh. U-19, 88 (Ceja execution)).  Additionally, in many of the Arizona reports, the DOCTORS performing the toxicology screens from MedTox state:  "Pentobarbital concentrations[8] as high as 50 mg/ml may be required to induce therapeutic coma, apparently suggesting concern that the blood levels were too low.  (Exh. U-4, 18, 19, 22-Arizona Reports.)  It is noteworthy that Arizona, apparently, uses the SAME amount of thiopental—5 grams—as California, yet, in numerous cases, little if any thiopental was detected in the blood.  (Exhs. U-4, 14, 16, 18, 19, 22, Arizona Toxicology Reports.)

Defendants also ignore the essence of Plaintiff's complaint:  the complete lack of safeguards to ensure that the procedure functions as intended and the lack of assurances that appropriately trained and screened people are conducting the execution.  Given the testimony in *Webb* about physician-supervised training and psychologically screened personnel, these are clearly areas that cry out for further inquiry, particularly in light of the documented history of problems in California executions.

Plaintiff has made as substantial a showing as possible given the information available to him.  As detailed in Plaintiff's discovery motion, Plaintiff sent defendant Warden a detailed letter asking her to provide Plaintiff's counsel with this information about the process.  The Attorney General, however, has taken the position that nothing related to the execution process is discoverable,

---

[8] The reports state that thiopental metabolizes to pentobarbital.

11

1
2
3
4

and nothing would be produced without a court order.  Plaintiff reiterates that he has more than made

his case for an injunction.  However, Defendants should not be allowed to argue that there are holes in

Plaintiff's proof when Defendants have taken such pains to shield the particulars of the lethal injection

process from public scrutiny.  The motion should be granted.

5
6

II.      **PLAINTIFF IS ENTITLED TO PRELIMINARY RELIEF TO PURSUE HIS
         FIRST AMENDMENT CLAIM ON THE MERITS**

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

The omissions in defendants' opposing papers are significant.  Defendants do not apply

the test set out in *Turner v. Saffley*, 482 U.S. 78 (1987), and they do not apply the test for a preliminary

injunction except to imply that they will be prejudiced if they cannot execute Plaintiff sooner rather

than later.  Defendants do not contend that under Procedure 770, pancuronium bromide is the agent

that causes death, or that administering it has any legitimate penological interest.  Such an argument

would fail given that this Circuit deems causing death by asphyxiation to be cruel and unusual

punishment, another proposition defendants do not dispute.  Defendants do not contest the linkage

between the First Amendment, Eighth Amendment and the development of execution policy in general

that underlay the decisions in *California First Amendment Coalition v. Woodford*, 2000 U.S. Dist.

LEXIS 22189 (N.D. Cal. July 26, 2000) and *California First Amendment Coalition v. Woodford*, 299

F.3d 868 (9th Cir. 2002) (collectively,"the *First Amendment Coalition* case").  Finally, defendants do

not dispute the finding from the *First Amendment Coalition* case that their execution policies are

motivated by a desire to conceal the reality of the process from the public in order to stifle debate.

22
23
24
25

Rather than engage seriously with this claim, defendants advance two meritless

propositions.  First, Defendants demean the notion that the First Amendment rights of a man about to

be executed deserve respect, calling this claim "make weight."  (Opp. at 7.)  Second, consistent with

26
27
28

12

their response to Plaintiff's Eighth Amendment claim, Defendants assert that the administration of pancuronium bromide will not violate any rights Plaintiff might have because he will have nothing to communicate or complain about, because the anesthetizing procedure, most of which remains shrouded in mystery, will go off without a hitch.  Neither of Defendants' contentions has merit.

This Court and the Ninth Circuit have given due consideration to First Amendment claims brought prior to execution.  Shortly before Darrell Rich was executed, he filed an action challenging the prison's refusal to provide him with a sweat lodge to conduct a purification ritual prior to his execution, a ritual considered essential to his Native American beliefs.  *Rich v. Woodford*, 210 F.3d 961, 963 (9th Cir. 2000) (Reinhardt, J., dissenting from denial of rehearing *en banc*).  He lost. However, he did not lose because the idea of a First Amendment claim by a man about to be executed is silly.  Rather, the district court denied Rich's claim by applying the Turner factors in light of the state's alleged security concerns.  Id. at 963.[11]

