**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

**JAN 14 2005**

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| DONALD BEARDSLEE, | No. 05-15042 |
| Plaintiff - Appellant, | D.C. No. CV-04-5381-JF |
| v. | |
| JEANNE S. WOODFORD, Director of the California Department of Corrections; JILL L. BROWN, Warden, California State Prison at San Quentin, | **OPINION** |
| Defendants - Appellees. | |

Appeal from the United States District Court
for the Northern District of California
Jeremy Fogel, District Judge, Presiding

Argued and Submitted January 12, 2005
San Francisco, California

Before: TASHIMA, THOMAS, and PAEZ, Circuit Judges.

**PER CURIAM:**

Donald Beardslee, a California death row inmate whose execution is

scheduled for Wednesday, January 19, 2004, at 12:01 a.m., appeals the district

court's order denying his motion for a preliminary injunction in his action

pursuant to 42 U.S.C. § 1983 against Jeanne S. Woodford, Director of the

California Department of Corrections, and Jill L. Brown, Warden of California State Prison at San Quentin, California (collectively, "the State"). Beardslee seeks to prevent Brown from executing him in accordance with California's lethal injection protocol, arguing that such an execution would violate his Eighth Amendment right to be free from cruel and unusual punishment and, potentially, his First Amendment right to freedom of speech. Beardslee also makes an emergency motion for a stay of execution.[1] We have jurisdiction under 28 U.S.C. § 1292(a)(1), and we affirm the district court and deny the motion.

I

Beardslee was convicted by a jury in San Mateo County, California of two counts of first degree murder with special circumstances and sentenced to death. The California Supreme Court affirmed his conviction and sentence. *People v. Beardslee*, 806 P.2d 1311 (Cal. 1991). After exhausting his state court remedies, Beardslee filed a habeas corpus petition in federal district court. The district court rejected each of his claims, including his challenge to California's method of execution, and dismissed the petition. Beardslee did not seek a Certificate of Appealability ("COA") as to his claim that California's method of execution

---

[1] Because the district court denied preliminary injunctive relief, we construe this motion as one for "an order . . . granting an injunction while an appeal is pending." Fed. R. App. P. 8(a)(1)(C); *see* Fed. R. Civ. P. 62(c).

violated the Eighth Amendment's prohibition against cruel and unusual punishment.

We affirmed the district court's denial of habeas relief, *Beardslee v. Woodford*, 358 F.3d 560 (9th Cir. 2004), and the Supreme Court denied Beardslee's petition for a writ of certiorari, *Beardslee v. Brown*, 125 S. Ct. 281 (2004). After denial of certiorari, but before our mandate was issued, Beardslee requested, and we granted, an expanded COA based on a decision, *Sanders v. Woodford*, 373 F.3d 1054 (9th Cir. 2004), that had been issued during the pendency of Beardslee's petition for a writ of certiorari. After briefing and oral argument, we issued a supplemental opinion denying federal habeas relief on December 29, 2004. *Beardslee v. Brown*, 2004 WL 3019188 (9th Cir. Dec. 29, 2004). No COA was issued during the federal appellate habeas proceedings for Beardslee's claim pertaining to the method of execution.

On December 20, 2004, Beardslee filed this § 1983 suit in federal district court challenging California's lethal injection protocol. He also moved the court for a temporary restraining order and a preliminary injunction enjoining the State from executing him using the existing lethal injection procedure. On January 7, 2005, the district court denied the motion for a temporary restraining order, denied

3

the motion for a preliminary injunction, and denied the motion for expedited discovery as moot. Beardslee appeals the denial of injunctive relief.

In order to obtain a preliminary injunction on his claim, Beardslee was required to demonstrate "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to the plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995) (internal quotation marks and citation omitted). Alternatively, injunctive relief could be granted if he "demonstrate[d] '*either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor.'" *Id.* (citation omitted). "These two alternatives represent 'extremes of a single continuum,' rather than two separate tests." *Clear Channel Outdoor Inc. v. City of Los Angeles*, 370 F.3d 810, 813 (9th Cir. 2003) (citation omitted). Thus, the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success must be established by the party. *Id.* "In cases where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff." *Fund for Animals, Inc. v. Lujan*,

4

962 F.2d 1391, 1400 (9th Cir. 1992); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

In capital cases, the Supreme Court has instructed that "[e]quity must take into consideration the State's strong interest in proceeding with its judgment." *Gomez v. U.S. Dist. Court for N. Dist. of California*, 503 U.S. 653, 654 (1992). In such cases, "[a] court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief." *Id.* Thus, before granting a stay of execution, courts "must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim." *Nelson v. Campbell*, 541 U.S. 637, ___, 124 S. Ct. 2117, 2126 (2004).