Of course, while the courts may have taken Rich's claim seriously, defendants did not. As Judge Reinhardt noted,

> "In its brief to this court, however, the state exhibited a bizarre attitude toward the subject of religion in general and Native Americans' beliefs in particular. The California Attorney General's office argued that the religious beliefs the condemned man adhered to were "incapable of either proof or refutation," and "secular authorities, such as the prison Warden, cannot be required, on faith, to accept risks to prison security and the personal safety of others, in order to satisfy *these kinds* of belief" Id. at

---

[11] The dissenting Ninth Circuit judges in the Rich case pointed out that defendants had fabricated the alleged security concerns that the district court relied on.  Id. at 963-64 (noting "transparent weakness of the state's purported concerns and summarizing evidence shown to be false; id. at 965 (Kozinski, J., dissenting from denial of rehearing *en banc*) (stating that constitutional rights of prisoner who "amply deserved to die" should be respected "where doing so will not impair serious governmental interests[,]"noting that state had made "no credible showing that its interests would be impaired" and opining that "the arguments contrived by the Attorney General to defeat Rich's request cast doubt on the professional candor of the lawyers who presented them;" id. at 965-66 (Wardlaw, J., dissenting from denial of rehearing *en banc*) (expressing concern "as to the State's representations to the Court" and stating that the Court "should be able to apply the "reasonableness" analysis required by *Turner* . . . with confidence in the information we have been provided."

13

962-63, footnotes omitted, emphasis in original.

The same dismissive attitude is on display here.  It should not distract this Court from confronting the factual and legal issues square on.

Touching the merits, defendants argue that pancuronium bromide cannot and will not invade Plaintiff's First Amendment rights because he will, guaranteed, be rendered unconscious by the sodium thiopental.  Obviously, Plaintiff disagrees.  In the First Amendment context, however, the probable reliability of the process is not dispositive.  Defendants do not rule out the possibility that the process could malfunction, that Plaintiff would not be rendered unconscious, and that he would experience torturous pain from the potassium chloride.  (Opp. at 7.)  Defendants would characterize such an occurrence as an "accident," rather than an Eighth Amendment violation.  Whatever it is, Plaintiff has a First Amendment right to communicate about what happened.  Pursuant to the policies articulated in the *First Amendment Coalition* case, he has the right to impart information about his experience that would help the legislative and executive decision makers evaluate whether, constitutional or not, executions in California should continue to be carried out under the current protocol, and he has the right to contribute to the public debate on this issue.  Defendants' position must be seen for what it is:  an attempt to restrict the flow of information in order to stifle debate.

In their papers, Defendants have expressly or impliedly conceded everything necessary under *Turner* for this Court to grant *permanent* relief, not just preliminary relief, against the administration of pancuronium bromide:  1) that Plaintiff has a First Amendment right to communicate information about his execution experience, 2) that the prevention of speech effected by pancuronium bromide is not content neutral, 3) that administering pancuronium bromide serves no legitimate penological goal, 4) that Plaintiff has no alternative means of exercising his rights, 5) that eliminating pancuronium bromide will have no impact on the institution, and 6) that available alternatives to the

14

1   impermissible goal of denying Plaintiff his First Amendment rights are not at issue.

2          Having expressly or impliedly conceded every prong of *Turner*, defendants have

3   conceded probable success on the merits.  Defendants do not dispute that Plaintiff will suffer

4   irreparable harm or that, in light of the *First Amendment Coalition* case, the right to be vindicated

5   serves the public interest.  To the extent they argue anything, it is only that vindicating Plaintiff's

6   rights will delay (not prevent) his execution.  Any delay is their fault.  Defendants would not now be

7   litigating a First Amendment claim in federal court if they had granted Plaintiff's request

8   administratively.  Their failure to do so in light of their abundant concessions should convince this

9   Court that pancuronium bromide is administered for an improper purpose.  The balance of hardships

10  clearly favors plaintiff.  The request for an injunction should be granted.

11

12  **III.  <u>CONCLUSION</u>**

13         For the foregoing reasons, Plaintiff's motion for preliminary relief should be granted.

14         DATED:  December 30, 2004

15                                        Respectfully submitted:

16

17

18                                        s/Steven S. Lubliner_____

19                                        Steven S. Lubliner
                                          Attorney for Donald Beardslee

20

21

22

23

24

25

26

27                                        15

28