We review the denial of a preliminary injunction for an abuse of discretion. *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730 (9th Cir. 1999). "Our review is limited and deferential." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc).

## II

The State contends that Beardslee is not entitled to relief because he previously litigated this claim in his federal habeas action. It is true that Beardslee asserted in his federal habeas petition a generic challenge to California's two

5

statutory methods of execution, lethal gas and lethal injection. However, the claims asserted in this § 1983 suit are different. In this case, Beardslee challenges California's lethal injection protocol, rather than the punishment of lethal injection *per se*, as asserted in his habeas petition. The State has acknowledged that a § 1983 action is a proper vehicle by which to challenge a method of execution, noting that such a challenge was entertained in *Cooper v. Rimmer*, 379 F.3d 1029 (9th Cir. 2004) and *Fierro v. Gomez*, 77 F.3d 301 (9th Cir.), *judgment vacated by* 519 U.S. 918 (1996).[2]

Section 1983 provides the statutory authorization for most federal court suits against local governments or state and local government officials to redress violations of federal civil rights. To bring a § 1983 action, a plaintiff must allege (1) a violation of a right secured by the Constitution or federal law, and (2) that this right was violated by someone acting under color of state law. 42 U.S.C. § 1983. In the instant case, the plaintiff seeks review of the method by which the sentence will be carried out, rather than a review of the fact that he was sentenced

---

[2] *Cooper* did not actually decide this issue. The panel reached the merits, but expressly declined to address the question of whether the claim was properly made in a habeas petition, a § 1983 action, or both. *Cooper*, 379 F.3d at 1031. The *Fierro* decision was vacated, and ultimately dismissed on standing grounds. *Fierro v. Terhune,* 147 F.3d 1158, 1160 (9th Cir. 1998). The Supreme Court recently has also declined to reach the issue. *Nelson*, 124 S. Ct. at 2122-23.

to death. He asserts that the defendants, acting under color of state law, will violate his Eighth Amendment and First Amendment rights by their use of California's lethal injection protocol. Thus, Beardlee's claim is more properly considered as a "conditions of confinement" challenge, which is cognizable under § 1983, than as a challenge that would implicate the legality of his sentence, and thus be appropriate for federal habeas review. *See Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991) ("Habeas corpus proceedings are the proper mechanism for a prisoner to challenge the 'legality or duration' of confinement. A civil rights action, in contrast, is the proper method of challenging 'conditions of . . . confinement.'") (citation omitted) (revision in original). Therefore, Beardslee is not foreclosed from asserting this challenge in a § 1983 action even though he raised a challenge to the constitutionality of the statute authorizing legal injection in his federal habeas proceeding.[3]

### III

Relying in large part on our decision in *Cooper*, the district court held that, because Beardslee did not file this action until his execution was scheduled, he was subject to a "strong equitable presumption against the grant of a stay [of

---

[3] For the same reason, Beardslee's § 1983 action cannot be considered a second or successive federal habeas corpus petition governed by 28 U.S.C. § 2254.

execution]" unless he could "make a showing of serious questions going to the merits that is sufficient to overcome that strong presumption." The district court, however, overreads *Cooper*. *Cooper* did not decide whether such a presumption existed; rather, the decision merely reported the finding of the district court, then reached the merits.

To be sure, as the Supreme Court has instructed in *Nelson* and *Gomez*, the district court is entitled to take delay into consideration in exercising its equitable powers. However, this consideration is based on the strong interest against the plaintiff engaging in manipulation of the system. *See Gomez*, 503 U.S. at 654 ("Equity must take into consideration the State's strong interest in proceeding with its judgment and [the petitioner's] obvious attempt at manipulation.").

In *Cooper*, the district court made a similar finding based on the facts and circumstances of that case. Here, however, the district court appeared to apply the presumption solely on the basis that Beardslee had not filed the case until the California Supreme Court lifted its stay of execution. Once an execution was imminent, Beardslee acted promptly. Beardslee correctly points out that the precise execution protocol is subject to alteration until the time of execution. Moreover, by regulation the California Department of Corrections does not permit

8

challenges to "anticipated action[s]." 15 Cal. Code Regs. § 3084.3(c)(3).[4]  A close

examination of the record indicates that, unlike the situation in *Cooper* or *Gomez*,

Beardslee pursued his claims aggressively as soon as he viewed them as ripe.[5]

    In short, the district court erred in applying a general rule that a claim was

dilatory if first filed at the time when the possibility of execution became

---

    [4]  The State claims that, regardless of this regulatory prohibition, Beardslee
could have brought his administrative challenges earlier.  Beardslee contends that
they would have been dismissed as unripe.  The plain language regulation supports
Beardslee's argument.  Whether or not exceptions would exist for circumstances
such as these is an unsettled question.  Furthermore, there may be some question,
in this context, about whether Beardslee was required to exhaust his state
administrative remedies under the Prison Litigation Reform Act,  42 U.S.C. §
1997e(a),  prior to filing a § 1983 action.  However, both parties have assumed
that exhaustion was required, and the same district court in *Cooper* had dismissed
Cooper's claims for failing to exhaust remedies.  In any case, given the regulation
and prior action, Beardslee cannot be faulted now for pursuit of his administrative
remedies prior to filing this action.

    [5]  To date, we have not resolved the question of when challenges to
execution methods are ripe.  In *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-
45 (1998), the Supreme Court held that an inmate's competency challenge was
properly dismissed as unripe because "his execution was not imminent and
therefore his competency to be executed could not be determined at that time."
The Court held that the inmate's claim was "unquestionably ripe" only after it was
clear that he "would have no federal habeas relief for his conviction or his death
sentence, and the Arizona Supreme Court issued a warrant for his execution." *Id.*
at 643.  We have suggested that a constitutional challenge to an execution method
becomes ripe when the method is chosen.  *LaGrand v. Stewart*, 170 F.3d 1158,
1159 (9th Cir. 1999).  However, because the execution protocol is subject to
change, Beardslee argues that his challenge to the protocol, as opposed to a
generic challenge to the statutorily specified method, did not become ripe until his
execution was imminent as described in *Martinez-Villareal*.  We need not, and do
not resolve this question.

9

imminent. Rather, the district court should have conducted a fact-specific inquiry to ascertain whether the claims could have been brought earlier, and whether the petitioner had good cause for delay.

### IV

Despite the district court's improper application of a "strong presumption," we cannot say, given our deferential standard of review, that the district court abused its discretion in denying the motion for a preliminary injunction and stay of execution based on Beardslee's Eighth and First Amendment claims.

### A

The Eighth Amendment prohibits punishments that are "incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion)). In the context of executions, the Eighth Amendment prohibits punishments that "involve the unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173 (1976), "involve torture or a lingering death," *In re Kemmler*, 136 U.S. 436, 447 (1890), or do not accord with "the dignity of man, which is the basic concept underlying the Eighth Amendment," *Gregg*, 428 U.S. at 173 (internal quotation marks and citation omitted). Thus, we held that execution by hanging under the State of

10

Washington's protocols did not constitute cruel and unusual punishment based on

the district court's findings that the "mechanisms involved in bringing about

unconsciousness and death in judicial hanging occur extremely rapidly, that

unconsciousness was likely to be immediate or within a matter of seconds, and

that death would follow rapidly thereafter." *Campbell v. Wood,* 18 F.3d 662, 687

(9th Cir. 1994) (en banc). In contrast, although the opinion was later vacated

based on the petitioner's lack of standing, we held in *Fierro v. Gomez* that

California's lethal gas execution protocol violated the Eighth Amendment. 77

F.3d at 308. The basis for our holding was the district court's findings that

inmates were likely to remain conscious for up to a minute after the execution

procedure commenced and that there was a substantial likelihood that some

consciousness would persist for several minutes during which "inmates suffer

intense, visceral pain, primarily as a result of lack of oxygen to the cells." *Id.*

In examining the "evolving standards of decency" under the Eighth

Amendment, we employ an "assessment of contemporary values concerning the

infliction of a challenged sanction." *Gregg*, 428 U.S. at 173. That determination

"should be informed by objective factors to the maximum possible extent." *Coker

v. Georgia*, 433 U.S. 584, 592 (1977) (plurality opinion). Among the "clearest and

most reliable objective evidence of contemporary values is the legislation enacted

by the country's legislatures." *Penry v. Lynaugh*, 492 U.S. 302, 331 (1989). In considering objections to a particular execution method, our "methodology review focuses more heavily on objective evidence of the pain involved in the challenged method." *Campbell*, 18 F.3d at 682. In the end, "the objective evidence, though of great importance, [does] not 'wholly determine' the controversy, 'for the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.'" *Atkins v. Virginia*, 536 U.S. 304, 312 (2002) (quoting *Coker*, 433 U.S. at 597).

In this case, Beardslee challenges San Quentin Institution Procedure 770, the current protocol by which lethal injection executions are performed at San Quentin. Under Procedure 770, three chemicals are used to carry out the execution. Five grams of sodium pentothal (also known as sodium thiopental), a barbiturate sedative, are first administered to the inmate to induce unconsciousness. The parties agree that this dosage of sodium pentothal would be sufficient to induce unconsciousness, and even cause death itself, if administered properly. This is followed by an injection of pancuronium bromide (also known as "Pavulon"), a curare-derived agent that paralyzes all skeletal or voluntary muscles, but which has no effect whatsoever on awareness, cognition, or

12

sensation. This neuromuscular blocking agent causes paralysis and, in sufficient dosages, stops respiration by paralyzing the diaphragm and lungs.  Finally, the inmate is injected with potassium chloride, an extraordinarily painful chemical which activates the nerve fibers lining the person's veins and which interferes with the rhythmic contractions of the heart, causing cardiac arrest.

Beardslee claims that there is a substantial risk that sodium pentothal will not be administered correctly, thereby subjecting him to excruciating pain that will be masked to observers by the paralyzing effects of pancuronium bromide.  He contends that if he is conscious during the administration of pancuronium bromide, he will experience suffocation similar to that observed in inmates executed by lethal gas.  He contends that if he conscious during the administration of potassium chloride, he will experience excruciating pain, but be unable to communicate because of the paralyzing effect of the pancuronium bromide.  The State concedes that if the inmate is not properly sedated by the first drug, the inmate will experience torturous pain.  However, it vigorously disputes Beardslee's claim that there is any likelihood that the first drug will be ineffective to render him unconscious for the duration of the execution procedure.

In support of his claim, Beardslee recites a number of perceived problems with previous lethal injection executions in California and toxicology reports from

13

autopsies in other states which he contends indicates that condemned prisoners may have been conscious or partly conscious during the administration of pancuronium bromide. Beardslee also points to the American Veterinary Medical Association's ("AVMA") prohibition on the use of neuromuscular paralytic agents, such as pancuronium bromide, in animal euthanasia. He underscores the fact that nineteen states have passed laws banning, in whole or in part, the use of neuromuscular paralytic agents as a means of euthanizing animals. Beardslee additionally challenges the lack of specificity in Procedure 770, contending that there are many variables that can complicate the proper administration of the drugs, such as the use of Valium as a pre-execution sedative, and the problems in finding acceptable veins for the insertion of an intravenous tube.

The State argues that twenty-seven of the thirty-seven states employing lethal injection use the same combination of chemicals as California; that no court in any state has found lethal injection or the drugs used in such executions to be constitutionally infirm;[6] and that this case is indistinguishable from *Cooper*. The

---

[6] The State also points out that we previously rejected challenges to Arizona's method of lethal injection in *LaGrand v. Stewart*, 133 F.3d 1253, 1265 (9th Cir. 1998), and *Poland v. Stewart*, 117 F.3d 1094, 1104-05 (9th Cir. 1997). However, as Beardslee correctly responds, those challenges were not to the execution protocol, did not involve the California procedure at issue here, and were mostly founded on evidentiary deficiencies.

State also underscores the concession by Beardslee's expert that, if properly administered, a five gram dose of sodium pentothal would likely be fatal. The State highlights, as it did in *Cooper*, its expert's declaration that all but an infinitesimally small number of people would be rendered unconscious within a minute after the proper administration of sodium pentothal. It contests the conclusions based on autopsy reports submitted by Beardslee, citing a lack of information about the specific protocol used in administering the drugs and the interval of time after death when the autopsy was performed.

In analyzing these arguments, and considering the objective factors present in this preliminary injunction record, we first examine the action by state legislatures. As we observed in *Cooper*, "[e]xecution by lethal injection is now used by 37 of the 38 states with the death penalty." *Cooper*, 379 F.3d at 1033.[7]

---

[7] Alabama, Ala. Code 1975 § 15-18-82; Arizona, Ariz. Rev. Stat. Ann. § 13-704; Arkansas, Ark. Code Ann. § 5-4-617; California, Cal. Penal Code § 3604; Colorado, Colo. Rev. Stat. Ann. § 18-1.3-102; Connecticut, Conn. Gen. Stat. § 54-100; Delaware, Del. Code Ann. tit. 11, § 4209(f); Florida, Fla. Stat. Ann. § 922.105; Georgia, Ga. Code Ann., § 17-10-38; Idaho, Idaho Code § 19-2716; Illinois, 725 Ill. Comp. Stat. Ann. 5/119-5(a)(1); Indiana, Ind. Code Ann. § 35-38-6-1; Kansas, Kan. Stat. Ann. § 22-4001; Kentucky, Ky. Rev. Stat. Ann. § 431.220; Louisiana, La. Rev. Stat. Ann. § 15:569 B; Maryland, Md. Code Ann., Corr. Servs. § 3-905; Mississippi, Miss. Code Ann. 99-19-51; Missouri, Mo. Rev. Stat. § 546.720; Montana, Mont. Code Ann. § 46-19-103; Nevada, Nev. Rev. Stat. § 176.355 1; New Hampshire, N.H. Rev. Stat. Ann. § 630:5 XIII; New Jersey, N.J. Stat. Ann. § 2C:49-2; New Mexico, N.M. Stat. Ann. § 31- 14-11; New York, N.Y. (continued...)

Thus, objective evidence of contemporary values indicates that lethal injection has been deemed an acceptable means for society to implement a death sentence. However, this observation does not address the issue raised in this case because Beardslee is not raising a generic challenge to lethal injection as a means of execution. Rather, he contests the specific protocol used in California, most importantly, the use of pancuronium bromide. In analyzing objective evidence of contemporary values on that issue, it is somewhat significant that at least nineteen states have enacted laws that either mandate the exclusive use of a sedative or expressly prohibit the use of a neuromuscular blocking agent in the euthanasia of animals.[8] It is also of some significance that the leading professional association

---

[7](...continued)
Correct. Law § 658; North Carolina, N.C. Gen. Stat. § 15-187; Ohio, Ohio Rev. Code Ann. § 2949.22; Oklahoma, Okla. Stat. Ann. tit. 22, § 1014; Oregon, Or. Rev. Stat. § 137.473, amended by 2003 Or. Laws 103; Pennsylvania, Pa. Stat. Ann. tit. 61, § 3004; South Carolina, S.C. Code Ann. 24-3-530; South Dakota, S.D. Codified Laws § 23A-27A-32; Tennessee, Tenn. Code Ann. § 40-23-114; Texas, Texas Crim. Proc. Code Ann. § 43.14; Utah, Utah Code Ann. § 77- 18-5.5; Virginia, Va. Code Ann. § 53.1-233; Washington, Wash. Rev. Code Ann. § 10.95.180; and Wyoming, Wyo. Stat. Ann. § 7-13-904. Since *Cooper* was decided, the death penalty statutes in New York and Kansas have been held unconstitutional for reasons other than the method of execution. *People v. LaValle*, 817 N.E.2d 341, 367 (N.Y. 2004); *State v. Marsh*, 102 P.3d 445, 458-59 (Kan. 1994).

[8] The states that expressly forbid the use of neuromuscular blocking agents to euthanize animals are: Florida, Fla. Stat. §§ 828.058 and 828.065; Georgia, Ga. Code Ann. § 4-11-5.1; Maine, Me. Rev. Stat. Ann., tit. 17, § 1044; Maryland, Md.
(continued...)

of veterinarians promulgated guidelines that prohibit the use of a sedative with a muscle-paralyzing drug for purposes of euthanasia, concluding that "[a] combination of pentobarbital with a neuromuscular blocking agent is not an acceptable euthanasia agent" for animals.  2000 Report of the American Veterinary Medical Association Panel on Euthanasia, 218 J. Am. Veterinary Med. Ass'n, 669, 681 (2001), at 680.[9]  Beardslee's expert opines that the AVMA condemns this combination due to the risk that the animal might not be properly sedated by the barbiturate and therefore would be conscious of the severe pain of asphyxiation while being suffocated by the neuromuscular blocking agent.  In any

---

[8](...continued)
Code Ann., Criminal Law, § 10-611; Massachusetts, Mass. Gen. Laws ch. 140 § 151A; New Jersey, N.J. Stat. Ann. 4:22-19.3; New York, N.Y. Agric. & Mkts Law § 374; Oklahoma, Okla. Stat. tit. 4, § 501; and Tennessee, Tenn. Code Ann. § 44-17-303.  The states that mandate the use of particular methods for animal euthanasia, most often the use of the sedative sodium pentobarbitol, and therefore implicitly ban the use of neuromuscular blocking agents are: Connecticut, Conn. Gen. Stat. § 22-344a; Delaware, Del. Code Ann. tit. 3, § 8001; Illinois, 510 Ill. Comp. Stat. 70/2.09; Kansas, Kan. Stat. Ann. § 47-1718(a); Kentucky, Ky. Rev. Stat. Ann. § 312.181(17) and Ky. Admin. Regs. 16:090 section 5(1); Louisiana, La. Rev. Stat. Ann. § 3.2465; Missouri, Mo. Rev. Stat. § 578.005(7); Rhode Island, R.I. Gen. Laws § 4-1-34; and South Carolina; S.C. Code Ann. § 47-3-420; Texas, Tex. Health & Safety Code Ann. § 821.052(a).

[9]  The most common protocol for animal euthanasia is a single overdose of a barbiturate, usually sodium pentobarbital (which is a longer acting barbiturate than sodium pentothal).

case, it is quite clear that the AVMA does not approve of the use of neuromusclar drugs in animal euthanasia, and this view has been adopted by many states.

In the context of this particular challenge, the more important consideration may be the examination of the objective evidence as to the pain caused by the particular method employed at San Quentin.

The procedure used in most states for lethal injections originated in Oklahoma when Senator Bill Dawson asked Dr. Stanley Deutsch, then chair of the Anesthesiology Department at Oklahoma University Medical School, to recommend a method for executing prisoners through the administration of intravenous drugs.  In a responsive letter, Dr. Deutsch recommended the administration of an "ultra short acting barbiturate" to induce unconsciousness, followed by the administration of a neuromuscular blocking drug to induce paralysis and death.  *See* Deborah W. Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What It Says About Us*, 63 Ohio St. L.J. 63, 95-97 (2002).  Shortly thereafter, in 1977, Oklahoma became the first state to adopt lethal injection as an execution method, employing the protocol described in Dr. Deutsch's letter.  *See* Rebecca Brannan, *Sentence and Punishment: Change Method of Executing Individuals Convicted of Capital Crimes from Electrocution to Lethal Injection*, 17 Ga. St. U.

18

L. Rev. 116, 121 (2000).  The first lethal injection execution occurred in Texas in 1982.  Christina Michalos, *Medical Ethics and the Execution Process in the United States of America*, 16 Med. & L. 125, 126 (1997).  Lethal injection has been an authorized method of execution in California since 1992, and the presumptive method since 1996. Cal. Penal Code § 3604, *amended by* 1992 Cal. Legis. Serv. 558 (West), *amended by* 1996 Cal. Legis. Serv. 84 (West).  Humane concerns formed a large part of the motivation in adopting lethal injection as the presumptive method of execution in California.  The California Assemblyman who introduced the measure in the wake of concerns over constitutionality of executing inmates by lethal gas, stated that lethal injection is "the only form of execution which from our own life's experience, we can conclude is entirely devoid of discomfort." He further asserted that "[n]o one knows for sure whether a prisoner suffers in the gas chamber. . . . With lethal injection, we know exactly what the person is going through because it's exactly what someone undergoing surgery experiences." Jonathan S. Abernethy, *The Methodology of Death: Re-examining the Deterrence Rationale*, 27 Colum. Hum. Rts. L. Rev. 379, 414 (1996).

Although the origins of the addition of potassium chloride to the combination are uncertain, it probably originated both from the advice of

19

consulting physicians and Fred Leuchter, the creator of execution machinery. Denno, *When Legislatures Delegate Death*, *supra*, at 99. Twenty-seven states use the three-drug protocol. *Id.* at 117. New Jersey uses a two-drug protocol, administering sodium pentothal with potassium chloride. *Id.* North Carolina uses a two-drug protocol, using sodium pentothal with pancuronium bromide. *Id.*[10]

The key element in this procedure is the proper administration of the barbiturate. It is undisputed that "substantial pain and suffering can occur when the inmate receives an inadequate dosage of sodium pentothal and therefore retains consciousness and sensation during the injection of the second and third chemicals." Deborah W. Denno, *Getting to Death: Are Executions Constitutional?*, 82 Iowa L. Rev. 319, 380 (1997). Despite the critical nature of correct medical procedure, lethal injection executions are hampered by ethical restrictions on physicians, who are prohibited from participating in executions. *See generally* W. Noel Keyes, *The Choice of Participation by Physicians in Capital Punishment*, 22 Whittier L. Rev. 809 (2001). Thus, the prisons must rely on personnel who may not always be experienced in establishing an intravenous

---

[10] The history of the use of the three chemical protocol gives some force to Beardslee's argument that the adoption of the procedure in California was informally based on the observation of two Texas executions by the then-warden of San Quentin and the precise protocol was never subjected to the rigors of scientific analysis.

connection. Compounding this problem is the fact that some prisoners have collapsed or inaccessible veins due to drug abuse or because the veins are too deep, too flat, or below layers of fat. Denno, *Getting to Death*, *supra* at 381. In some cases, executioners are forced to perform a "cutdown," a surgical procedure that exposes the vein. *Id.* at 382. In addition, sodium pentothal is a short acting barbiturate that must be administered properly to induce the desired effect and thereafter monitored carefully. *Id.* at 380. The sensitivity to sodium pentothal varies greatly among the population. *Id.* Some individuals, particularly those who have been building additional resistance by taking Valium or other anti-anxiety medication, are significantly more resistant to sodium pentothal than others. *Id.*

Beardslee has submitted evidence that he contends shows that a number of executed inmates in California may have been conscious, or partially conscious, during the administration of chemicals that would cause significant pain for a period similar to the one involved in *Fierro*. 77 F.3d at 308. He points to the California execution logs of William Bonin, Keith Williams, Jaturun Siripongs, and Manuel Babbit, which contain indications that there were problems associated with the administration of the chemicals that may have resulted in the prisoners being conscious during portions of the executions. This evidence, coupled with the opinion tendered by Beardslee's expert, raises extremely troubling questions

21

about the protocol.  Nonetheless, the record before us at this stage is insufficient to support a conclusion that the district court abused its discretion in denying the preliminary injunction.

Beardslee tendered an expert opinion based on the witness accounts and execution logs.  However, the value of Beardslee's expert's interpretations of the witness accounts and execution log entries was undercut by the expert's concession that his expertise regarding the "pharmacokinetics [the time course of medications in the body] and pharmacodynamics [the effect of medications on the body] of sodium thiopental" was inferior to the State's expert on those matters. *See Reid v. Johnson*, 333 F.Supp.2d 543, 547 n.7 (E.D. Va. 2004).  According to the State's expert, over 99.999999999999% of the population would be unconscious within sixty seconds from the start of the administration of five grams of sodium pentothal – which is 12.5 times the normal surgical dosage – and would render most people unconscious for a period in excess of 13 hours.  Given the comparative expertise of the experts in different fields, the district court did not abuse its discretion in crediting the State's expert's interpretation.

As the district court correctly observed, the evidence and the arguments in this case are almost identical to those made in *Cooper*.  Beardslee's challenge to the protocol is not based on any factors peculiar to him, such as those that were at

22

issue in *Nelson* involving compromised veins in the condemned inmate. *See* 124 S. Ct. at 2121. Furthermore, even Beardslee's expert concedes that the amount of sodium pentothal given under Procedure 770, if properly administered, would likely be sufficient to cause loss of consciousness and probable death prior to the administration of pancuronium bromide.

In addition to his challenge to the use of pancuronium bromide as part of Procedure 770, Beardslee also raises a series of questions about the ambiguity of the procedure and noting the risks attendant to the improper administration of the drugs. Obviously, there are risks involved in virtually every method of execution. However, the Supreme Court has rejected Eighth Amendment challenges based on an "unforeseeable accident," *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 464 (1947), and has presumed that state officials have acted "in a careful and humane manner," *id.* at 462; *see also Campbell,* 18 F.3d at 682 ("The risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review.").

On the other hand, the State has tendered only minimal evidence in response to Beardslee's claims. Virtually the only affirmative evidence tendered by the State was its expert's declaration that all but an infinitesimally small number of people would be rendered unconscious within a minute after the proper

administration of sodium pentothal. The State did not defend the protocol. Indeed, the State declined to produce significant portions of Procedure 770.[11] The State did not, even under repeated questioning at oral argument, provide a single justification for the use of pancuronium bromide, which is one of the key issues. This response is, to say the least, troubling.[12]

Nonetheless, the question before us is not the ultimate resolution of the merits of this issue. That will have to await another day, based on a full record. Our "[a]ppellate review of the grant or denial of preliminary injunctive relief requires consideration of the merits of the underlying issue, but it does not decide them." *Cooper*, 379 F.3d at 1034 (Browning, J., concuring) (citing *Roe v. Anderson*, 134 F.3d 1400, 1402 (9th Cir. 1998)); *Southwest Voter*, 344 F.3d at 918). Our review at this stage is "limited and deferential." *Southwest Voter*, 344 F.3d at 918.

The critical question that we must ultimately answer in this case is not whether Beardslee has raised serious questions about the protocol itself, but

---

[11] The State has advanced no legitimate reason, indeed, no reason at all, for its refusal to disclose the entire protocol to the condemned prisoner.

[12] Indeed, the State's expert conceded that at least one of the purposes for the use of pancuronium bromide in the lethal injection protocol is to prevent seizures that often occur after cardiac arrest induced by the administration of potassium chloride that could be interpreted erroneously by lay observers as pain or discomfort. The record does not contain any other explanation.

24

whether, in this specific challenge, he has shown enough of a likelihood that he will be conscious during the administration of pancuronium bromide and potassium chloride to experience pain. The undisputed evidence in this limited record is that an administration of five grams of sodium pentothal will produce unconsciousness, and perhaps even death, if properly administered. Beardslee has not shown a sufficient likelihood that the administration will be improper in his case, or that there are specific risks unique to him that require modification of the protocol. His objections to the use of pancuronium bromide become irrelevant upon the proper administration of sodium pentothal.

Given the undisputed evidence that death or unconsciousness is likely to occur prior to the administration of pancuronium bromide and the lack of showing of any unique risk to Beardslee in this limited record, we cannot say that the district court abused its discretion in applying the appropriate balancing tests in the context of a last minute request for a stay of execution and denying the preliminary injunction.

B

Beardslee also raises a First Amendment claim. This claim was not litigated in *Cooper*. Beardslee contends that the use of pancuronium bromide will prevent him from audibly and consciously expressing his pain, thereby denying him his

right to free speech under the First Amendment. Framed in this manner,

Beardslee's argument is tied to his claim that there is a risk that he will be

conscious when the final two drugs are administered. On this limited record, he

has not made that showing. Therefore, in the context at this stage of the case, the

district court did not abuse its discretion in denying preliminary injunctive relief

on Beardslee's independent First Amendment claim.[13]

V

For these reasons, we conclude that the district court did not abuse its

discretion in denying the preliminary injunction, given the limited record and the

context of the case. We express no opinion on the ultimate merits of the claims.

---

[13] We granted the ACLU of Northern California and Death Penalty Focus leave to file an amici brief in this case, and heard argument from Amici. Amici argue that the public has a First Amendment right to a pancuronium bromide-free execution independent of that of Beardslee. Amici contend that the use of pancuronium bromide serves no purpose during an execution other than a purpose not recognized by the Constitution – to prevent viewers from seeing the inmate suffer excruciating pain and convulse as the lethal chemicals are administered. Thus, Amici claim that pancuronium bromide acts as a "chemical curtain" interfering with the public's right to know. *See Cal. First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002). Although their arguments are compelling, these parties did not intervene in the district court action and their independent claims are not properly before us. *See Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1141 n.1 (9th Cir. 1998) ("Generally, we will not consider on appeal an issue raised only by an amicus.").

The district court's order denying injunctive relief is **AFFIRMED**.  The motion for a stay of execution is **DENIED**.

<u>COUNSEL</u>

Steven S. Lubliner, Petaluma, California, for petitioner-appellant.

Dane R. Gillette, Senior Assistant Attorney General, Bill Lockyer, Attorney General of the State of California, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Ronald S. Matthias, Supervising Deputy Attorney General, San Francisco California, for defendant-appellees.

Alan L. Schlosser, San Francisco, California, for *amici curiae* American Civil Liberties Union Foundation of Northern California and Death Penalty Focus.

Stephen F. Rhode, Los Angeles, California, of counsel for *amici curiae* Death Penalty Focus.